**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED SPINAL ASSOCIATION, INC.<br>120-34 Queens Boulevard, #320<br>Kew Gardens, NY 11415,<br><br>                              Plaintiff,<br><br>v.<br><br>ANDREW M. SAUL<br>*in his official capacity as*<br>Commissioner of the Social Security<br>Administration<br>6401 Security Boulevard<br>Baltimore, MD 21235,<br><br>                              Defendant. | Civ. No. _____ |

## <u>COMPLAINT</u>

### I.      NATURE OF ACTION

1.      This is an action for judicial review and declaratory and injunctive relief from the unlawful, inconsistently applied, otherwise unreasonable, and now temporarily (but only partially) suspended "wet ink" signature requirements imposed on persons with disabilities in connection with applications for certain disability benefits administered by Defendant, Andrew M. Saul, Commissioner of the Social Security Administration ("SSA").  Defendant's "wet ink" signature requirements unlawfully, irrationally and unnecessarily interfere with persons with disabilities ability to pursue their rights to federal disability benefits—making an already cumbersome application process for persons with disabilities even more difficult.

2.      *First*, the "wet ink" signature requirements are contrary to law and exceed the agency's authority under the law.  The SSA's rejection of electronic signatures violates federal statutes, including the decades-old E-SIGN Act and Government Paperwork Elimination Act, that

prohibit federal agencies from rejecting electronic signatures as invalid due to their form.  SSA's policy also impermissibly adds further conditions for appearances by counsel before SSA beyond those permitted under the Agency Practice Act, and violates the First Amendment's protection for citizens seeking to petition and otherwise communicate with the government through the representatives of their choice.

3.      *Second*, the "wet ink" signature requirements are arbitrary and capricious because they not only lack a rational basis, but also are inconsistently applied.  SSA's policy depends upon attributing inconsistent interpretations to the term "sign" used in the governing regulations.  SSA allows an electronic signature on an application submitted by a claimant, and has not justified, and cannot logically justify, its failure to accept the same signature when a representative is appointed or submits the application on the claimant's behalf.

4.      And *third*, the "wet ink" signature requirements, which appear only in SSA's program manual, amount to substantive rules affecting rights to benefits that are invalid because SSA did not adopt them through required notice-and-comment rulemaking.

5.      The "wet ink" requirements should thus be held invalid and set aside, and SSA should be directed to accept electronic signatures for the purpose of applications submitted by representatives, as well as representative appointments and fee arrangements.  It long ago became time for the SSA to comply with the Congressional mandate to modernize and accept electronic signatures.

## II.      JURISDICTION AND VENUE

6.      This case arises under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201, 2202.

7.      Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1361.

8.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391(e).

## III.    THE PARTIES

9.      United Spinal Association ("United Spinal") is a national 501(c)(3) nonprofit membership organization, founded by paralyzed veterans in 1946, dedicated to enhancing the quality of life of all people living with spinal cord injuries and disorders, including veterans, and providing support and information to loved ones, care providers and professionals.  United Spinal has nearly 75 years of experience educating and empowering over 2 million individuals with spinal cord injuries and disorders to achieve and maintain the highest levels of independence, health and personal fulfillment.[1]  It brings the instant case on behalf of its members who are living with spinal cord injuries and disorders, as well as their family members, caregivers, friends, and healthcare providers.

10.      Defendant is Andrew Saul in his official capacity as Commissioner of SSA.  SSA is the federal agency that administers disability benefits programs under the Social Security Act.

## IV.    STATUTORY AND REGULATORY BACKGROUND

### A.    Federal Law Requiring Acceptance of Electronic Signatures

11.      In 1995, twenty-five years ago, Congress enacted the Paperwork Reduction Act of 1995 "to have Federal agencies become more responsible and publicly accountable for reducing the burden of Federal paperwork on the public, and for other purposes."  Pub. L. No. 104-13, pmbl., 109 Stat. 163, 163 (1995).  Among its stated purposes was to "minimize the paperwork burden . . . resulting from the collection of information by or for the Federal Government."  44 U.S.C. § 3501.  Under the Paperwork Reduction Act, agencies must, with certain exceptions, solicit comments from the public and affected agencies about a proposed collection of information

---

[1] *Our Story*, United Spinal Ass'n, https://unitedspinal.org/our-story (last visited Aug. 13, 2020); *Membership*, United Spinal Ass'n, https://unitedspinal.org/join-united-spinal-association/ (last visited Aug. 13, 2020).

and obtain clearance from the Office of Management and Budget ("OMB") to collect that information.  *See id.* §§ 3503, 3504(c), 3506(c)(2).

12.     Three years later, and more then two decades ago, Congress went even further in enacting the Government Paperwork Elimination Act.  *See* Pub. L. No. 105–277, 112 Stat. 2681, 2749–51 (1998).  Under the Act, "[e]lectronic records submitted or maintained in accordance with procedures developed under this title, or electronic signatures or other forms of electronic authentication used in accordance with such procedures, shall not be denied legal effect, validity, or enforceability because such records are in electronic form." *Id.* § 1707, 112 Stat. at 2751.  The Government Paperwork Elimination Act defines "electronic signature" as "a method of signing an electronic message that—(A) identifies and authenticates a particular person as the source of the electronic message; and (B) indicates such person's approval of the information contained in the electronic message." *Id.* § 1710(1), 112 Stat. at 1751.  Within five years of its enactment, *i.e.*, by 2003, agencies were required when practicable to "provide . . . for the use and acceptance of electronic signatures." *Id.* § 1704(2), 112 Stat. at 2750.

13.     The Senate Report on the Government Paperwork Elimination Act explained that the act was "intended to preclude agencies or courts from systematically treating electronic documents and signatures less favorably than their paper counterparts."  Rep. of the S. Comm. on Commerce, Sci., & Transp. on S. 2107, S. Rep. No. 105–335, at 7 (1998).  The Report discussed how "[t]he widespread use of electronic forms can greatly improve the efficiency and speed of government services.  Such efforts as people traveling to government offices for forms would no longer be required.  If implemented, the bill would save the government millions of dollars in costs associated with such things as copying, mailing, filing and storing forms." *Id.* at 2.  Further, the Report stated that "[e]lectronic signatures can offer greater assurances that documents are

authentic and unaltered.  They minimize the chances of forgeries or people claiming to have had their signatures forged."  *Id.*

14.     In implementing the Government Paperwork Elimination Act, OMB directed in May 2000 that an agency may not simply declare electronic signatures less valid than their ink and paper counterparts.[2]  Rather, any assessment of the costs and benefits of electronic signature alternatives "must recognize that neither handwritten signatures nor electronic signatures are totally reliable and secure.  Every method of signature, whether electronic or on paper, can be compromised with enough skill and resources, or due to poor security procedures, practices, or implementation."  65 Fed. Reg. 25,508, 25,515 (May 2, 2000).  OMB further specified that agencies "should periodically redo [their] risk and cost-benefit analyses on those programs where electronic transactions were initially deemed impracticable to determine whether costs and/or technologies have changed enough so that electronic transactions have become practicable."  *Id.*  Among the benefits of electronic signatures discussed in the notice were "[i]mproved security," as "[d]esigned, implemented, and managed properly, electronic transactions can have fewer opportunities for fraud and more robust security measures than paper and envelope transactions."  *Id.* at 25,516.

15.     On June 30, 2000, Congress extended the requirement to accept electronic signatures to all commercial transactions, including those involving the government in the

---

[2] Section 1702 of the Government Paperwork Elimination Act amended portions of the Paperwork Reduction Act, to require the Director of OMB to "provide direction and oversee . . . the acquisition and use of information technology, including alternative information technologies that provide for electronic submission, maintenance, or disclosure of information as a substitute for paper and for the use and acceptance of electronic signatures."  *See* 44 U.S.C. § 3504(a)(1)(B)(vi).  Further, the Government Paperwork Elimination Act requires that the Director of OMB work in consultation with the National Telecommunications and Information Administration to "develop procedures for the use and acceptance of electronic signatures by Executive agencies."  § 1703(a), 112 Stat. at 2749.

Electronic Signatures in Global and National Commerce Act ("E-SIGN Act"). *See* Pub. L. No. 106–229, 114 Stat. 464 (2000). This Act provides that in any transaction affecting interstate commerce, "a signature . . . may not be denied legal effect, validity, or enforceability solely because it is in electronic form[.]" 15 U.S.C. § 7001(a)(1); *compare* Government Paperwork Elimination Act Pub. L. No. 105–277, § 1707, 112 Stat. 2681, 2750 (1998) (providing that "[e]lectronic records submitted or maintained in accordance with procedures developed under this title, or electronic signatures or other forms of electronic authentication used in accordance with such procedures, shall not be denied legal effect, validity, or enforceability because such records are in electronic form"). Congress created only one exception to this mandate, not applicable here, by not "requir[ing] any person to agree to use or accept electronic records or electronic signatures, other than a governmental agency with respect to a record other than a contract to which it is a party." 15 U.S.C. § 7001(b)(2). The E-SIGN Act thus reinforced and expanded agencies' mandatory obligation under federal law to accept electronic signatures as legally valid. *See* 15 U.S.C. § 7004(c)(2).

16.     In 2018, faced with federal agency delay in complying with the Government Paperwork Reduction Act and the E-SIGN Act, Congress further enacted the 21st Century Integrated Digital Experience Act, which in relevant part directs the head of each executive agency to submit to Congress and OMB "a plan to accelerate the use of electronic signatures standards established under the [E-SIGN Act]." Pub. L. No. 115-336, § 5, 132 Stat. 5025, 5027 (2018). This further enactment of Congress also requires that agencies review their non-digital, paper-based forms and services, determine to the extent practicable these forms can be made digital, and within two years "ensure that any paper based form that is related to serving the public is made available in a digital format." *Id.* § 4(a)-(c), 132 Stat. at 5026-27. Finally, it also requires

the head of an agency to identify any form that cannot be made digital, explain why it cannot be made digital, and also provide potential solutions for making the form digital. *Id*. § 4(d), 132 Stat. at 5027.

**B.     SSA's Inconsistent, Partial Implementation of the Federal Requirements to Accept Electronic Signatures**

17.     On August 30, 2002, SSA published in a notice of its understanding of the Government Paperwork Elimination Act's mandate that "electronic signatures are not to be denied legal effect, validity or enforceability merely because they are in electronic form." 67 Fed. Reg. 55,906, 55,906 (Aug. 30, 2002).   To that end, SSA confirmed that "approved electronic signature technologies will be deemed by the Agency to convey the same authority to an individual as that associated with the traditional paper-based or 'wet ink' signature." *Id.*

18.     But the SSA nonetheless lagged in its implementation of the requirement to accept electronic signatures.   Recognizing the E-SIGN Act's even stronger mandate that SSA go electronic, in February 2004, the Office of Inspector General for SSA ("OIG") issued a memorandum to the Commissioner reiterating that under the E-SIGN Act, "no contract, signature or record can be denied legal effect solely because it is in an electronic form."[3] The memorandum outlined the experience of private and public entities authenticating electronic records, with the OIG explaining that "[l]ike SSA, some insurance companies have many signature requirements for their paper records," and described the experience of one insurance company in transitioning to electronic signatures. *Id.* at 7.   Among the "dramatic benefits" this company realized, according to the memorandum, were "reducing processing costs, improved timeliness, increased

---

[3] Memorandum from the Off. of Inspector Gen. to the Comm'r of Soc. Sec., *Current Practice in Electronic Records Authentication* at 1 (Feb. 3, 2004), https://ssaoigstg.prod.acquia-sites.com/sites/default/files/audit/full/pdf/A-04-04-24004.pdf.

productivity, and enhanced customer service."  *Id.*  On this basis, the memorandum from the Office of Inspector General encouraged SSA to consider the further use of certain electronic signature technologies.  *Id.* at 10.

19.     In December 2019, SSA published a report as required by the 21st Century Integrated Digital Experience Act identifying key websites and digital services that "have been prioritized and targeted for modernization" to comply with the E-SIGN Act's mandate.[4]  On this list of agency priorities were the online applications for SSDI and SSI benefits.  *Id.*  The report did not address other related transactions with SSA that continue to require "wet ink" signatures. *Id.*

20.     At this time, SSA has permanently adopted electronic signature mechanisms for several highly sensitive transactions, including applications submitted directly by disability benefit claimants and even appeals prosecuted by their representatives.  *See, e.g.*, 20 C.F.R. § 422.505(a); 20 CFR §§ 404.1713, 416.1513; *see also infra* ¶¶ 26, 56.  And SSA has temporarily adopted some work-arounds in light of the COVID-19 pandemic and litigation challenging SSA's failure to allow electronic signatures for blind individuals seeking disability benefits.[5]  But as explained more fully below, SSA has not complied with its clear duty under federal law to accept electronic signatures for applications completed by claimants' chosen representatives, or for representative appointments or fee agreements.

---

[4] *Public Law 115-336, "21st Century Integrated Digital Experience Act December": December 2019 Report*, Soc. Sec. Admin., at 2 https://www.ssa.gov/digitalstrategy/documents/Website_Modernization_Report_for_Congress_2 1st_Century_IDEA.pdf.

[5] *Representing Social Security Claimants, Temporary procedure announced for written notices of appointment and fee agreements to enhance flexibility during the COVID-19 emergency,* Soc. Sec. Admin., https://www.ssa.gov/representation/ (last visited Aug. 13, 2020); *How will SSA process my notice of appointment while emergency procedures are in place?*, Soc. Sec. Admin., https://www.ssa.gov/coronavirus/ (last visited Aug. 13, 2020).

C.      SSA and Its Disability Benefit Programs

21.      SSA provides disability benefits through the Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") programs.[6]  SSDI is authorized by Title II of the Social Security Act, codified at 42 U.S.C. §§ 401–434, and is available to those who, *inter alia*, are below the retirement age, meet the statutory criteria for disabled, and are "insured" for disability benefits, which is based on how much a claimant has worked.  *See* 42 U.S.C. §§ 409, 410, 413, 414, 423.  SSI is authorized by Title XVI of the Social Security Act, codified at 42 U.S.C. §§ 1381–1385, and is available to individuals with limited income who, *inter alia*, are 65 years or older or who are blind or disabled.  *See* 42 U.S.C. §§ 1381, 1381a, 1382.

22.      The SSDI program pays benefits to qualifying individuals and certain family members, which may include a spouse, divorced spouse, child, disabled child, and adult disabled child younger than age 22.[7]  In 2020, the Substantial Gainful Activity amount—that is, the amount an individual must earn before becoming eligible for SSDI benefits—is $1,260 per month for individuals with disabilities other than blindness and $2,110 per month for blind individuals.[8]  The amount of an individual's monthly disability benefit will depend on their "lifetime average earnings covered by Social Security."[9]  A recipient's monthly benefit amount may also be reduced

---

[6]  *See* Publ'n No. 05-10029, *Disability Benefits*, Soc. Sec. Admin., at 1 (July 2019), https://www.ssa.gov/pubs/EN-05-10029.pdf ("We pay disability benefits through two programs: the Social Security disability insurance (SSDI) program and the Supplemental Security Income (SSI) program.").

[7]  *Disability Benefits*, Soc. Sec. Admin., https://www.ssa.gov/benefits/disability/ (last visited Aug. 13, 2020); *Disability Benefits – Family Benefits*, Soc. Sec. Admin., https://www.ssa.gov/benefits/disability/family.html (last visited Aug. 13, 2020).

[8]  *Substantial Gainful Activity*, Soc. Security Admin., https://www.ssa.gov/oact/cola/sga.html (last visited Aug. 13, 2020).

[9]  *Disability Benefits – You're Approved*, Soc. Sec. Admin., https://www.ssa.gov/benefits/disability/approval.html (last visited Aug. 13, 2020).

in certain circumstances, such as where he or she received workers' compensation, public disability payments, or retirement-age benefits.  *See* 20 C.F.R. § 404.317.  Once an individual has received disability benefits for two years, he or she is eligible for the Medicare program.[10]

23.     SSI provides monthly payments to low-income individuals who are 65 or older, blind, or disabled.[11]  Whether a claimant is eligible for SSI depends on both their income (*e.g.*, wages, Social Security benefits, pensions, food, and shelter) and resources (*e.g.*, bank accounts, real estate, cash, stocks, and bonds).[12]  Once a claimant is deemed eligible for SSI benefits, the amount of benefits they receive will be determined each month "by reducing the benefit rate . . . by the amount of [the recipient's] countable income."  20 C.F.R. § 416.420.  In 2020, the federal benefit rate is a maximum of $783 per month for an individual who meets the criteria for eligibility and of $1,175 per month for an eligible couple.[13]  As of December 2019, more than 8 million people were receiving SSI benefits.[14]

---

[10]     *See Medicare Information*, Soc. Sec. Admin., https://www.ssa.gov/disabilityresearch/wi/medicare.htm (last visited Aug. 13, 2020) ("Everyone eligible for Social Security Disability Insurance (SSDI) benefits is also eligible for Medicare after a 24-month qualifying period."); *see also Medicare Coverage If You're Disabled*, Soc. Sec. Admin., https://www.ssa.gov/benefits/disability/approval.html (last visited Aug. 13, 2020) ("We automatically enroll you in Medicare after you get disability benefits for two years.").

[11] Publ'n No. 05-11000, *Supplemental Security Income (SSI)*, Soc. Sec. Admin., at 1 (Aug. 2017), https://www.ssa.gov/pubs/EN-05-11000.pdf.

[12] *Id.* at 2; *see also* 20 C.F.R. §§ 416.1102 (describing what constitutes income under the SSI program), 416.1201 (defining "resources" as "cash or other liquid assets or any real or personal property that an individual (or spouse, if any) owns and could convert to cash to be used for his or her support and maintenance").

[13] *What's New in 2020?*, Soc. Sec. Admin., https://www.ssa.gov/redbook/newfor2020.htm (last visited Aug. 13, 2020); *SSI Federal Payment Amounts For 2020*, Soc. Sec. Admin., https://www.ssa.gov/oact/cola/SSI.html (last visited Aug. 13, 2020).

[14]     *Fast Facts & Figures About Social Security*, *2020*, Soc. Sec. Admin., https://www.ssa.gov/policy/docs/chartbooks/fast_facts/2020/fast_facts20_text.html#page24 (last visited Aug. 13, 2020).

24.     Under Social Security Act Title II, "disability" is defined as "(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months, or (B) blindness; and the term 'blindness' means central visual acuity of 20/200 or less in the better eye with the use of a correcting lens." 42 U.S.C. § 416(i)(1).  Title XVI uses the same definitions of "blind" and "disability" for purposes of qualifying for SSI benefits.  *See* 42 U.S.C. § 1382c(a)(2)–(3). To complete an SSDI application, a claimant must provide detailed information about, *inter alia*, the applicant's medical condition, health care providers, medications, past work, and other benefits received.[15] In addition to the application itself, a claimant must also submit several documents including W-2 forms, a medical release form, medical records, physicians' reports, and test results.[16]

25.     SSA uses a five-step process to evaluate a claimant's disability for SSDI and SSI applications.  20 C.F.R. § 404.1520 (SSDI); 20 C.F.R. § 416.920(a)(4) (SSI).[17]  First, SSA determines whether a claimant is engaged in "substantial gainful activity"; if so, then the claimant is not considered disabled.  Second, SSA determines the severity of a claimant's impairment and whether it has lasted or will have lasted for at least twelve months.  Third, SSA considers whether the claimant's impairment is one listed in the appendix to the regulations; if so, then a claimant will be found to be disabled.  If not, at step four, SSA assesses a claimant's "residual functional

---

[15] *Apply Online for Disability Benefits*, Soc. Sec. Admin., https://www.ssa.gov/applyfordisability/ (last visited Aug. 13, 2020); Publ'n No. 05-10029, *Disability Benefits*, Soc. Sec. Admin., at 4-5, https://www.ssa.gov/pubs/EN-05-10029.pdf.

[16] *Id.*

[17] Regulations pertaining to Title II of the Social Security Act (SSDI) are found in 20 C.F.R. §§ 404.1–404.2127.  Regulations pertaining to Title XVI (SSI) are found in 20 C.F.R. §§ 416.101–2227.  When these regulations are identical or parallel, they are cited together.

capacity" and whether the claimant can still engage in his or her past work; if so, the claimant will be found not disabled.  Finally, at step five, SSA considers the claimant's residual functional capacity, age, education, and work experience to see if the claimant can make an adjustment to other work.  If not, then a claimant will be found disabled.

  **D.**  **Electronic Signatures and Disability Benefits Applications**

  26.  More than 2 million people apply for SSDI benefits each year.[18]

  27.  A claimant can submit an application for SSDI in one of four ways: (1) an online application; (2) an appointment with an SSA agent at a local SSA office;[19] (3) an appointment with an SSA agent over the telephone; or (4) a mailed application.  20 C.F.R. § 422.505(a).[20]

  28.  Claimants may submit an online application if they (i) are 18 or older; (ii) are not currently receiving benefits; (iii) are unable to work because of a medical condition expected to last at least 12 months or result in death; and (iv) have not been denied disability benefits in the last 60 days.[21]  If a claimant submits an application online, then the claimant can sign by simply pressing the electronic "Sign Now" button.[22]

---

[18] *See Disability Insurance Applications Filed via the Internet FY 2012 – Onward*, Soc. Sec. Admin., available for download at https://www.ssa.gov/open/data/ (last visited Aug. 13, 2020).

[19] This option is currently unavailable due to the COVID-19 pandemic.  *See Coronavirus Disease (COVID-19)*, Soc. Sec. Admin., https://www.ssa.gov/coronavirus/ (last visited Aug. 13, 2020).

[20] *See also Disability Determination Process, How to Apply*, Soc. Sec. Admin., https://www.ssa.gov/disability/disability.html (last visited Aug. 13, 2020).  The application for disability insurance benefits is available at https://www.ssa.gov/forms/ssa-16-bk.pdf.

[21] *Apply Online for Disability Benefits*, Soc. Sec. Admin., https://www.ssa.gov/applyfordisability/ (last visited Aug. 13, 2020).

[22] *See* Soc. Sec. Handbook, Ch. 15 § 1500.2, https://www.ssa.gov/OP_Home/handbook/handbook.15/handbook-1500.html (last updated Apr. 12, 2010).

29.     However, this is not the case for an online application submitted by a claimant's chosen representative.  Under the regulations, a representative cannot sign a benefits application on behalf of a claimant except under certain circumstances such as if the claimant is a minor, mentally incompetent, or physically unable to sign.  20 C.F.R. §§ 404.1710, 416.1510; 20 C.F.R. §§ 404.612(b)–(c), 416.315(b)–(c).

30.     If a representative submits an SSDI online application on behalf of a claimant when the claimant is not also present, then the representative must select an option stating that the application is being submitted on behalf of a claimant.[23]  Currently, a claimant must either verify the representative's electronic submission of the application in a telephone call with an SSA agent or wait for SSA to mail a hardcopy summary of the application and provide a "wet ink" signature on a hardcopy form.[24]  This verification process could take weeks or months.

31.     For applications that claimants complete with an SSA agent by telephone or in person, "the application is signed once the SSA interviewer confirms and annotates the system electronically of the claimant's intent to file, his or her affirmation of the correctness of the information that is provided under penalty of perjury, and agreement to sign the application."  *See* Program Operations Manual System ("POMS"), GN 00201.015(C). [25]  That is, the claimant does

---

[23] *Appointed Representative Best Practices and Tips*, Soc. Sec. Admin., at 2 (Apr. 16, 2020), https://www.ssa.gov/representation/documents/Best%20Practices%20and%20Tips.pdf; Richardson Decl. ¶ 57, *Nat'l Fed'n of the Blind v. Saul*, 1:20-cv-01160-TSC (D.D.C. May 18, 2020), ECF No. 15-1.

[24] *Appointed Representative Best Practices and Tips*, Soc. Sec. Admin., at 2 (Apr. 16, 2020), https://www.ssa.gov/representation/documents/Best%20Practices%20and%20Tips.pdf; *Representing Social Security Claimants, Temporary procedure announced for written notices of appointment and fee agreements to enhance flexibility during the COVID-19 emergency,* Soc. Sec. Admin., https://www.ssa.gov/representation/ (last visited Aug. 13, 2020); Richardson Decl. ¶ 57, *Nat'l Fed'n of the Blind v. Saul*, 1:20-cv-01160-TSC (D.D.C. May 18, 2020), ECF No. 15-1.

[25] POMS GN 00201.015 is available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0200201015 (last visited Aug. 13, 2020) ("For Title II and XVI in-person applications and teleclaims . . . the interviewer confirms the proper applicant's intent to file and sign the application and other forms,

not need to provide a "wet ink" signature for applications submitted through an SSA agent—
either by telephone or in person.  *Id.*

32.     If a claimant submits an SSDI application by mail, then a "wet ink" signature is
required on the application.[26]

33.     As of June 2020, approximately half of all adult applicants for SSDI filed their
applications online.[27]  SSA describes the online SSDI option as "[t]he most convenient way to
apply for disability" and explains that it "use[s] the most secure technology on the Internet to
keep [claimants'] information private."[28]  Online claimants can also submit the medical release
form electronically as part of the SSDI application.[29]  According to SSA's estimates, simply filing
the authorization form online reduces the "disability application processing time by nine
days[.]"[30]

---

provides and reviews the penalty clause notice, and attests to the proper applicant's intent to sign
the application and other forms by annotating SSA records . . . . The act of attesting to these facts
is documentation of the proper applicant's signature and is deemed equivalent to a signature.").

[26] *See Completing the Application Form*, Soc. Sec. Handbook, Ch. 15 § 1511.2,
https://www.ssa.gov/OP_Home/handbook/handbook.15/handbook-1511.html  (last updated Sept.
1, 2009); POMS GN 00201.015(E) ("When a paper application/printout . . . is filed with a pen-
and-ink signature and the proper applicant has not previously signed the application and/or other
form via attestation, a SSA employee annotates . . . to indicate that he or she received the paper
application/printout and/or other form with a pen-and-ink signature on it.").

[27] *See Disability Insurance Applications Filed via the Internet FY 2012 – Onward*, Soc. Security
Admin., available for download at https://www.ssa.gov/open/data/ (last visited Aug. 13, 2020).

[28] Publ'n No. 05-10550, *Apply Online for Disability Benefits*, Soc. Sec. Admin., at 1 (Apr. 2018),
https://www.ssa.gov/pubs/EN-05-10550.pdf.

[29] *Id.* at 4.

[30] *Alternative Signature Processes for Form SSA-827 – "Authorization to Disclose Information to
the Social Security Administration (SSA),"* Soc. Sec. Admin.,
https://www.ssa.gov/disability/professionals/eAuthorization.htm (last visited Aug. 13, 2020).

34.     Certain claimants can apply for SSI benefits online if they are concurrently filing for SSDI benefits.[31]  SSA then contacts those who apply online for any additional information needed.[32]

35.     Otherwise, SSI applications must be completed either with an SSA agent, in person or telephonically, or in hardcopy.  *See* 20 C.F.R. § 416.310.  The SSI application is a 23 page-long document, consisting of questions about, *inter alia*, a claimant's living arrangements, expenses, resources.[33]  SSA's manual, POMS, states that the application "is not a self-help form. It is designed for completion by one of the following trained interviewers:" claims representatives, field representatives, technical experts, or members of SSA management.   POMS, SI 00604.001.[34]   SSA requires original documents for SSI applications.[35]   Similar to SSDI applications, applications for SSI submitted through an agent can be authenticated with a verbal attestation of identify as opposed to a physical signature, while paper applications need a "wet ink" signature.  POMS, GN 00201.015(C).

---

[31]  *Supplemental    Security    Income    (SSI)    Benefits*,    Soc.    Sec.    Admin., https://www.ssa.gov/benefits/ssi/ (last visited Aug. 13, 2020).  These claimants include those who are concurrently filing for SSDI and (i) are between the ages of 18 and 65; (ii) have never been married; (iii) are a U.S. citizen residing in one of the fifty states, the District of Columbia, or the Northern Mariana Islands; and (iv) have not previously applied for or received SSI benefits.  *Id.*

[32] *Id.*

[33]  *Application for Supplemental Security Income (SSI)*, Form SSA-8000-BK (01-2012), https://www.ssa.gov/legislation/Attachment%20for%20SSA%20Testimony%207_25_12%20Human%20Resources%20Sub%20Hearing.pdf.

[34]  POMS, SI 00604.001 is available at  https://secure.ssa.gov/apps10/poms.nsf/lnx/0500604001 (last visited Aug. 13, 2020).

[35] *Understanding Supplemental Security Income Documents You May Need When You Apply – 2020 Edition*, Soc. Sec. Admin.,  https://www.ssa.gov/ssi/text-documents-ussi.htm (last visited Aug. 13, 2020).

36.     According to SSA, the adjudication of a disability application typically takes three to five months.[36]   SSA has explained "[t]he definition of disability in the Social Security Act is strict, and the rules for determining disability are complicated.   Applying for disability benefits can be a difficult experience for individuals with disabilities, not only because of the complexities of the program but also because of their disabilities."[37]

37.     If a disability claim is denied, then the claimant can appeal the denial administratively.   *See* 20 C.F.R. §§ 404.900(a), 416.1400(a).   There are four levels of appeal: reconsideration; hearing by an administrative law judge; review by the Appeals Council; and federal court review.   *See id.*   A claimant may also request an expedited appeal directly to federal district court if there is "no dispute with [SSA's] findings of fact and [SSA's] application and interpretation of the controlling laws, but [the claimant] believe[s] that a part of the law is unconstitutional[.]"   20 C.F.R. §§ 404.900(a)(6), 416.1400(a)(6).

38.     A claimant can request reconsideration, a hearing by an administrative law judge, and review by the Appeals Council online.[38]   A "wet ink" signature is not required to file or pursue an administrative appeal.[39]   SSA explains that "[t]he fastest and easiest way to file an appeal . . .

---

[36] *What You Should Know Before You Apply for Social Security Disability Benefits*, Soc. Sec. Admin., at 2 (last visited Aug. 13, 2020), https://www.ssa.gov/disability/Documents/Factsheet-AD.pdf; Publ'n No. 05-10029, *Disability Benefits*, Soc. Sec. Admin., at 4 (July 2019), https://www.ssa.gov/pubs/EN-05-10029.pdf.

[37] Mark Green et al., *Addressing the Challenges Facing SSA's Disability Programs*, 66 Soc. Sec. Bull., No. 3, 2005/2006, at 29.

[38] *Appeal a Decision*, Soc. Sec. Admin., https://www.ssa.gov/benefits/disability/appeal.html (last visited Aug. 13, 2020); *About the Disability Appeal Application*, Soc. Sec. Admin., https://www.ssa.gov/hlp/iappeals/how-to.htm (last visited Aug. 13, 2020); *Information You Need To Complete Your Disability Appeal*, Soc. Sec. Admin., https://www.ssa.gov/hlp/iappeals/info-u-need.htm#document (last visited Aug. 13, 2020).

[39] *See id.*

is by visiting *www.socialsecurity.gov/disability/appeal*.   You can file online and provide documents electronically to support your appeal."[40]

### E.        Representatives and the Disability Benefit Claim and Appeal Process

39.        Under the Agency Practice Act, 5 U.S.C. § 500, an attorney in good standing may represent an individual before any agency by "filing with the agency a written declaration that he is currently qualified as provided by this subsection and is authorized to represent the particular person in whose behalf he acts."  5 U.S.C. § 500(b); *see* Pub. L. No. 89–332, 79 Stat. 1281 (1965) (enacting the Agency Practice Act); Pub. L. No. 90-83, 81 Stat. 195 (1967) (incorporating into the U.S. Code).

40.        For both SSDI and SSI, the Social Security Act and implementing regulations provide that an applicant is entitled to appoint a representative to assist with completing the application for benefits and representing the applicant before SSA throughout the lengthy application evaluation, and if necessary, the appeals process.  *See* 42 U.S.C. § 406(a); 42 U.S.C. § 1383(d)(2)(A); 20 C.F.R. §§ 404.1700, 416.1500.[41]  A representative may be an attorney or a non-attorney.   42 U.S.C. § 406(a)(1); 42 U.S.C. § 1383(d)(2)(A); 20 C.F.R. §§ 404.1705, 416.1505.

---

[40]  Publ'n No. 05-10041, *The Appeals Process*, Soc. Sec. Admin., at 1 (Jan. 2018), https://www.ssa.gov/pubs/EN-05-10041.pdf.

[41]  *See also Representing Social Security Claimants*, Soc. Sec. Admin., https://www.ssa.gov/representation/index.htm (last visited Aug. 13, 2020) (every disability claimant "has the right to be represented by an attorney or other representative while pursuing a claim or other rights"); Publ'n No. 05-10029, *Disability Benefits*, Soc. Sec. Admin., at 4 (July 2019), https://www.ssa.gov/pubs/EN-05-10029.pdf.

41.     Attorneys who are members of a bar in good standing may represent a claimant for disability benefits before SSA.  *See* 42 U.S.C. § 406(a)(1); 42 U.S.C. § 1383(d)(2)(A).[42]  For non-attorney representatives, the Commissioner of Social Security "may prescribe rules and regulations governing the recognition of agents or other persons, other than attorneys" and is vested with the authority to set forth rules and standards governing who can represent a disability claimant.  *See id.*

42.     Under the regulations, a non-attorney representative must be "capable of giving valuable help to [the claimant] in connection with [his or her] claim," of good character, and otherwise not disqualified from serving as a representative.  20 C.F.R. §§ 404.1705, 416.1505.

43.     Further, through regulations, SSA has set forth rules of conduct and standards of responsibility governing all representatives acting on behalf of claimants.  *See* 20 C.F.R. §§ 404.1740, 416.1540.  These rules and standards include affirmative responsibilities as well as prohibited actions.  *Id.*  For example, representatives must "[a]ct with reasonable promptness to help obtain the information or evidence that the claimant must submit"; "[c]onduct his or her dealings in a manner that furthers the efficient, fair, and orderly conduct of the administrative decision-making process"; and cannot "[m]ake or present, or participate in the making or presentation of, false or misleading oral or written statements."  *Id.*  SSA has explained that it set forth these regulations so that all representatives appearing before SSA "be bound by the same set of rules."  63 Fed. Reg. 41,404-01, 41,405 (Aug. 4, 1998); *see also id.* at 41,408 ("[I]t is only fair and equitable to hold all representatives who practice before us to the same standards.").

---

[42] The Commissioner may refuse to recognize attorneys who have previously been debarred or suspended from a bar or who have been disqualified from practicing before a federal program or agency.  *See* 42 U.S.C. § 406(a)(1)(A); 42 U.S.C. § 1383(d)(2)(A).

44.     Once appointed, a representative may obtain information about the claimant, submit evidence, make statements about facts and law, and make requests and give notice related to proceedings before SSA.  20 C.F.R. §§ 404.1710, 416.1510.

45.     According to a 2017 Government Accountability Office report, "claimants who had a representative—either an attorney or a non-attorney representative—were allowed at a rate 2.9 times higher than a typical claimant with no representative."[43]

46.     SSA regulations require that a claimant must "*sign a written notice* stating" the claimant seeks to appoint that representative.  20 C.F.R. §§ 404.1707(a), 416.1507(a) (emphasis added).  The regulations do not, however, specify what type of signature is required.

47.     In publishing these regulations in 1980, SSA stated that the purposes of requiring a signature for the representative appointment were "to assure that we have the name and address of any person designated to act as a representative" and also "to protect confidential personal information from unauthorized disclosure, while facilitating its release to designated representatives."  40 Fed. Reg. 52,078 (Aug. 5, 1980).

48.     According to the agency's more recent reports, "SSA uses the information on the SSA-1696-U4 [used to appoint a representative] to document the appointment of the representative."  84 Fed. Reg. 4597, 4599 (Feb. 15, 2019); 83 Fed. Reg. 49965, 49967 (Oct. 3, 2018); 83 Fed. Reg. 31,987, 31,988 (July 10, 2018).[44]  Other reports likewise state that "SSA

---

[43] U.S. Gov't Accountability Off., GAO-18-37, *Social Security Disability: Additional Measures and Evaluation Needed to Enhance Accuracy and Consistency of Hearing Decisions*, at 24 (Dec. 2017), https://www.gao.gov/assets/690/688824.pdf.  Allowance rates are defined as "the rate at which [SSA] administrative law judges allowed disability benefits to be paid when claimants appealed." *Id.* at Overview.

[44] The current SSA-1696 is available at https://www.ssa.gov/forms/ssa-1696.pdf (adopted Feb. 2020).  This revised version was published on February 11, 2020.  *See Representing Social Security Claimants*, Soc. Sec. Admin., https://www.ssa.gov/representation/ (last visited Aug. 13, 2020).  A

collects the information on Form SSA-1696-U4 to verify the appointment of these representatives." *See, e.g.*, 82 Fed. Reg. 10,623, 10625 (Feb. 14, 2017); *see also* 81 Fed. Reg. 80,159, 80,160 (Nov. 15, 2016) ("SSA collects the information on Form SSA-1696-U4 to verify the appointment of such representatives."); 78 Fed. Reg. 70,391 (Sept. 3, 2013) (same); 75 Fed. Reg. 61,550 (Oct. 5, 2010) (same). SSA has consistently recognized that these hardcopy representative appointment forms create a considerable administrative burden on the agency. *See, e.g.*, 84 Fed. Reg. 4597, 4599 (Feb. 15, 2019) (reporting 800,000 respondents used the Form SSA-1696-U4, amounting to an estimated total annual burden of 160,000 hours resulting from the form); 82 Fed. Reg. 10623, 10625 (Feb. 14, 2017) (reporting 800,000 respondents used the form, with an estimated total annual burden of 133,333 hours); 81 Fed. Reg. 80,159, 80,160 (Nov. 15, 2016) (same); 78 Fed. Reg. 54363, 54364 (Sept. 3, 2013) (same).

49.     Although the regulations do not specify what type of signature is required on the appointment form, POMS, SSA's program manual, mandates that "[t]he claimant's signature must be in ink."  POMS GN 03910.040(A)(1).[45]  Specifically, POMS states, "We **do not** accept signatures generated from electronic software programs (e.g., DocuSign or HelloSign) or rubber-stamped signatures from claimants on written notices of appointment." *Id.* (emphasis in original).  SSA instructs its agents to "[r]eturn a notice of appointment if the claimant's signature is electronic." *Id.*  SSA then does not recognize the appointment.  *See* 20 C.F.R. §§ 404.1707(a); 416.1507(a) (explaining that SSA "will recognize a person as your representative if," *inter alia*,

---

claimant may submit an SSA-1696 or "any other writing" to appoint a representative.  POMS GN 03910.040.

[45] This requirement was also present in the 2011 version of POMS.  *See* Archive of POMS GN 03910-040,                                                                                                                               SSA, https://web.archive.org/web/20111018005919/https://secure.ssa.gov/apps10/poms.nsf/lnx/0203910040 (last visited Aug. 13, 2020).

the claimant "sign[s] a written notice stating that [he or she] want[s] the person to be [his or her] representative in dealings with us").[46]

50.    Under the regulations, a non-attorney representative must also countersign the notice of appointment.  20 C.F.R. §§ 404.1707(b), 416.1507(b).  For this signature, a "rubber stamp or electronic method" is sufficient.  POMS GN 03910.040(A)(2).  By contrast, SSA encourages, but does not require, an attorney representative to countersign the notice of appointment.  *Id.*; *see also* 20 C.F.R. §§ 404.1707(b), 416.1507.

51.    As to fees paid to a representative, under the Social Security Act, the Commissioner of Social Security has authority to "prescribe the maximum fees which may be charged for services performed in connection with any claim before the Commissioner[.]"  42 U.S.C. § 406(a)(1); 42 U.S.C. § 1383(d)(2)(A).  Further, "[i]n the case of a claim of entitlement to past-due benefits," the Commissioner shall approve a fee for a representative if, *inter alia*, "an agreement between the claimant and another person regarding any fee to be recovered by such person to compensate such person for services with respect to the claim is presented in writing."  42 U.S.C. § 406(a)(2)(A); 42 U.S.C. § 1383(d)(2)(A).  The statute does not require a particular kind of signature on the written agreement.  *See id.*

52.    Nor do the regulations specify form of signature required.  *See* 20 C.F.R. §§ 404.1720(b), 416.1520(b); 20 C.F.R. §§ 404.1725, 416.1525.  Under the regulations, a representative is required to file a written request with one of SSA's offices in order to obtain approval for a fee, and SSA "decide[s] the amount of the fee, if any, a representative may charge or receive." 20 C.F.R. §§ 404.1720(b), 416.1520(b).

---

[46] *Representing Social Security Claimants*, Soc. Sec. Admin., https://www.ssa.gov/representation/ (last visited  Aug.  13,  2020); *Coronavirus  Disease  (COVID-19)*, Soc. Sec. Admin., https://www.ssa.gov/coronavirus/ (last visited Aug. 13, 2020).

53.     POMS instructs that in order "[t]o validate the agreement, we also require that all parties sign the same agreement."  POMS GN 03940.003(B)(2).[47]  Moreover, while SSA accepts a representative's stamped signature, SSA only "accept[s] the claimant's signature in pen and ink."  *Id.*  In this provision, which became effective July 12, 2018 and remains in effect, SSA states, "While we cannot currently accept electronic signatures on fee agreements, we will as they become available through future systems enhancements."  *Id.*  Incongruously, although SSA requires a "wet ink" signature by the claimant, it then permits the parties to "submit a photocopy or fax of the original fee agreement."  *Id.*[48]

54.     During the COVID-19 pandemic, SSA announced "temporary procedures" for representative appointments and fee agreements, so long as fee agreements are submitted along with  appointment notices.[49]  Under these temporary procedures, a claimant may use an electronic signature on the appointment notices.  SSA still does not consider that electronic signature sufficient, however.  *Id.*  After receipt of the electronically signed appointment form, SSA makes three attempts to contact the claimant using an electronic signature by telephone to verify the claimant's identity and signature.  *Id.*  If SSA cannot reach the claimant, then it will return the notice of appointment form "without recognizing the appointment."  *Id.*

55.     Defendant's regulations provide that the rejection of a notice of appointment for lack of a "wet ink" signature is not an initial determination, and as such, is not subject to the

---

[47] POMS, GN 03940.003 is available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0203940003 (last visited Aug. 13, 2020).

[48] *See* Form SSA-1693, https://www.ssa.gov/forms/ssa-1693.pdf.

[49] *Representing Social Security Claimants*, Soc. Sec. Admin., https://www.ssa.gov/representation/ (last visited Aug. 13, 2020); *Temporary Instructions for the documentation of the Appointment of a Representative during the Coronavirus Disease 2019 (COVID-19) Pandemic*, Soc. Sec. Admin., https://secure.ssa.gov/apps10/reference.nsf/links/05212020012614PM  (last  visited  Aug.  13, 2020).

administrative review process.  *See* 20 C.F.R. §§ 404.903(g), 416.1403(7) ("Refusing to recognize, disqualifying, or suspending a person from acting as your representative in a proceeding before us" is an administrative action that is not an initial determination.); 20 C.F.R. §§ 404.903, 416.1403 ("Administrative actions that are not initial determinations may be reviewed by us, but they are not subject to the administrative review process.").  The same goes for SSA's determination of "the fee that may be charged or received by a person who has represented you in connection with a proceeding before [SSA]." 20 C.F.R. §§ 404.903(f), 416.1403(6).

56.    If a representative files an appeal of a disability benefits denial, then the representative "[has] the affirmative duty to use the iAppeals [online] applications."  POMS, GN 03102.100(C)(2).[50]  This requirement became effective on March 16, 2012. *Id.*; *see also* 20 CFR §§ 404.1713, 416.1513 (requiring representatives to "conduct business" with SSA "electronically at the times and in the manner [SSA] prescribe[s]").

57.    There is no requirement that a representative sign or obtain the signature of the applicant on any appeal to file any of the many levels of appeal within the SSA.  POMS, GN 03102.100(C)(2).[51] If the applicant seeks review in Court of a final decision of SSA as to benefits, 20 C.F.R. §§ 404.900(a)(5), 416.1400(a)(5), likewise, the applicant's legal representative may file a complaint electronically, without a wet ink signature of either the applicant or the attorney. *See* LCvR 5.4(b)(4) ("The use of a CM/ECF password to log in and submit documents creates an

---

[50] POMS, GN 03102.100 is available at https://secure.ssa.gov/poms.nsf/lnx/0203102100 (last visited Aug. 13, 2020); *see also Appointed Representative Best Practices and Tips*, Soc. Sec. Admin.,          at          2          (Apr.          16,          2020), https://www.ssa.gov/representation/documents/Best%20Practices%20and%20Tips.pdf.

[51] *See also Appointed Representative Best Practices and Tips*, Soc. Sec. Admin., https://www.ssa.gov/representation/documents/Best%20Practices%20and%20Tips.pdf.

electronic record that serves as the signature of the person to whom the password is assigned for all purposes under the Federal Rules of Civil Procedure and the Local Rules of this Court.").

    **F.**    **Other Related Litigation Challenging the "Wet Ink" Signature Policy**

    58.    SSA's "wet ink" signature requirement is currently the subject of another case pending before the Court. *See Nat'l Fed'n of the Blind v. Saul*, No. 1:20-cv-1160-TSC (D.D.C. 2020).

    59.    The plaintiffs there brought claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, challenging, *inter alia*, SSA's "wet ink" signature requirements. *See* Compl. at ¶¶ 81–105, *Nat'l Fed'n of the Blind*, No. 1:20-cv-1160-TSC (D.D.C. May 4, 2020), ECF No. 1. The plaintiffs in that case filed their complaint and a motion for preliminary injunction on May 4, 2020. *Id.*; Pls.' Mot. Prelim. Inj., *Nat'l Fed'n of the Blind,* No. 1:20-cv-1160-TSC (D.D.C. May 4, 2020), ECF No. 2.

    60.    On July 22, 2020, the Court denied the plaintiffs preliminary injunction motion in that action based on a finding that the plaintiffs did not show irreparable harm. Mem. Op. & Order, *Nat'l Fed'n of the Blind*, No. 1:20-cv-1160-TSC, 2020 WL 4201637, at *3–6 (D.D.C. July 22, 2020), ECF Nos. 26, 27. The Court did not rule on the merits of the plaintiffs underlying claims.

## V.    FACTS SPECIFIC TO THIS CASE

    61.    United Spinal has over 56,000 members, 52 chapters, close to 200 support groups and more than 100 rehabilitation facilities and hospital partners nationwide, including 10 distinguished Spinal Cord Injury Model System Centers that support innovative projects and research in the field of spinal injuries and disorders. United Spinal is also a U.S. Department of Veterans Affairs-accredited veterans service organization serving veterans with disabilities of all

kinds.  United Spinal believes "no person should be excluded from opportunity based on their disability."[52]  United Spinal's "goal is to provide people living with [spinal cord injuries and disorders] programs and services that maximize their independence and enable them to remain active in their communities."[53]

62.     As a result of representing persons with disabilities, one major focus of United Spinal Association's advocacy work is the preservation of Social Security benefits for people living with spinal cord injuries and disorders.  Specifically, the association "[a]dvocate[s] for policies that improve, simplify, and update [SSDI] benefits for individuals with disabilities and [SSI] to individuals with disabilities with limited income" and further to "ensure that claimants receive their disability benefits as quickly as possible."[54]

63.     Spinal cord injuries and disorders result in varying levels of paralysis, depending on which vertebrae are injured.[55]  In particular, individuals with spinal cord injuries and disorders may experience limited dexterity in their hands ranging from loss of strength or function to complete loss of use of the hands.[56]  Significant loss of motor function in the hands makes producing a "wet ink" signature difficult, if not impossible, and presents significant obstacles in fulfilling SSA's signature requirements for individuals seeking to use representatives' services in applying for SSDI and/or SSI benefits through the online application process.  Accordingly,

---

[52] *Our Story*, United Spinal Ass'n, https://unitedspinal.org/our-story (last visited Aug. 13, 2020)

[53] *Id.*

[54] *Policy Priorities*, United Spinal Ass'n, https://unitedspinal.org/what-were-fighting-for/ (last visited Aug. 13, 2020).

[55] *See The Body Before and After Injury*, Model Systems Knowledge Translation Center, https://msktc.org/sci/factsheets/understanding_sci_part_1 (last visited Aug. 13, 2020).

[56] *Id.*

members of United Spinal Association are directly affected by SSA's "wet ink" signature requirements.

## VI.    ASSIGNMENT OF ERRORS

64.    The Administrative Procedure Act ("APA") provides for a reviewing court to "set aside" an agency's determination if, *inter alia*, it is "arbitrary, capricious, an abuse of discretion," contrary to law, "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2).  Further, the APA also provides that in reviewing agency action, a court "shall . . . compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  SSA's requirements interfering with the ability to appoint and utilize representatives along with its "wet ink" signature policy should be declared invalid, and set aside, for a number of reasons including those described below.

65.    In addition, this Court should invalidate  SSA's rejection of electronic signatures under the doctrine of non-statutory review, which "has been employed repeatedly" to grant relief "'to one who has been injured by an act of a government official which is in excess of his express or implied powers.'"  *See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (quoting *Harmon v. Brucke*r, 355 U.S. 579, 581–82 (1958)) (collecting cases).

**COUNT I – "WET INK" CLAIMANT SIGNATURE REQUIREMENTS ARE
CONTRARY TO FEDERAL LAW MANDATING THE ACCEPTANCE OF
ELECRONIC SIGNATURES**

66.    Plaintiff incorporates paragraphs 1 through 65.

67.    Defendant's rejection of electronic signatures for verifying disability benefits applications submitted by representatives as well as for representative appointment and fee agreements is contrary to law because it violates the mandates of the E-SIGN Act and the Government Paperwork Elimination Act not to deny signatures legal effect solely because they

are "in electronic form," 15 U.S.C. § 7001(a)(1); Pub. L. No. 105–277, § 1704(2), 112 Stat. 2681, 2750 (1998).

68.     SSA accepts electronic signatures from applicants filing without representation and on other key transactions, *see, e.g.*, 20 C.F.R. § 422.505(a); 20 CFR §§ 404.1713, 416.1513; *see also supra* ¶¶ 26–27, 56, and provides no explanation why it cannot accept claimants' electronic verification of signatures for disability benefits applications submitted by representatives.   For verification of representative appointments, SSA states without further explanation that it "do[es] not accept signatures generated from electronic software programs." POMS, GN 03910.040(A)(1).   Further, for fee agreements, SSA states it "accepts the claimant's signature in pen and ink," explaining that "[w]hile we cannot currently accept electronic signatures on fee agreements, we will as they become available through future systems enhancements."   POMS, GN 03940.003.   The POMS provision still requiring electronic signatures is dated July 12, 2018—two years ago, and more than twenty years after the Government Paperwork Elimination Act and E-SIGN Acts were enacted.   *Id.*

69.     SSA already accepts electronic signatures on SSDI applications filed directly by claimants or by representatives with the claimants present, and accepts claimants' electronic signatures on medical release forms, administrative appeal filings, and numerous others.[57]

70.     SSA's other acceptance of electronic signatures demonstrates that SSA has the technological means to accept electronic signatures from claimants and that this process meets the agency's standards for information verification.   SSA's "click and sign" method for applying for benefits requires a claimant to "represent[] his or her affirmation under penalty of perjury that

---

[57] *See Apply Online for Disability Benefits: Who can apply for adult disability benefits online?*, Soc. Sec. Admin., https://www.ssa.gov/applyfordisability/ (last visited Aug. 13, 2020); *see also supra* ¶¶ 26–27, 32, 56.

the information provided is correct, and intent to electronically sign and submit application data to SSA."  POMS, GN 00201.015(B)(2); *see also* POMS, DI 11005.056(D)(1) (applying "click and sign" to Authorization to Disclose Information to SSA, Form SSA-827).  Indeed, in allowing electronic signatures on the authorization to release medical and other information, SSA explained that this transaction with an electronic signature meets all of the requirements for "a valid authorization under the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule."[58]

71.     The time for SSA to adopt full use of electronic signatures and thereby comply with these statutes has long passed.  It has been two decades since Congress enacted the Government Paperwork Elimination Act and E-SIGN Act.  *See* Pub. L. No. 105–277, 112 Stat. 2681, 2749–51 (1998) (Government Paperwork Elimination Act); *See* Pub. L. No. 106–229, 114 Stat. 464 (2000) (E-SIGN Act).  Furthermore, while the Government Paperwork Elimination Act provided agencies a five-year runway in which to comply with its mandate to begin accepting electronic signatures, that grace period expired 17 years ago, in 2003.  Pub. L. No. 105–277, § 1704(2) 112 Stat. at 2750.  This sort of excessive delay in complying with Congressional directives represents agency action "unlawfully withheld or unreasonably delayed."  *See* 5 U.S.C. § 706(1).  Courts "designated by statute to review agency actions may play an important role in compelling agency action that has been improperly withheld or unreasonably delayed."  *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984).  Courts similarly grant injunctions to compel agency action in the form of mandamus relief.  *See Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (quoting *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir.

---

[58] *Frequently Asked Questions Regarding New Electronic Signature Process*, Soc. Sec. Admin., https://www.ssa.gov/disability/professionals/legalpoints.htm (last visited Aug. 13, 2020).

1996) (explaining that "a request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty")); 28 U.S.C. § 1361. The most critical factors in determining whether agency action is unlawfully delayed include the length of time and whether Congress provided a timetable or other indication of expected pace. *See Telecomms. Research & Action Ctr.*, 750 F.2d at 80; *see also In re Core Communications, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (Time is "[t]he first and most important factor.").

72.     In a recent instructive example, the D.C. Circuit granted an order of mandamus where "[f]or nineteen years, the agencies have failed to comply with their statutory mandate despite Congress's command to 'make every effort' to do so within two years of an application." *In re Public Emps. For Envtl. Responsibility*, 957 F.3d 267, 273 (D.C. Cir. 2020). Furthermore, the Court reasoned that "the agencies' competing obligations cannot justify their nineteen-year holdup" and that in creating a schedule to comply with the Court's order "the agencies should bear in mind that Congress expected them to complete the task in two years." *Id.* at 274. For these same reasons, this Court should compel SSA to finally fully adopt electronic signatures under its authority to compel "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

73.     The failure to allow electronic signatures and the requirement of "wet ink" signatures violates the federal statutes requiring acceptance of electronic signatures and is contrary to law.

### COUNT II – "WET INK" CLAIMANT SIGNATURE REQUIREMENTS VIOLATE THE AGENCY PRACTICE ACT AND THE FIRST AMENDMENT

74.     Plaintiff incorporates paragraphs 1 through 73.

75.     SSA's "wet ink" signature requirements unlawfully interfere with claimant's right to be represented by others in making claims to the agency.

76.     The rejection of electronic signatures for verifying disability benefits applications submitted by representatives, as well as for representative appointment and fee agreements, violates the Agency Practice Act, 5 U.S.C. § 500.  This Act provides that in order to represent individuals before an agency, a licensed attorney only needs to file "with the agency a written declaration that he is currently qualified as provided by this subsection and is authorized to represent the particular person in whose behalf he acts."  5 U.S.C. § 500(b).

77.     This Act sets the outer limits on what any agency can require for an attorney to practice before an agency.  The statute "prohibits agencies from erecting their own supplemental admission requirements for duly admitted members of a state bar."  *Polydoroff v. ICC*, 773 F.2d 372, 374 (D.C. Cir. 1985) ; *see also Neuhoff v. Comm'r of Internal Revenue*, 75 T.C. 36, 42 (1980) ("The provisions of 5 U.S.C. § 500 et seq., were enacted to enable, as far as possible, persons to be represented by any attorney in good standing in matters before Federal agencies and to require the agencies to deal with a representative qualified in the manner provided by Congress."), *aff'd*, 669 F.2d 291 (5th Cir. 1982).  Accordingly, requiring the claimant to provide a "wet ink" signature or phone verification in order to be represented before the agency, *see* 20 C.F.R. §§ 404.1707(a), 416.1507(a), impermissibly imposes a requirement in excess of those established by the Agency Practice Act.

78.     This was precisely the holding of *McDaniel v. Israel*.  *See* 534 F. Supp. 367, 370 (W.D. Va. 1982), *amended*, 537 F. Supp. 273 (W.D. Va. 1982), *amended*, 540 F. Supp. 404 (W.D. Va. 1982).  There, claimants and an attorney alleged that 20 C.F.R. § 404.1707, requiring submission of a signed notice of appointment, was "illegal and void because it requires an

additional task (submission of a signed notice appointing your representative in dealings with the Social Security Administration) beyond that required by the Agency Practices Act, 5 U.S.C. § 500(f)." *Id.* at 368.  The District Court agreed and held that 20 C.F.R. § 404.1707 was "squarely in conflict with the Agency Practice Act and neither . . . necessary nor appropriate for the effective administration of justice by the Social Security Administration." *Id.* at 370.[59]  So too here, SSA's requirement of a signed notice of appointment is inconsistent with 5 U.S.C. § 500(f) and therefore contrary to law.

79.    SSA has established several unnecessary requirements that serve as obstacles to claimants' ability to use authorized representatives to assist them in navigating the complicated process of applying for SSDI and SSI benefits.  By establishing these arbitrary barriers to claimants' use of a representative's assistance in seeking benefits from SSA, the agency has also violated those claimants' First Amendment rights.

80.    The claimant "wet ink" signature requirements for verifying disability benefits applications submitted by representatives, as well as for representative appointments and fee agreements, impose an unjustifiable burden on claimants' ability to consult with advisors in connection with petitioning the government.

81.    "The right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985).  It "was inspired by the same ideals . . . that gave us the freedoms to speak, publish, and assemble." *Id.* at 485.  Further, the right to petition "extends to all

---

[59] The defendants subsequently moved to amend the court's judgment, which the court did in part in April 1982 by granting relief only to named plaintiffs. *McDaniel*, 537 F. Supp. at 274.  This was based on a stipulation filed by the parties. *Id.*

departments of the Government," including administrative agencies. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 611–12 (1972).

82. The requirements imposed to both appoint and compensate a representative and then to have a representative submit a disability benefits application interfere with claimants' First Amendment right to petition. Each of these requirements interferes with the ability of representatives to assist claimants with critical functions throughout the application process. *See* 20 C.F.R. §§ 404.1710(a), 416.1510(a) (allowing a representative to obtain information, submit evidence, make statements about facts and law, make requests, and give notice about proceedings).

83. It has been long recognized that the First Amendment "require[s] a measure of protection for 'advocating lawful means of vindicating legal rights.'" *See In re Primus*, 436 U.S. 412, 432 (1978) (quoting *NAACP v. Button*, 371 U.S. 415, 437 (1963)); *see, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (holding a Congressional spending condition barring a nonprofit legal services corporation from representing clients seeking to amend or challenge existing welfare laws violated the First Amendment and explaining that "[i]n the specific context of . . . suits for benefits, an LSC-funded attorney speaks on behalf of the client in a claim against the government for welfare benefits").

84. SSA regulations acknowledge that all representatives, including attorney and non-attorney representatives, provide valuable assistance to claimants seeking benefits. *See* 20 C.F.R. §§ 404.1705(b)(1), 416.1505(b)(1) ("You may appoint any person who is not an attorney to be your representative in dealings with us if the person . . . [i]s *capable of giving valuable help to you in connection with your claim*." (emphasis added)).

85.     The numerous barriers SSA has erected to utilizing the services of a representative before the agency unjustifiably burden claimants' right to have assistance in petitioning the government.  The application process is notoriously complicated, and SSA itself acknowledges that it is not designed for "self-help," POMS, SI 00604.001, but rather to be completed with a person with the requisite qualifications and skills to assist.  *See* 42 U.S.C. § 406(a)(1); 42 U.S.C. § 1383(d)(2)(A); 20 C.F.R. §§ 404.1705, 416.1505 (setting criteria for representatives).  The need for help from a representative continues throughout the disability evaluation process, as government statistics show that applicants who use a representative (whether a lawyer or not) are nearly three times as likely to successfully navigate the cumbersome appeals process.[60]  SSA's anachronistic insistence on "wet ink" signatures and the incumbent mail delays in order to appoint a representative, when SSA's own procedures (not to mention numerous statutes) recognize the security of electronic signature technologies, suggests that SSA's requirements serve to deter applicants from utilizing the assistance of a representative.  Given the higher rate of success by represented applicants, the reason underlying this otherwise inexplicable insistence on outdated mechanisms seems clear—to reduce the rate of successful applications and appeals.  It goes without saying that this apparent goal cannot be an adequate governmental interest to overcome applicants' First Amendment Right to Petition.

### COUNT III – "WET INK" CLAIMANT SIGNATURE REQUIREMENTS ARE INCONSISTENT WITH THE APPLICABLE REGULATION

86.     Plaintiff incorporates paragraphs 1 through 85.

---

[60] U.S. Gov't Accountability Off., GAO-18-37, *Social Security Disability: Additional Measures and Evaluation Needed to Enhance Accuracy and Consistency of Hearing Decisions*, at 24 (Dec. 2017), https://www.gao.gov/assets/690/688824.pdf.

87.   SSA's rejection of electronic signatures for verifying disability benefits applications submitted by representatives as well as for signing representative appointment and fee agreements is unsupported by the plain text of its own regulations.

88.   SSA regulations require only that a claimant "sign" a document appointing a representative.  20 C.F.R. §§ 404.1707(a), 416.1507(a). Any rejection of this information based on the form of a claimant's signature violates the regulation.

89.   Rather than comply with the plain text of the regulation, SSA inconsistently interprets "sign."  For notifying SSA of representation, SSA interprets "sign" to mean "wet ink" in 20 C.F.R. §§ 404.1707(a), 416.1507(a), and to mean "rubber stamp or electronic method" for other purposes in the next subsection, 20 C.F.R. §§ 404.1707(b), 416.1507(b); *see* POMS, GN 03910.040(A).

90.   It is long established that words in a regulation should be treated consistently: one of the foundational canons of interpretation requires the presumption of consistent usage.  *See IBM, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) (explaining that in the "normal rule" of interpretation "identical words used in different parts of the same statute are generally presumed to have the same meaning."); *see also Gustafson v. Alloyd Co*., 513 U.S. 561, 569 (1995) (explaining how acts should be "interpreted as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout").  "The rules of statutory construction apply when interpreting an agency regulation." *Williams v. Chu*, 641 F. Supp. 2d 31, 38 (D.D.C. 2009) (quoting *Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006)); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (endorsing the application of "traditional tools" of statutory construction to administrative regulations).  SSA's requirement for a claimant "wet ink" signature for representative appointment thus cannot be sustained and should be set aide.

## COUNT IV –"WET INK" CLAIMANT SIGNATURE REQUIREMENTS ARE ARBITRARY AND CAPRICIOUS

91.     Plaintiff incorporates paragraphs 1 through 90.

92.     Defendant's rejection of electronic signatures for verifying disability benefits applications submitted by representatives as well as for representative appointment and fee agreements is also arbitrary and capricious under the APA.  *See* 5 U.S.C. § 706(2)(A).

93.     Agency action is arbitrary and capricious if the agency (i) "has relied on factors which Congress has not intended it to consider"; (ii) "entirely failed to consider an important aspect of the problem"; (iii) "offered an explanation for its decision that runs counter to the evidence before the agency"; or (iv) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Each of these factors applies here.

94.     *First*, in inexplicably requiring claimants' "wet ink" signatures for disability benefits applications submitted by representatives as well as for representative appointments and fee agreements, SSA has ignored Congress's goal of moving toward electronic signatures.  Congress was clear that the Government Paperwork Elimination Act was "intended to preclude agencies or courts from systematically treating electronic documents and signatures less favorably than their paper counterparts," and that "[e]lectronic signatures can offer greater assurances that documents are authentic and unaltered.  They minimize the chances of forgeries or people claiming to have had their signatures forged."  S. Rep. No. 105–335, at 2, 7 (Sept. 17, 1998).

95.     *Second*, in imposing the burden of "wet ink" signatures on claimants (or alternatively, requiring claimants to reach the SSA telephonically), SSA has without justification created obstacles and potential barriers to claimants' obtaining representation.  SSA has acknowledged that 800,000 claimants submit notices of representative appointments each year,

resulting in hundreds of thousands of hours of administrative work.[61]  Yet the agency has failed

to consider the substantial and potentially prohibitive burden on claimants seeking to appoint and

utilize representatives.

96.    *Third*, SSA's requirement for "wet ink" signatures is inconsistent with the

evidence before it regarding the security and effectiveness of "wet ink" signatures.  SSA has stated

that the purpose of requiring a written notice of appointment is "to assure that we have the name

and address of any person designated to act as a representative" and "to protect confidential

personal information from unauthorized disclosure, while facilitating its release to designated

representatives."  44 Fed. Reg. 20,176, 20,177 (Apr. 4, 1979); *see also, e.g.*, 84 Fed. Reg. at 4599

("SSA uses the information on the SSA-1696-U4 to document the appointment of the

representative."); 82 Fed. Reg. at 10,625 ("SSA collects the information on Form SSA-1696-U4

to verify the appointment of these representatives.").  These goals can be fully achieved through

an electronic signature.  As the Senate Report on the Government Paperwork Elimination Act

explained, "[e]lectronic signatures can offer greater assurances that documents are authentic and

unaltered.  They minimize the chances of forgeries or people claiming to have had their signatures

forged."  S. Rep. No. 10–335, at 2.  Further, SSA itself has stated in relation to the Government

Paperwork Elimination Act that "approved electronic signature technologies will be deemed by

the Agency to convey the same authority to an individual as that associated with the traditional

paper-based or 'wet' signature."  67 Fed. Reg. at 55,906.  And SSA has recognized in the context

---

[61] *See, e.g.*, 84 Fed. Reg. 4597, 4599 (Feb. 15, 2019) (reporting 800,000 respondents used the Form SSA-1696-U4, amounting to an estimated total annual burden of 160,000 hours resulting from the form); 82 Fed. Reg. 10,623, 10,626 (Feb. 14, 2017) (reporting 800,000 respondents used the form, with an estimated total annual burden of 133,333 hours); 81 Fed. Reg. 80,159, 80,160 (Nov. 15, 2016) (same); 78 Fed. Reg. 54,363, 54,364 (Sept. 3, 2013) (same).

of authorizations to release medical or other information that electronic signatures meet the strict
HIPAA requirements for transfer of highly sensitive personal health information.[62]

97.     *Fourth*, SSA's inexplicable insistence on "wet ink" signatures reveals that these
arbitrary requirements cannot "be ascribed to a difference in view or the product of agency
expertise," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.   Again, SSA has recognized that
applications, along with voluminous amounts of highly sensitive personal and medical
information, can be submitted securely and effectively electronically.[63]   Further, SSA allows
claimants to authorize, with an electronic signature, the disclosure of "[a]ll . . . medical records,"
"education records and other information related to [a claimant's] ability to perform tasks" in a
manner compliant with HIPAA.[64]   In the preamble to the regulation governing releases of
information, 45 C.F.R. § 164.508, the Department of Health and Human Services ("HHS"), which
promulgated the regulations regarding disclosure of private medical information, stated that as
long as the signature meets the requirements under HIPAA, HHS does "not require any
verification of the individual's identity or authentication of the individual's signature," whether
in "wet ink" or electronic.   65 Fed. Reg. 82,462, 82,512 (2000).   Yet, SSA, without explanation,
applies a different standard when a claimant wants to appoint a representative or submit a fee

---

[62] *Frequently Asked Questions Regarding New Electronic Signature Process*, Soc. Sec. Admin.,
https://www.ssa.gov/disability/professionals/legalpoints.htm (last visited Aug. 13, 2020).

[63] *Apply Online for Disability Benefits*, Soc. Sec. Admin., https://www.ssa.gov/pubs/EN-05-
10550.pdf (last visited Aug. 13, 2020) (describing the online SSDI option as "[t]he most
convenient way to apply for disability" and explains that it "use[s] the most secure technology on
the Internet to keep [claimants'] information private"); *The Appeals Process*, Soc. Sec. Admin.,
https://www.ssa.gov/pubs/EN-05-10041.pdf, at 1 (last visited Aug. 13, 2020) ("The fastest and
easiest way to file an appeal . . . is by visiting *www.socialsecurity.gov/disability/appeal*.   You can
file online and provide documents electronically to support your appeal.").

[64] *Authorization to Disclose Information to the Social Security Administration (SSA),* Form SSA-
827, https://www.ssa.gov/forms/ssa-827.pdf.

agreement.  SSA also provides no explanation as to why a duly appointed representative, who can obtain information about the claimant, submit evidence, make statements about facts and law, and make requests and give notice related to proceedings before SSA, 20 C.F.R. § 404.1710; 20 C.F.R. § 416.1510—and is otherwise *required* to make electronic submissions to SSA, 20 C.F.R. §§ 404.1713, 416.1513, cannot submit a disability application containing a claimant's electronic signature.

98.     What is more, "[a] long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (collecting cases).  In fact, courts have routinely held that "inconsistent treatment is the hallmark of arbitrary agency action." *Utility Air Regulatory Grp. v. EPA*, 885 F.3d 714, 723 (D.C. Cir. 2018) (quoting *Catawba County v. EPA*, 571 F.3d 20, 51 (D.C. Cir. 2009)).

99.     As discussed above, SSA provides no sound basis for interpreting "sign" to require "wet ink" signatures for claimants' signatures for representative appointment and fee agreements, especially in light of its acceptance of electronic signatures on SSDI applications, medical release forms, and administrative appeal requests.  And SSA has even begun allowing electronic signatures for the purpose of appointing representatives, albeit with phone call verification, as a temporary response to the COVID-19 pandemic.  Further, SSA has imposed different requirements for the word "sign," even when the same word is used in the same regulation.  Defendant's regulations, 20 C.F.R. §§ 404.1707, 416.1507, require both the claimant and a non-attorney representative simply to "sign" a written notice.  *See* 20 C.F.R. §§ 404.1707(a), 416.1507(a) ("You sign a written notice stating that you want the person to be your representative . . . .); 20 C.F.R. §§ 404.1707(b), 416.1507(b) ("That person signs the notice,

agreeing to be your representative, if the person is not an attorney."). An applicant and the representative meet this requirement with either a "wet ink" signature or an electronic signature. The regulations do not distinguish the meaning of the word "sign" among the different subsections nor provide any basis why the signatures should take different meanings. Yet POMS explicitly construes the word "sign" in subsection (a) of these regulations differently from how it construes the same word in subsection (b). POMS mandates that "[t]he claimant's signature must be in ink" and that SSA will not accept electronic signatures. POMS, GN 03910.040(A)(1). The same section in POMS states that the "[r]epresentatives may use a rubber stamp or electronic method to sign the written notice." POMS, GN 03910.040(A)(2). There is no basis in the regulation to construe the same word in sequential, inter-related subsections of a regulation in diametrically opposite ways.

100. SSA has provided no rational basis for why a claimant's electronic signature is sufficient for some purposes and not others. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 57 ("[I]t is the agency's responsibility . . . to explain its decision."). Similarly, SSA has provided no basis for why a representative can submit an appeal on behalf of a claimant but cannot submit an application without the claimant taking additional steps to finalize the submission. SSA's lack of an explanation for these distinctions is arbitrary and capricious in and of itself. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (explaining that a "fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action" (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001))).

101. It is well settled "that '[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.'" *Kreis v. Sec'y of Air Force*, 406

F.3d 684, 687 (D.C. Cir. 2005) (quoting *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248,

1258 (D.C. Cir. 1996)).  And "[a] long line of precedent has established that an agency action is

arbitrary when the agency offered insufficient reasons for treating similar situations differently."

*Transactive*, 91 F.3d at 237.  The agency must explain "*how* it evaluated" the factors that led to

its disparate treatment of similar situations and "*why* its evaluation" of those factors led to its

disparate treatment.  *See Lilliputian Sys., Inc. v. Pipeline & Hazardous Safety Admin.,* 741 F.3d

1309, 1313 (D.C. Cir. 2014).  Where the agency has failed to follow this rule, as it has here, the

decision or policy should be set aside.  *Kreis*, 406 F.3d at 687 (setting aside agency decision when

it was inconsistent with its regulation and how similar situations were previously treated).

102.    Finally, SSA's "wet ink" signature requirement for representative appointments is

arbitrarily inconsistent with the acceptance of electronic signatures for that purpose by another

federal agency that administers disability benefits, the U.S. Department of Veterans Affairs (the

"VA").  Veterans can use an electronic form to appoint accredited representatives for assistance

in obtaining veterans' benefits.[65]  These appointed representatives help veterans apply for a

variety of benefits, including disability benefits, financial support, home loans, insurance, and

health care.[66]  This means that the same veterans with disabilities (which account for a number of

Plaintiff's members) face different signature requirements for securing assistance with obtaining

federal disability benefits depending on the agency that administers the benefits.  These veterans

can appoint representatives online for help seeking a variety of benefits—including disability

---

[65]  *See Get help filing your claim or appeal,* U.S. Dep't of Veterans Affairs, https://www.va.gov/disability/get-help-filing-claim/ (last visited Aug. 13, 2020); *see also Accredited Representatives*, U.S. Dep't of Veterans Affairs, https://www.benefits.va.gov/vso/index.asp (last visited Aug. 13, 2020) (noting that representatives may be appointed online using eBenefits or by mail).

[66]  *Get help filing your claim or appeal,* U.S. Dep't of Veterans Affairs, https://www.va.gov/disability/get-help-filing-claim/ (last visited Aug. 13, 2020).

benefits—from the Department of Veterans Affairs, yet need to provide "wet ink" signatures when seeking to do the same for disability benefits from SSA.

103.    SSA's requirements for representatives' submission of online applications, representative appointments, and fee agreements are arbitrary and capricious and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

### COUNT V – "WET INK" CLAIMANT SIGNATURE REQUIREMENT FOR REPRESENTATIVE APPOINTMENT WAS ISSUED WITHOUT OBSERVANCE OF REQUIRED PROCEDURE

104.    Plaintiff incorporates paragraphs1 through 103.

105.    Defendant's rejection of electronic signatures for representative appointment and fee agreements constitutes a substantive legislative rule, but it was issued without observance of the required procedure pursuant to the APA and without providing fair notice.  *See* 5 U.S.C. § 552(a)(1)(E)("[A] person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."); § 706(2)(D) (A "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law.").

106.    Unlike the regulations, *see* 20 C.F.R. §§ 404.1707(a); 416.1507(a); 20 C.F.R. §§ 404.1720, 404.1725, 416.1520, 416.1525, SSA's POMS mandates that claimants sign notices of representative appointments with "wet ink" signatures.  *See* POMS, GN 03910.040(A)(1); POMS, GN 03940.003.  POMS is an SSA program manual that is not adopted through notice-and-comment rulemaking before implementation.  *See Dixon v. Sullivan*, 792 F. Supp. 942, 948 (S.D.N.Y. 1992) (recognizing that the Program Operations Manual System was not promulgated via notice and comment rulemaking under the APA), *aff'd sub nom. Dixon v. Shalala*, 54 F.3d 1019 (2d Cir. 1995).  Further, while the regulations provide that generally claimants must sign

their disability benefits applications and do not require "wet ink" signatures, 20 C.F.R. §§ 404.1710, 416.1510; 20 C.F.R. §§ 404.612(b)–(c), 416.315(b)–(c), SSA through its website has mandated that claimants' verification of applications submitted by representatives electronically must be in "pen and ink."[67]

107.    Under the APA, courts should set aside agency actions issued "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Substantive, or legislative, rules must follow notice and comment rule-making pursuant to 5 U.S.C. § 553.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–98, 101 (2015).

108.    A rule is substantive or legislative when, inter alia, it expresses "binding norm[s]" that are "finally determinative of … issues or rights," *see Croplife Am. v. EPA*, 329 F.3d 876, 881 (D.C. Cir. 2003) (internal quotation marks omitted) and "'grant[s] rights, impose[s] obligations, or produce[s] other significant effects on private interests.'" *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) (quoting *Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C. Cir. 1980)).  Such changes of law can be accomplished only through notice-and-comment rulemaking procedures in accordance with 5 U.S.C. § 553.  *See, e.g., Mendoza v. Perez*, 754 F.3d 1002, 1020-21 (D.C. Cir. 2014) (recognizing that notice-and-comment requirements apply to legislative rules).

109.    Here, the claimant "wet ink" signature requirement is a legislative rule, affecting and binding all claimants who seek to retain representation, and the SSA employees who review the applications.  *See Hall v. Sebelius*, 689 F. Supp. 2d 10, 20 (D.D.C. 2009) (explaining that POMS "determines rights and creates legal consequences").  An "agency pronouncement will be

---

[67]    *Appointed Representative Best Practices and Tips*, Soc. Sec. Admin., https://www.ssa.gov/representation/documents/Best%20Practices%20and%20Tips.pdf (last visited Aug. 13, 2020).

considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (holding a guidance document that required parties to submit applications that conformed to the specifications of the guidance document to be binding and carry the force of law).  That is, an agency document "is for all practical purposes 'binding,'" if the "agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, [or] if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000); *cf. Mortg. Bankers Ass'n,* 575 U.S. at 97 (explaining that "[i]nterpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process'" (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).

110.    Further, "mandatory, definitive language is a powerful, even potentially dispositive, factor suggesting that [rules] are substantive rules." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987).  Here, POMS is clear and unequivocal: "We **do not** accept signatures generated from electronic software programs" for notices of appointment, POMS, GN 03940.003(B)(2); and "We accept the claimant's signature in pen and ink" for fee agreements, POMS, GN 03940.003(B)(2).  *See* POMS GN 03910.040(A)(1) ("Return a notice of appointment if the claimant's signature is electronic.").[68]

---

[68] *See also Representing Social Security Claimants, Temporary procedure announced for written notices of appointment and fee agreements to enhance flexibility during the COVID-19 emergency,* Soc. Sec. Admin.,  https://www.ssa.gov/representation/ (last visited Aug. 13, 2020) ("If we cannot reach the claimant and he or she does not return our call, or does not verify the signature, we will return the paperwork to the person who submitted it without recognizing the appointment."); *How*

111.    In *Brow v. Secretary of Health & Human Services*, the Court held that a POMS directive that "resource eligibility determinations are made only as of the first moment of the first day of each month" was substantive.  *See* 627 F. Supp. 1467, 1468 (D. Vt. 1986) (quoting POMS, SI 01150.005(E)).  The Court explained that the requirement affected which claimants were eligible to receive benefits on a pro rata basis and "had a substantial impact on low income people like plaintiff who are financially dependent upon SSI benefits."  *Id.* at 1471.

112.    For these reasons, the imposition of "wet ink" signature requirements for those claimants signing documents relating to  their representation, notwithstanding the lack of any such requirement in the regulations itself, was a substantive change or amendment to the regulations, and a rule that "effectively amends a prior legislative rule" requires notice and comment rulemaking.  *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).  Stated otherwise, a policy that "work[s] substantive changes" or makes "major substantive legal addition[s]" to existing regulations requires notice and comment.  *U.S. Telecom. Ass'n v. FCC*, 400 F.3d 29, 34–35 (D.C. Cir. 2005) (second alteration in original) (emphasis omitted).  The agency cannot effectively amend the regulations, and issue a binding requirement, as it did here, without undertaking notice and comment.  *See id.*

113.    As substantive rules, the claimant "wet ink" signature requirements for  disability benefits applications submitted by representatives, as well as representative appointments and fee agreements, were issued without observance of procedure required by law and should be set aside pursuant to 5 U.S.C. § 706(2).

---

*will SSA process my notice of appointment while emergency procedures are in place?*, Soc. Sec. Admin. (June 10, 2020), https://www.ssa.gov/coronavirus/ (same).

## VII.   RELIEF REQUESTED

For the foregoing reasons, Plaintiff requests that the Court:

a)   declare that the rejection of electronic signatures for verifying disability benefits applications submitted by representatives, as well as for representative appointment and fee agreements, violates federal law mandating acceptance of electronic signatures, including the Government Paperwork Elimination Act, Pub. L. No. 105–277, 112 Stat. 2681, 2750 (1998); the E-SIGN Act, Pub. L. No. 106–229, 114 Stat. 464 (2000); the Agency Practice Act, Pub. L. No. 89–332, 79 Stat. 1281 (1965); and the First Amendment of the U.S. Constitution;

b)    declare that the rejection of electronic signatures for representative appointment violates Defendant's own regulations at 20 C.F.R. §§ 404.1707(a); 416.1507(a);

c)   declare that the rejection of electronic signatures for verifying disability benefits applications submitted by representatives as well as for representative appointment and fee agreements is arbitrary and capricious;

d)   declare that the rejection of electronic signatures for verifying disability benefits applications submitted by representatives as well as for representative appointments and fee agreements in the Program Operations Manual System and in other agency publications was issued without observance of procedure required by law;

e)   set aside the claimant "wet ink" signature requirements for disability benefits applications submitted by representatives as well as for representative appointments and fee agreements;

f)   enjoin SSA from denying legal effect, validity, or enforceability to claimants' electronic signatures for disability benefits applications submitted by representatives, for

representative appointment, or for fee agreements because such records are in electronic

form;

g) direct SSA to pay Plaintiff's legal fees and other costs of suit; and

h) provide such other relief as the Court may deem appropriate.


Respectfully submitted,

_/s/ Stephanie A. Webster_
Stephanie A. Webster
   D.C. Bar No. 479524
Douglas H. Hallward-Driemeier
   D.C. Bar No. 994052
Alex J. Talley
   D.C. Bar No. 1020488
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006-6807
t: (202) 508-4859
f: (202) 383-9334
stephanie.webster@ropesgray.com

_Attorneys for Plaintiff_

Dated:  August 14, 2020