**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED SPINAL ASSOCIATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:20-cv-02236-TSC |
| | ) | |
| ANDREW M. SAUL | ) | |
| *in his official capacity as* | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN, D.C. BAR # 924092
Civil Chief

JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
Civil Division
555 4th Street, N.W. Washington, D.C. 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Counsel for Defendant

**TABLE OF CONTENTS**

INTRODUCTION……………………………………………………….……..........1

BACKGROUND…….……………………………………………….......................4

LEGAL STANDARD……………………………………..……………………......11

ARGUMENT……………………………………………………………………...15

I.      Plaintiff's Claims Should be Dismissed Under Rule 12(b)(1) For
Lack Of Subject Matter Jurisdiction And Standing ………..................................15

        A.  Plaintiff Has Failed To Plead Standing On Its Own Behalf……………16

        B.  Plaintiff Has Failed To Plead Or Establish Associational
          Standing…………………………………………………………….....17

           1.  Plaintiff Lacks Standing Because It Has Failed To Plead
              Or Establish That Any Of Its Members Suffered An
              Injury-In-Fact…………………………………………………17

           2.  Plaintiff Lacks Standing Because Any Alleged Harm Is Voluntarily
              Assumed And Severs The Casual Link Necessary To Confer
              Standing………………………………………….……...…....20

           3.  Plaintiff Lacks Standing Because United Spinal Has Failed To Plead
              The Jurisdictional Presentment Requirements of 42 U.S.C. §
              405(g)………………………………………………………….23

II.     Plaintiff's Claims Should Be Dismissed Under Rule 12(b)(6) Or, Alternatively,
Summary Judgment Should Be Granted To Defendant……………………….…26

        A.  The Social Security Act And/Or The Rehabilitation Act Provide An
          "Adequate Remedy" Precluding A Claim Under The APA……………26

        B.  Plaintiff Has Failed To Plausibly Plead A Claim Under
          The APA……………………………..………………………….....27

           1.  The Challenged Procedures Are Not Contrary
              To Law…………………….………………..…………….…...29

i

a.  The E-Sign Act and Government Paperwork Elimination Act...……………………….………30

b.  Plaintiff Has No APA Claim Based On The Agency Practices Act……………………………….………...33

c.  Plaintiff Fails To State An APA Claim Based On The First Amendment……………….............................36

2.  SSA's Assessment Of What Constitutes An Acceptable "Signature" In Different Contexts Is Not Arbitrary Or Capricious……….…..............38

3.  The Challenged Procedures Do Not Violate Notice-And-Comment Rulemaking Procedures…………………………...………………44

CONCLUSION……… ……………………..…………...........................................................45

# TABLE OF AUTHORITIES

*Cases*

*Abigail Alliance for Better Access to Dev. Drugs v. Von Eschenbach,*
  469 F.3d 129 (D.C. Cir. 2016)...............................................................................17

*Alon Ref. Krotz Springs v. EPA,*
  936 F.3d 628 (D.C. Cir. 2019)...............................................................................30

*Al-Owhali v. Ashcroft,*
  279 F. Supp. 2d 13 (D.D.C. 2003)........................................................................12

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001).............................................................................14

*Am. Chemistry Council v. Dep't of Transp.,*
  468 F.3d 810 (D.C. Cir. 2006).........................................................................17, 18

*Am. Farm Bureau Fed. v. EPA,*
  559 F.3d 512 (D.C. Cir. 2009).............................................................................15

*Am. Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008).............................................................................15

*Ariz. Christian Sch. Tuition Org. v. Winn,*
  131 S. Ct. 1436 (2011).........................................................................................15

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).............................................................................................14

*AT&T Corp. v. FCC,*
  220 F.3d 607 (D.C. Cir. 2000).............................................................................15

*Barnhart v. Thomas,*
  540 U.S. 20 (2003)...............................................................................................39

*Barnhart v. Walton,*
  535 U.S. 212 (2001).......................................................................................39, 43

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007).............................................................................................13

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971).............................................................................................15

*Clapper v. Amnesty Int'l,*
  568 U.S. 398 (2013).............................................................................................15

iii

*Clifford v. Peña*,
  77 F.3d 1414 (D.C. Cir. 1996) ............................................................................39

*Conley v. Gibson*,
  355 U.S. 41 (1957) ............................................................................................13

*Crawford v. Marion Cty. Election Bd.*,
  553 U.S. 181 (2008) ....................................................................................37, 38

*Curran v. Holder*,
  626 F. Supp. 2d 30 (D.D.C. 2009) .....................................................................11

*Dominguez v. UAL Corp.*,
  666 F.3d 1359 (D.C. Cir. 2012) .........................................................................15

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ...........................................................................14

*El Rio Santa Cruz Neighborhood Health Center, Inc. v. U.S. Dep't of Health & Human Servs.*,
  396 F.3d 1265 (D.C. Cir. 2005) .........................................................................27

*Erby v. United States*,
  424 F. Supp. 2d 180 (D.D.C. 2006) ..............................................................12, 13

*Erickson v. Pardus*,
  551 U.S. 89 (2007) ............................................................................................13

*Florida Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ..........................................................................................14

*Gallucci v. Chao*,
  374 F. Supp. 2d 121 (D.D.C. 2005) ............................................................passim

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ...........................................................................27

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
  185 F. Supp. 2d 9 (D.D.C. 2001) .......................................................................12

*Grocery Mfrs. Ass'n v. EPA*,
  693 F.3d 169 (D.C. Cir. 2012) ...............................................................20, 21, 22

*Hecht v. Ludwig*,
  82 F.3d 1085 (D.C. Cir. 1996) ...........................................................................14

*Heckler v. Campbell*,
  461 U.S. 458 (1983) ....................................................................................39, 42

*Heckler v. Ringer*,
   466 U.S. 602 (1984) ...................................................................................... 23, 24, 25, 26

*Herbert v. Nat'l Acad. of Sciences*,
   974 F.2d 192 (D.C. Cir. 1992) .................................................................................12

*Hollingsworth v. Duff*,
   444 F. Supp. 2d 61 (D.D.C. 2006) ...........................................................................12

*Huron v. Berry*,
   12 F. Supp. 3d 46 (D.D.C. 2013) .........................................................................20, 23

*In re Bluewater Network*,
   234 F.3d 1305 (D.C. Cir. 2000) ...........................................................................31, 33

*Jerome Stevens Pharmacy, Inc. v. FDA*,
   402 F.3d 1249 (D.C. Cir. 2005) ...............................................................................12

*Jovanovic v. US-Algeria Bus. Council*,
   561 F. Supp. 2d 103 (D.D.C. 2008) .........................................................................13

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) .............................................................................................31

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) .................................................................................................12

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,
   507 U.S. 163 (1993) .................................................................................................12

*Levine v. Saul*, No. 19-569WES, 2020 U.S. Dist. LEXIS 160631 (D.R.I. Sept. 3, 2020) .....33-36

*Long Island Care at Home, Ltd v. Coke*,
   551 U.S. 158 (2007) ...........................................................................................39, 43

*Lovitky v. Trump*,
   949 F.3d 753 (D. C. Cir. 2020) .................................................................................24

*Lubow v. United States Dep't of State*,
   783 F.3d 877 (D.C. Cir. 2015) ......................................................................15, 38, 43

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................16

*Marshall Cnty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ...............................................................................14

*McDaniel v. Israel*,
   534 F. Supp. 367 (W.D. Va. 1982) .............................................................. 33, 34, 35, 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Insurance Co.*,
    463 U.S. 29 (1983) ...................................................................................... 15

*New Hampshire Hosp. Ass'n v. Azar*,
    887 F.3d 62 (1st Cir. 2018) ......................................................................... 44

*Norton v. South Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ...................................................................................... 31

*Oryszak v. Sullivan*,
    576 F.3d 522 (D.C. Cir. 2009) ..................................................................... 26

*P & V Enters. v. Army Corps of Eng'rs*,
    466 F. Supp. 2d 134 (D.D.C. 2006) ............................................................. 36

*Parent/Professional Advocacy League v. City of Springfield*,
    *Ma.*, 934 F.3d 13 (1st Cir. 2019) ................................................................ 25

*Pauley v. BethEnergy Mines, Inc.*,
    501 U.S. 680 (1991) ..................................................................................... 15

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015) ....................................................................................... 44

*Petro-Chem Processing, Inc. v. EPA*,
    866 F.2d 433 (D.C. Cir. 1989) ............................................................... 20, 22

*Pittston Coal Group v. Sebben*,
    488 U.S. 105 (1988) ..................................................................................... 31

*Powderly v. Schweiker*,
    704 F.2d 1092 (9th Cir. 1983) ..................................................................... 44

*Resources Defense Council v. E.P.A.*,
    489 F.3d 1364 (D.C. Cir. 2007) ................................................................... 24

*Seized Prop. Recovery, Corp. v. U.S. Customs & Border Prot.*,
    502 F. Supp. 2d 50 (D.D.C. 2007) ................................................................. 1

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ..................................................................... 17

*Smith v. Berryhill*,
    139 S. Ct. 1765 (2019) ................................................................................. 24

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................... 19, 20

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) ......................................................................................37

*U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer*,
778 F. Supp. 2d 37 (D.D.C. 2011) ................................................................12

*United States*,
101 F.3d 1423 (D.C. Cir. 1996) ....................................................................17

*Univ. Med. Ctr. v. Shalala*,
173 F.3d 438 (D.C. Cir. 1999) ......................................................................14

*Washington v. D*OJ,
("CREW"), 846 F.3d 1235 (D.C. Cir. 2017) ...........................................27, 28

*Washington v. DOJ*,
164 F. Supp. 3d 145 (D.D.C. 2016) ..............................................................26

*Weinberger v. Salfi*,
422 U.S. 749 (2011) ......................................................................................23

*Williams v. Conner*,
522 F. Supp. 2d 92 (D.D.C. 2007) ................................................................27

*Women's Equity Action League v. Cavazos*,
("WEAL"), 906 F.2d 742 (D.C. Cir. 1990) ..................................................26

**Statutes**

5 U.S.C. § 500 ...........................................................................................30, 33, 36

5 U.S.C. § 553(b)(A) ...........................................................................................44

5 U.S.C. § 704 ................................................................................................4, 26

5 U.S.C. § 706 ......................................................................................................1

5 U.S.C. § 706(2) ................................................................................................14

5 U.S.C. §§ 552a(b) ..............................................................................................9

5 U.S.C. §§ 701-706 ............................................................................................26

15 U.S.C. § 7001 ..................................................................................................29

15 U.S.C. § 7004 ..................................................................................................30

28 U.S.C. § 2201-2202 ..........................................................................................1

28 U.S.C. § 2401(a) ................................................................................................36

28 U.S.C. §§ 1331 ..................................................................................................24

42 U.S.C. 301 ...........................................................................................................4

42 U.S.C. § 405(g) ....................................................................................3, 4, 23, 24

42 U.S.C. § 405(h) .............................................................................................23, 24

42 U.S.C. § 406 .........................................................................................................9

42 U.S.C. § 406(a) ..................................................................................................34

42 U.S.C. § 406(a)(1) ...........................................................................................9, 44

42 U.S.C. § 423(a)(1) ................................................................................................4

42 U.S.C. §§ 1381a ...................................................................................................4

# INTRODUCTION

In August 2020, Plaintiff United Spinal Association, Inc. ("United Spinal") filed the instant lawsuit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706,[1] asserting that Defendant's alleged "'wet ink' signature requirements" unreasonably interfere with "persons with disabilities ability to pursue their rights to federal disability benefits" and are contrary to law, arbitrary and capricious and are invalid because they were not adopted through notice-and-comment rulemaking. (Compl. ¶¶ 1-4, 6)  Plaintiff seeks an order invalidating these alleged requirements and directing the Social Security Administration ("SSA") "to accept electronic signatures for the purpose of applications submitted by representatives, as well as representative appointments and fee arrangements." (*Id*. ¶ 5)

Plaintiff's lawsuit, however, is based on a faulty premise, namely, that "wet ink" signatures of claimants are "require[d]" to obtain Social Security benefits.  To the contrary, SSA provides multiple options for claimants to apply for benefits, including the option to apply entirely by telephone with no hard copies or "wet ink" signatures required; an online application that claimants can personally sign and submit electronically; and a third-party online application process that can be initiated by someone else of the claimant's choosing and attested to by the claimant telephonically.  As to representative appointment forms, which Plaintiff also seeks to challenge,

---

[1]     Plaintiff also asserts that this case arises under the Declaratory Judgment Act, 28 U.S.C. § 2201-2202. (Compl. ¶ 6)  However, although that Act allows the Court to "'declare the rights and other legal relations of any interested party seeking such declaration,' 'it is not an independent source of federal subject matter jurisdiction.'" *Seized Prop. Recovery, Corp. v. U.S. Customs & Border Prot.*, 502 F. Supp. 2d 50, 64 (D.D.C. 2007)).  Remedies under the Declaratory Judgment Act are available only if a "judicially remediable right" already exists. *Gallucci v. Chao*, 374 F. Supp. 2d 121, 128-29 (D.D.C. 2005).  Accordingly, whether Plaintiff has asserted a viable claim rests entirely on whether Plaintiff has asserted a viable claim under the APA.

SSA currently accepts the appointment forms electronically signed by a claimant with a follow-up telephonic confirmation.[2]

To be sure, SSA also offers hard-copy options (requiring a wet ink signature) for applications and representative appointment forms. But providing an additional option is not contrary to law, as Plaintiff wrongly suggests. On the contrary, it is consistent with the provisions of the 21st Century Integrated Digital Experience Act ("IDEA"), 132 Stat. 5025 (Dec. 20, 2018), which *requires* agencies to "maintain an accessible method of completing digital services through in-person, paper-based, or other means, such that individuals without the ability to use digital services are not deprived of or impeded in access to those digital services." *Id.* § 4(e).

This case, therefore, does not concern "wet ink" signature requirements at all. Rather, Plaintiff seemingly contends that the agency's policy to require telephonic attestation for online applications submitted by third parties and telephonic confirmation of electronically submitted representation forms is contrary to law, arbitrary and capricious, or void for lack of notice-and-comment rulemaking. As discussed more fully below, Plaintiff has failed to identify *any* statutory mandate that would preclude use of a telephonic attestation or confirmation of an electronic signature as an additional authenticating step, nor has Plaintiff identified any statute that deprives SSA of discretion regarding its plans for transition to electronic signatures for the forms and online processes it utilizes, or mandates a complete transition to electronic signatures by a date certain.

---

[2]      Although the Complaint broadly references so-called "wet ink" signature requirements, its actual focus is far more limited as acknowledged by United Spinal in its motion for summary judgment. There, United Spinal frames the issue more narrowly, specifically, as concerning SSA's alleged failure to unconditionally "accept claimants' electronic signatures for [1] applications submitted by representatives on behalf of claimants applying for disability benefits or [2] for representative appointments and fee arrangements" without additional telephone processes. (Pl. Mot. at 1). To the extent United Spinal may contend that its claims should be read more broadly, it alleges insufficient facts – and presents insufficient evidence and argument on summary judgment – to proceed with respect to other Social Security forms.

Plaintiff's characterization of SSA's telephonic processes as "unnecessarily" burdensome is also without basis and is predicated entirely on conclusory allegations and conjecture. SSA's determination that a telephonic confirmation is warranted to guard against fraud or identity theft with respect to an application filed by a third party, and to guard against unauthorized disclosure of highly sensitive and personal information in connection with an appointment form, falls well within its broad discretion as the agency responsible for implementing the complex social security programs. As to the alleged "burden" of such telephonic processes, moreover, this Court already has rejected a similar argument in the related case, *National Federation of the Blind v. Saul*, Case No. 20-1160 (TSC), brought under Section 504 of the Rehabilitation Act of 1973. (Mem. Op. at 9, 11) The reasoning in that decision applies equally here. Finally, SSA's determination as to what constitutes an acceptable "signature" required by its regulations in varying contexts does not impose any new obligation, but falls within the category of "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice" that are exempt from notice-and-comment procedures under the APA.

This action also fails at the threshold for several reasons. First, as the sole Plaintiff, United Spinal has failed to plead that it has standing in its own right to challenge the third party application and representative appointment process. Instead, United Spinal appears to rely on an associational standing theory – that is, standing that is derivative of the standing of its members. Yet United Spinal has failed to plausibly plead any non-speculative, cognizable injury to any one of its members.

Second, were United Spinal to identify an individual member who experienced an injury as a result of the policies it seeks to challenge, United Spinal would need to plead that its member had presented his or her claim to the agency at the administrative level pursuant to 42 U.S.C. §

405(g) before the Court could even potentially exercise subject matter jurisdiction. No such allegations appear in the Complaint and associational standing, which is derivative in nature, cannot be based on the alleged standing of a member who has failed to meet the jurisdictional prerequisites for himself or herself to assert a claim in court.

Third, relief under the APA is limited to circumstances in which "there is no other adequate remedy in a court." *See* 5 U.S.C. § 704. Plaintiff's claims arise under the Social Security Act, 42 U.S.C. § 405(g), and thus are subject to the remedial scheme of that statute. Even if that remedial scheme were somehow inapplicable (and it is not), section 504 of the Rehabilitation Act would afford an "adequate" remedy if the claims had a basis, specifically, if the signature procedures for third party applications and representative appointments unlawfully burdened individuals with certain types of disabilities (here, limited hand dexterity due to spinal disorders (Compl. ¶ 63)).

For all of these reasons, as discussed more fully below, this Court should dismiss the Complaint or, alternatively, grant summary judgment in favor of SSA and deny Plaintiff's competing motion.

## BACKGROUND

## I.   Social Security Disability Insurance & Supplemental Security Income

Title II of the Social Security Act, 42 U.S.C. 301 *et seq.*, authorizes Social Security Disability Insurance ("SSDI") benefits to certain individuals with disabilities. 42 U.S.C. § 423(a)(1). Title XVI of the Social Security Act authorizes Supplemental Security Income ("SSI") payments to individuals with limited income and resources who are disabled, blind, or age 65 or older. *See* 42 U.S.C. §§ 1381a; 1382; 1382c.

The SSDI and SSI programs are complicated and particularly resource-intensive to administer—requiring the agency to obtain and analyze medical, vocational, and other records and,

for SSI, to engage in a complex inquiry related to claimants' income, resources, and living arrangements.  (Richardson Decl. ¶ 6)  On an annual basis, these programs together serve about 18 million beneficiaries and distribute more than $200 billion.  (*Id.* ¶ 5)  The scope and complexity of these programs means that any changes to SSA's processes and procedures must be coordinated with the utmost care and with meticulous attention to operational impact in order to avoid enormous loss of efficiency, protect claimant privacy, and deter fraud. (*Id.* ¶¶ 8–14)

Consequently, any new online application necessarily undergoes intensive development, testing, and review.  It must be compatible with SSA's information systems, be easy to navigate by the end-user, comport with SSA's complex programmatic statutory and regulatory criteria, and also comply with other applicable statutes, such as the Privacy Act.  (*Id.* ¶ 17)  As a result, SSA's development and roll out of tools such as online applications can occur only in phases and as resources allow.  (*Id.* ¶ 18)

## A.      First-Party Applications for SSDI & SSI

A claimant applies for SSDI or SSI through an application prescribed by SSA.  20 C.F.R. § 404.611(a).  Longstanding regulations require that a claimant's application for benefits must be signed by the claimant, subject to certain exceptions in which certain categories of people can sign for the claimant, including when the claimant cannot physically sign.  *See* 20 C.F.R. §§ 404.612(a)–(b), 416.315(a)–(b)).[3]  SSA, in an exercise of its discretion, determines the form and manner of "signature" that it considers acceptable on the application and other documents,

---

[3]      For instance, when a claimant cannot physically sign, the application can be signed by a court-appointed representative or a person who is responsible for the care of the claimant, including a relative.  *See* 20 C.F.R. §§ 404.612(b)-(c), 416.315(b)-(c).  *See also* Program Operations Manual System ("POMS") GN 00204.003(B)(1)(c) (an adult claimant does not need to sign the disability application if he is physically unable, which is further defined in POMS GN 00204.003B.4 to include an "individual who is paralyzed and unable to communicate clearly").

accounting for operational efficiencies as well as the risks of fraud and identity theft in the context presented.  (Richardson Decl. ¶ 13)

Applicants for SSDI can apply in-person (an option currently limited in light of the COVID-19 pandemic), by mail, by telephone, and online.  (Richardson Decl. ¶¶ 15, 28)  An online application for SSDI submitted by a claimant (i.e., a first-party online application) can be signed electronically by the claimant.  (*Id.* ¶ 28)  No "wet ink" signature is required, nor is the electronic signature confirmed through a telephonic attestation.  (*Id.*)  Instead, when an applicant goes online to complete and sign an application herself, the agency takes steps to authenticate her identity, thereby eliminating the need for further attestations after-the-fact.  (*Id.* ¶ 37)

Claimants seeking SSI payments can apply in-person, by mail, or by phone.  (Richardson Decl. ¶ 28)  Currently, given the complexities of the SSI program and application process, SSA does not offer a standalone online SSI application.  (*Id.,* ¶ 28 n.6) [4]  However, claimants who are concurrently applying online for SSDI and SSI and meet certain criteria can use the agency's online portal to initiate the SSI application for later telephone follow-up with an agency representative.  (*Id.*)  An agency employee will follow up with the claimant by phone to complete the SSI-specific portion of the application, in which a telephonic attestation serves as the requisite "signature."  (*Id*)

In short, first-party applications do not require wet-ink signatures.  If a claimant submits an application online on her own behalf, the claimant signs electronically.  (*Id.* ¶¶ 29-30) Claimants who choose to submit an application by phone also are not required to provide a wet-

---

[4]      For additional information about the complexities involved in the resource and income features of an SSI application, *see* https://www.ssa.gov/oact/ssir/SSI20/ssi2020.pdf (pages 88-93).

ink signature.  (*Id.* ¶ 28)  Rather, claimants use SSA's attestation process over the phone to sign their application.  (*Id.*)

## B.  Online Applications Submitted By A Third Party

Online applications submitted by a third party on the claimant's behalf also do not require "wet ink" signatures, though they do require an additional step.  As noted, a claimant must sign his or her own application (*See* 20 C.F.R. §§ 404.612(a)–(b), 416.315(a)–(b)).  At the time of submission, therefore, a third party application is not yet signed.

At that time, i.e., at the time a claimant is first applying for benefits, no formal "representative" has yet been appointed under normal agency procedures.  A third party application can be submitted by *anyone* on behalf of another individual.  (Richardson Decl. ¶ 38)  The agency then follows up with the claimant as described below.

After the agency receives the third-party online application, an SSA agent assigned to the online application will initiate telephone contact with the claimant.  In that telephone call, the agency seeks to verify that the applicant, in fact, wishes to make the application that was submitted on her behalf.  This involves a series of questions to verify the applicant's identity as well as her intention to make an application for benefits.  If the applicant verifies her identity and confirms her intention to file the application, the SSA agent will proceed to review the information the third party submitted and obtain any additional information that may be needed for the application.  The SSA agent will then obtain the claimant's signatures by telephone attestation for the application and Form SSA-827 (the form that authorizes SSA to obtain the claimant's medical records from other entities).  All of this happens in the normal course of events, without the applicant needing to initiate telephone contact with SSA.  No wet ink signatures or hard copies are required for completion of the application in this fashion.  (Richardson Dec. ¶¶ 32-36)

During the telephone call, the SSA technician will advise the claimant that he or she will *also* receive a notice with a copy of the Application Summary in the mail, but that it is not necessary to sign and return it because he or she has already provided the appropriate information and attestation or "signature" over the phone. (*Id.* ¶ 35)  If during the telephone call the claimant does not wish to utilize the telephone attestation, she may choose to sign and return the hard copy that arrives in the mail. (*Id.*).  Thus, while the claimant has the option to physically sign that hard-copy application and mail it back to SSA, she is not required to do so. (*Id.* ¶¶ 35-36).

There are also other processes a claimant can use to complete an online application submitted by a third party.  For example, the claimant can call the agency (without awaiting the agency's call) to finalize and effectuate the submission and is free to do so prior to receiving the hard copy application or the agency's telephone call (though it may result in needing to leave a message if the relevant agency representative is unavailable). (*Id.* ¶ 34 n.9)  A claimant's representative (or other third party) can also complete parts of the online SSDI application on behalf of the claimant, and the claimant can then complete the remainder of the application by working with an SSA agent over the telephone. (*Id.* ¶ 31 n.7)

## C.    Other Means For Claimants To Utilize Third Party Assistance to Submit Applications

If the claimant wishes to avoid the telephone or mail processes described above, there are several additional ways in which the claimant can receive assistance from a representative (or other third party) with respect to an initial online application that the claimant signs himself or herself. A third party may assist a claimant in completing an online application, either by sitting with the claimant when feasible, speaking with the claimant by telephone as the claimant moves through the application, or using Skype or similar video technologies as the claimant moves through the application.  In such circumstances, so long as the claimant will click the "sign" button in the

application herself, the application and related forms can all be completed with the claimant's electronic signature.  (*Id.* ¶ 30)

Claimants who wish to apply entirely by telephone (without using an online application) may have third parties on the phone during the phone application process if they elect to do so, as long as the claimant authorizes the third-party's participation.  (*Id.* ¶ 31 n.7)  If the third party has not yet been appointed as a representative, the agency will direct questions to the claimant, but the third-party may assist the applicant during that process.  (*Id.*)

## II.    Claimants Appointing a Representative

Claimants can choose to appoint representatives to assist them in the presentation of their cases to the agency.  42 U.S.C. § 406(a)(1).  Representatives can be attorneys or non-attorneys. (42 U.S.C. § 406; Richardson Decl. ¶ 40)

Very specific risks attach to appointment of representatives in administrative practice before SSA.  Once formally appointed, a representative is authorized to carry out multiple tasks on behalf of a claimant in SSA proceedings—in particular, to (1) obtain the same information about the claim as the claimant; (2) submit evidence; (3) make statements about facts and law; and (4) make a request or give any notice about the proceedings before SSA, *see* 20 C.F.R. §§ 404.1710(a), § 416.1510(a).  The representative will be given access to all of the medical evidence that the agency generates (through examinations and file-review) and all of the medical evidence (including psychological treatment records, if any) that the agency collects from the claimant's treating professionals.  (Richardson Decl. ¶ 40)  That means the agency is in the position of facilitating *disclosure* of highly sensitive, personal information about the claimant to the appointed representative – a matter strictly regulated by the Privacy Act, under which the agency can be held liable for improper disclosure.  *See* 5 U.S.C. §§ 552a(b), (g)(1)(D), (g)(4); *see also* § 552a(e)(10).

Based on these considerations, under agency regulations, claimants must submit a signed, written statement to SSA that advises SSA that the claimant has appointed an individual to represent him or her.  20 C.F.R. § 404.1707(a) (SSA cannot recognize a person as a claimant's representative without "written notice stating that [claimant] want[s] the person to be [their] representative in dealings with [SSA]").  The agency issued the current version of Section 404.1707(a) in 1980.  45 Fed. Reg. 52078, 52090 (Aug. 5, 1980).  The representative appointment is typically accomplished using Form SSA-1696.

Under long-standing written agency policy set forth in the agency's Program Operations Manual System ("POMS"), the claimant's signature on the written notice of appointment must be in ink.  *See* POMS GN 03910.040A.1.  However, there are exceptions to this wet ink signature requirement that are relevant here.  If an individual is physically unable to sign a written notice of appointment, there is an alternative process involving witnesses that can substitute for the claimant's signature.  *See id.*

Furthermore, in response to issues presented by the COVID-19 pandemic, SSA has put in place a temporary process through which wet-ink signatures are not required on the written notice of appointment.  (Richardson Decl. ¶ 44)  Under this temporary process, putative representatives can submit written notices of appointment with the claimant's electronic signature.  *Id.*  An SSA representative will subsequently call the claimant to verify the claimant's identity and confirm their intent to establish the appointment.  *Id.*  The agency also permits representatives to submit the fee agreement with a claimant's electronic signature if the representative submits the fee agreement and written notice of appointment together.  (*Id.* ¶ 45) With implementation of this new electronic signature/verbal confirmation process for appointment of a representative, the entire application and representative appointment processes can be completed with no "wet ink"

signature or use of the mail, even for claimants who are physically able to sign in wet ink on a paper document.  (*Id.* ¶ 46)

These temporary processes have been available to claimants and representatives since May 2020 and recently have been extended through the first half of 2021.  (*Id.* ¶¶ 44, 47) The agency is also looking ahead to permanent alternatives to wet signatures for representative appointment forms that would be permitted for all applicants.  Under current planning, in or before June 2021 (i.e., before the agency allows the temporary COVID protocol to expire), the agency intends to stand up an electronic version of the representative appointment form that will allow representatives and claimants to complete and sign the appointment form through an online means and without telephone confirmation.  (*Id.* ¶ 48) The agency will make one or more alternatives to wet ink signature appointments available on a permanent basis and will not revert to only offering a wet-ink-signature-required option, even for those claimants who are physically able to sign in ink.  (*Id.*)  The agency is also committed to facilitating electronic submission of representative fee agreements (form SSA-1693), which it plans to address after executing the permanent appointment solution described above.  The agency's current planning is to stand up an electronic process for the fee agreement within about 3 to 6 months after completing its work on the representative appointment form.  (*Id.* ¶¶ 48-49)

## LEGAL STANDARD

### I.     Rule 12(b)(1) Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance."  *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted).  "[I]t is presumed that a cause lies outside

[the federal courts'] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction.  *See, e.g.*, *U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011) (citing *Hollingsworth v. Duff*, 444 F. Supp. 2d 61, 63 (D.D.C. 2006)).  Thus, the "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim.'" *Id.* (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (internal citation and quotation marks omitted)).

More specifically, a Rule 12(b)(1) motion to dismiss for lack of jurisdiction may be presented as either a facial or factual challenge.  *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992) (a district court may "dispose of a motion to dismiss for lack of subject matter jurisdiction . . . on the complaint standing alone" or "may consider the complaint supplemented by undisputed facts").  "A facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint."  *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotations and citations omitted).

When a defendant makes a facial challenge, the district court must accept the allegations contained in the complaint as true and consider the factual allegations in the light most favorable to the non-moving party.  *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006).  With respect to a factual challenge, the district court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims.  *Jerome Stevens Pharmacy, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The plaintiff bears the burden of

establishing the factual predicates of jurisdiction by a preponderance of evidence. *Erby*, 424 F. Supp. 2d at 182.

## II.    Rule 12(b)(6) Standard

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint. In ruling on a motion to dismiss, the Court "must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Jovanovic v. US-Algeria Bus. Council*, 561 F. Supp. 2d 103, 110 (D.D.C. 2008).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Id.* at 555 (*quoting Conley v. Gibson*, 355 U.S. 41, 47, 78 (1957)); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The Court stated that while there was no "probability requirement at the pleading stage," *id.* at 556, "something beyond . . . mere possibility . . . must be alleged[.]" *Id.* at 557-58. The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id.* at 555, or must be sufficient to "state a claim for relief that is plausible on its face," *id.* at 570. The Court referred to this newly clarified standard as "the plausibility standard." *Id.* at 560-61 (abandoning the "no set of facts" language from *Conley v. Gibson*).

The Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), further clarified the plausibility pleading standard, explaining that this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* The plausibility standard "asks for more than a sheer possibility that a defendant acted unlawfully. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n] that the pleader is entitled to relief.'" *Id.* On a motion to dismiss, under Rule 12(b)(6), the Court may consider, in addition to the facts alleged in the complaint, documents either attached to, or incorporated into the complaint by reference, as well as matters of which it may take judicial notice. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997).

## III.    Rule 56

Where plaintiffs seek to set aside agency action, they must show that the action in question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "The entire case on review is a question of law, and only a question of law," and can be resolved in the context of a motion for summary judgment to the extent based on evidence that the Court considers to be extrinsic to the Complaint. *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001); *Univ. Med. Ctr. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999). In such cases, the district court generally does not resolve factual issues or duplicate agency fact-finding efforts, but instead functions as an appellate court addressing a legal issue. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply

. . . APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court.").

The arbitrary and capricious standard is "[h]ighly deferential," and "presumes the validity of agency decisions." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000). Deference is especially appropriate in areas that are "complex and highly technical." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991); *see, e.g., Am. Farm Bureau Fed. v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008).

In short, the scope of the Court's review is "narrow," and "the court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43 (1983); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The Court will consider whether the agency made a reasonable decision, not whether it made the best decision or the decision the Court may have reached had it considered the issue *de novo*. *See Lubow v. United States Dep't of State*, 783 F.3d 877, 887 (D.C. Cir. 2015).

## ARGUMENT

## I.      Plaintiff's Claims Should Be Dismissed Under Rule 12(b)(1) For Lack Of Subject Matter Jurisdiction and Standing

Standing is a necessary predicate to any exercise of federal jurisdiction and, when it is lacking, the dispute fails to present a concrete case or controversy under Article III. *Ariz. Christian Sch. Tuition Org. v. Winn,* 131 S. Ct. 1436, 1442 (2011); *Dominguez v. UAL Corp.,* 666 F.3d 1359, 1361 (D.C. Cir. 2012). To establish standing, Plaintiff must demonstrate that it suffered an injury-in-fact, specifically an injury that is "'concrete, particularized, and actual or imminent;'" that the injury is "'fairly traceable to the challenged action;'" and that it is "likely," not speculative, that the injury is "'redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l,* 568 U.S. 398, 409

(2013); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Plaintiff bears the burden of establishing each element.  *Lujan*, 504 U.S. at 561.

### A.  Plaintiff Has Failed To Plead Standing On Its Own Behalf

As alleged in the Complaint, United Spinal is a non-profit organization dedicated to enhancing the quality of life of all people living with spinal cord injuries and disorders, including veterans, and providing support and information to loved ones, care providers and professionals. (Compl. ¶ 9)  However, United Spinal, as an entity, is not a claimant for disability benefits, nor does United Spinal allege that it serves as a representative of claimants in the filing of applications with SSA for such benefits.  Indeed, while SSA's regulations permit "an attorney" and "a person other than an attorney" to represent a claimant, 20 C.F.R. 404.1705(a), (b), only individuals may act as representatives.[5]  As an entity, United Spinal cannot act in that capacity (*id*.) and does not allege that it does so.

Thus, United Spinal fails to allege that it has suffered any concrete injury that could confer it standing to sue in its own right; it does not even purport to bring the case to seek redress for harm to itself.  Instead, it alleges that it "brings the instant case o*n behalf of its members* who are living with spinal cord injuries and disorders, as well as their family members, caregivers, friends, and healthcare providers."  (Compl. ¶ 9) (emphasis supplied)[6]

---

[5]     The regulations define the term "entity" separate from the term "representative," who must be "an attorney" or "a person other than an attorney." 20 C.F.R. § 404.1703 ("*Entity* means any business, firm, or other association, including but not limited to partnerships, corporations, for-profit organizations, and not-for-profit organizations."); *see* 74 Fed. Reg. 48,381, 48,382 (Sept. 23, 2009) (stating that, with the term "entity," the rules "define[d] that term to exclude individuals"). Agency guidance further explains that representatives must be individuals. *See* POMS GN 03910.020B.

[6]     As noted, United Spinal expressly alleges that it brings suit "on behalf of its members" (i.e, not on its own behalf).  (Compl. ¶ 9)  It does not allege, therefore, that Defendant's alleged conduct has directly conflicted with its mission, nor does it plead facts that could plausibly support such a

**B.  Plaintiff Has Failed To Plead or Establish Associational Standing**

An organization may have standing to bring suit on behalf of its members, but only if its members would otherwise have standing to sue in their own right.[7]  *See, e.g., Sierra Club v. EPA,* 292 F.3d 895, 898 (D.C. Cir. 2002); *Am. Chemistry Council v. Dep't of Transp.,* 468 F.3d 810, 815 (D.C. Cir. 2006).  To the extent United Spinal asserts standing on this basis, United Spinal must, as a threshold matter, plead facts to establish that one of its members would have standing to sue in his or her own right.  Yet, no members of United Spinal have joined as plaintiffs in this action, nor does the Complaint plead any facts regarding the individual experience of any of its members in applying for disability benefits or submitting a representative appointment form.

**1.  Plaintiff Lacks Standing Because It Has Failed To Plead Or Establish That Any Of Its Members Suffered An Injury-In-Fact.**

United Spinal has failed to plausibly plead that any of its members suffered a concrete, particularized injury resulting from the currently available options for the submission of a third party application for benefits or representative appointment form.  The only paragraph in the Complaint that addresses the alleged effects of the so-called "wet ink" signature requirements on United Spinal's members is paragraph 63.  Indeed, that paragraph is the *only* basis in the record

---

contention as would be necessary to plead organizational standing (including injury in fact to itself). *Compare Abigail Alliance for Better Access to Dev. Drugs v. Von Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2016) (organizational standing was properly pled given allegations that defendant's conduct had "frustrated" the plaintiff's efforts to assist the public in accessing potentially life-saving drugs by causing a "drain" on its own resources); *see also Nat'l Treas. Emples. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("if the government's conduct does not directly conflict with the organization's mission, the alleged injury to the organization likely will be one that is shared by a large class of citizens and thus insufficient to establish injury in fact").

[7]     Although also purporting to sue on behalf of "family members, caregivers, friends, and healthcare providers" of its members, United Spinal has pled no facts that would establish its standing on that basis.  Accordingly, Defendant addresses the issue of associational standing on the basis of United Spinal's members.

cited in Plaintiff's motion to support its assertion that "United Spinal's members experience substantial burdens in the SSDI and SSI application processes as a result of SSA's rejection of claimants' electronic signatures for disability benefits applications submitted by representatives, representative appointments, and fee agreements." (Pl. Mot. at 22-23, citing "Compl. ¶ 63")

In that paragraph, United Spinal alleges that some, but not all, "individuals with spinal cord injuries and disorders may experience limited dexterity in their hands ranging from loss of strength or function to complete loss of use of the hands" and that "[s]ignificant loss of motor function in the hands makes producing a 'wet ink' signature difficult, if not impossible, and presents significant obstacles in fulfilling SSA's signature requirements for individuals seeking to use representatives' services in applying for SSDI and/or SSI through the online application process." (Comp. ¶ 63) United Spinal alleges generally that its members are "directly affected by SSA's 'wet ink' signature requirement" (*id*.) but not that any of its members have been prevented – or even impeded – from obtaining benefits or representation in the application process.

United Spinal also does not identify the nature of the alleged "significant obstacles in fulfilling SSA's signature requirements" for its members, which alone is an implausible allegation given the numerous options to "wet ink" signatures that SSA offers claimants. SSA does not require "wet ink" signatures to apply for benefits, either individually or through representatives. And paragraph 63, as well as the remainder of the Complaint, fails to allege that United Spinal's members who may have difficulty producing a "wet ink" signature have been unable, through the alternative means made available by SSA (including, among other things, telephonic attestation, online applications submitted by the claimants themselves or signatures on behalf of a claimant when a claimant cannot physically sign), to apply successfully for disability benefits or to complete representative appointment forms.

18

Nor has Plaintiff pled any measurable burden on its members as a result of these alternative methods beyond entirely conclusory and speculative allegations that lack any supporting factual basis regarding any member's individualized experience. (Compl. ¶¶ 80, 85, 95)  The Complaint thus lacks any factual basis for the assertion of "significant obstacles" with respect to SSA's signature options.  Ultimately, Plaintiff offers only generalized statistical information and general references to the complexity of the application process that would be applicable to all claimants, and that are not in any way unique to its members' particular disabilities.  (Pl. Mot. at 17, 27)  And although United Spinal seeks summary judgment, it offers no evidence whatsoever on point.

As regards Plaintiff's claim based on an alleged violation of the Agency Practices Act, which establishes eligibility requirements for attorneys to appear before federal agencies, Plaintiff further lacks standing because neither United Spinal, nor any of its members, are alleged to act in the capacity of licensed attorneys before the SSA to whom this statute applies.  *See* 5 U.S.C. § 550 (b).  Accordingly, for that additional reason it lacks standing to assert an APA claim based on the alleged violation of that statute.

Plaintiff instead appears to assert standing on the basis of a bare violation of statute, namely, based on alleged violations of the Agency Practice Act and the other identified statutes (the E-Sign Act and Government Paperwork Elimination Act) in the abstract rather than in a manner that has resulted in any injury-in-fact to its members.  Plaintiff contends that these statutes require SSA to accept third-party online applications and electronically signed representative appointment forms without the additional step of a telephonic attestation and that the alleged violation of these statutes alone suffices to establish the requisite harm.

However, in *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016), the Supreme Court held that allegations of a bare violation of a statute without alleged concrete harm is insufficient.  *Id.* at

1549.  The Court explained that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.*  Instead, "Article III standing requires a concrete injury even in the context of a statutory violation" and, "[f]or that reason, [a plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement." *Id.*  That is precisely what Plaintiff alleges and that is insufficient to establish standing.

### 2.  Plaintiff Lacks Standing Because Any Alleged Harm Is Voluntarily Assumed And Severs The Causal Link Necessary To Confer Standing.

Even if the Complaint could be read to adequately plead an injury-in-fact, any such alleged harm should be considered voluntarily assumed given the options offered by SSA for obtaining benefits that do not require a "wet ink" signature or even a telephone attestation.  It is well-settled that voluntarily assumed harm "severs the causal link necessary to establish standing." *Huron v. Berry,* 12 F. Supp. 3d 46, 52 (D.D.C. 2013) (citing *Petro-Chem Processing, Inc. v. EPA,* 866 F.2d 433, 438 (D.C. Cir. 1989); *Grocery Mfrs. Ass'n v. EPA,* 693 F.3d 169, 177 (D.C. Cir. 2012)).

Claimants, for instance, can apply for benefits themselves through a first party online application process that can be signed by the claimant electronically and that does not require a telephonic attestation.  A third party may also assist a claimant in completing a first party online application, either by sitting with the claimant when feasible, speaking with the claimant by telephone as the claimant moves through the application, or using Skype or similar video technologies as the claimant moves through the application.  (Richardson Decl. ¶ 30)  So long as the claimant will click and sign himself or herself, the application and related forms can be all be completed with the claimant's electronic signature.  (*Id.*)  No representative appointment form, moreover, is required for a third party to assist in this capacity.  (*Id.*)

United Spinal also does not allege that the type of disability experienced by its members interferes with its members' ability to complete first party online applications themselves.  The allegation instead is limited to the assertion that the loss of dexterity in the fingers experienced by some of its members makes it difficult for them to produce "wet ink" signatures.  (Compl. ¶ 63)  Although United Spinal alleges that the application form is complex (Compl. ¶ 35), it does not allege that that complexity is more challenging to its members a result of their specific disabilities than it is to any other member of the public. Relatedly, United Spinal does not allege that its members are prevented by their specific disabilities from completing an application with the assistance of a third party. As stated above, and explained in more detail below, that assistance can be provided in numerous ways, for both the first party and third party online applications, and the third-party providing the assistance need not be formally appointed to do so. (Richardson Decl. ¶ 30)  Although some of those options involve a telephonic attestation (some do not), none require a "wet ink" signature. (*Id.*)  Plaintiff has not alleged that its members' specific disabilities interfere with their ability to utilize these alternative options to "wet ink" signatures.

A telephonic attestation by the claimant is one potential option to complete an application submitted online by a third party.  An alternative option is for the claimant to submit an online application herself, which can be done with the assistance of a third party (i.e., by the third party being present with the claimant, by telephone, or through video technologies) as noted above. There are also multiple other alternatives, including applying entirely by telephone, with or without a third party on the line.  (Richardson Decl. ¶ 30 n.6)  Consequently, whether to have a third party submit an online application is a voluntary choice among several options.[8]

---

[8]     SSA observes that, in a situation where a third party completes an application on behalf of a claimant (rather than assisting the claimant in submitting the application by him/herself), the

Accordingly, even if the Complaint could be read as plausibly pleading any harm resulting from online third party application processes (which SSA denies as addressed above), that would be harm voluntarily undertaken and insufficient to establish standing as the D.C. Circuit has made clear in analogous contexts.  For instance, in *Petro-Chem*, a trade organization claimed it had standing to challenge an EPA regulation that authorized hazardous waste disposal in geologic repositories because it placed members in a "lose-lose" situation.  Although the regulations did not require the use of such repositories, the plaintiff alleged that its members were being placed in a position of having to choose between two competing economic interests:  if they chose not to use geologic repositories for hazardous waste disposal, they would lose potential business, but if they chose to use geologic repositories, they would face potential liability from leaking repositories. *Petro-Chem,* 866 F.2d at 438.

The D.C. Circuit concluded that the trade organization lacked standing to sue even though the regulation placed its members in the position of having to make this choice.  *Id.* ("It is of no moment for the inquiry at hand that they may be 'forced' by competitive pressures to choose" between these options.)  In other words, any alleged injury was self-inflicted because the choice between the two alternatives was voluntary.  *Petro-Chem,* 866 F.2d at 438; *see also Grocery Mfrs. Ass'n v. EPA,* 693 F.3d 169, 177 (D.C. Cir. 2012) (alleged harm resulting from a choice grounded in economics is a voluntary choice and any alleged resulting injury is a "'self-inflicted harm'").

Here, depending on the application, claimants have multiple options to apply for disability benefits, including through purely electronic means and through purely telephonic means, while other options combine an online option (or electronic signature) with a follow up telephonic

---

claimant still would need to participate in that process so that the third party provides correct information.

attestation.  That claimants may "reject a certain option because it is less favorable in some ways and more favorable in others does not transform an otherwise voluntary decision into a coerced one."  *Huron*, 12 F. Supp. 3d at 53.  Accordingly, even if Plaintiff could establish some added burden from the telephonic attestation process (which Defendant disputes as addressed above), any alleged burden is voluntarily assumed.  Standing, therefore, is lacking for this additional reason.

### 3.  Plaintiff Lacks Standing Because United Spinal Has Failed to Plead the Jurisdictional Presentment Requirements of 42 U.S.C. § 405(g).

Under section 405(h) of the Social Security Act, district courts lack jurisdiction over any claim brought against SSA "arising under" the Social Security Act except as set forth in section 405(g) of the Act.  *See* 42 U.S.C. § 405(h).  The "arising under" language is interpreted "quite broadly to include any claims in which 'both the standing and the substantive basis for the presentation' of the claims is the Social Security Act."  *Heckler v. Ringer*, 466 U.S. 602, 615 (1984).  Among other things, that language encompasses claims not only over "claimants' specific requests for benefits" but also over claims for injunctive and declaratory relief concerning the agency's underlying rules and policies.  *Id.* at 621 (holding that the "arising under" language applies to a lawsuit seeking to invalidate an agency rule that a certain medical procedure is not a covered service).

The fact that the relief sought is not an "award of benefits" is of no moment in the "arising under" analysis.  *See Ringer,* 466 U.S. at 623.  And just because another statute (or the Constitution) is "critical to" the complaint does not mean that the action does not "arise under" the Social Security Act.  *See Weinberger v. Salfi,* 422 U.S. 749, 760 (2011).  On the contrary, even when claims are based in part on other statutes or the Constitution, they still "arise under" the Social Security Act when, as here, the Social Security Act provides the "standing and the

23

substantive basis for the presentation" of those statutory or constitutional contentions. *Weinberger v. Salfi*, 422 U.S. 749, 760 (1975).

Here, Plaintiff pleads jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1361 (mandamus). (Compl. ¶ 7)  But this case is about permissible methods for seeking benefits under the Social Security Act.  By its terms, the Social Security Act precludes federal question jurisdiction for "any claim arising under" it.  42 U.S.C. § 405(h).  Mandamus jurisdiction – also invoked by Plaintiff (Compl. ¶ 7) – is questionable in any case arising under the Social Security Act, *see Ringer,* 466 U.S. at 616, and is lacking for additional reasons discussed *infra,* including the absence of a clear right to relief and a non-discretionary duty.  *Lovitky v. Trump,* 949 F.3d 753, 759 (D. C. Cir. 2020).

Once jurisdiction is properly understood to rest, if at all, on Section 405(g), it is clear that jurisdiction is deficient here.  Section 405(g) provides that an "individual" may obtain review of an agency decision in court, 42 U.S.C. § 405(g) (first sentence), and requires that the individual pursue her claim administratively before an action proceeds in court.  *Smith v. Berryhill,* 139 S. Ct. 1765, 1773 (2019).  To be sure, the requirement that the claimant proceed through every level of administrative review set forth in governing Social Security regulations is waivable.  *Id.*  But the Commissioner has not waived administrative exhaustion here.  Furthermore, there is an element of administrative exhaustion that is *jurisdictional* and, therefore, not waivable, i.e., the threshold requirement that the claim be "presented" to the agency.  *Id.*

Plaintiff cannot evade administrative exhaustion – including the jurisdictional requirement of presentment – by suing in its own name.  Associational standing is derivative of an individual member's standing to sue.  It requires that the association demonstrate that "at least one member would have standing under Article III to sue in his or her own right" and that, among other things,

"neither the claim asserted nor the relief requested requires that an individual member participate in the lawsuit." *National Resources Defense Council v. E.P.A.,* 489 F.3d 1364, 1370 (D.C. Cir. 2007). "Put another way, it would not make sense to allow the organizations here to escape the exhaustion requirement for the [members] they are purportedly representing. Otherwise, associational standing in this type of suit would be inconsistent with the Congressional requirement of exhaustion" in the applicable statute. *See, e.g., Parent/Professional Advocacy League v. City of Springfield, Ma.,* 934 F.3d 13, 34 (1st Cir. 2019).

In *Parent/Professional Advocacy League*, the Court found associational standing lacking because the students on whose behalf the organization purportedly was suing had not exhausted administrative remedies; the Court declined to allow such an "end run" around administrative exhaustion requirements. *Id.* Here, that concern is even more pronounced, as the "end run" that is being attempted concerns a jurisdictional prerequisite to suit, not merely a waivable administrative exhaustion process as was the case in *Parent/Professional Advocacy League*.

In all events, section 405(h) precludes the filing of any action against SSA if the jurisdictional prerequisite of presentment in section 405(g) is not satisfied. The Complaint here does not allege that United Spinal or any of its members satisfied that requirement. Accordingly, whether on the basis of standing or otherwise, this Court lacks jurisdiction over this litigation for that reason alone. *See also Heckler*, 466 U.S. at 622 ("Thus it is not the case that Ringer has no 'claim' cognizable under § 405(g); it is that he must pursue his claim under that section in the manner which Congress has provided. Because Ringer has not given the Secretary an opportunity to rule on a concrete claim for reimbursement, he has not satisfied the nonwaivable exhaustion requirement of § 405(g).")

**II.    Plaintiff's Claims Should Be Dismissed Under Rule 12(b)(6) Or, Alternatively, Summary Judgment Should Be Granted To Defendant.**

    **A.  The Social Security Act And/Or The Rehabilitation Act Provide An "Adequate Remedy" Precluding A Claim Under The APA. [9]**

Relief under the APA is limited to circumstances in which "there is no other adequate remedy in a court." *See* 5 U.S.C. § 704; *Women's Equity Action League v. Cavazos* ("*WEAL*"), 906 F.2d 742, 750-51 (D.C. Cir. 1990). Here, as already addressed above, Plaintiff's claims arise under the Social Security Act, which sets forth a specific statutory scheme for claimants to seek relief in connection with applications for benefits. Section 405(g) provides an "adequate remedy" that precludes any claim for relief under the APA. *See Heckler*, 466 U.S. at 617 ("Here respondents clearly have an adequate remedy in § 405(g) for challenging all aspects of the Secretary's denial of their claims for payment for the BCBR surgery, including any objections they have to the instructions or to the ruling if either ultimately should play a part in the Secretary's denial of their claims.")

Alternatively, were the Court to find that remedial scheme somehow inapplicable based on the manner in which this lawsuit has been framed, section 504 of the Rehabilitation Act, which is the basis of the related lawsuit, *National Federation of the Blind*, affords an "adequate" remedy to redress such claims, were they to have merit. Although SSA disputes the merits of that litigation,

---

[9]    "The judicial review provisions of the APA, 5 U.S.C. §§ 701-706, provide 'a limited cause of action for parties adversely affected by agency action'", but have been held by the D.C. Circuit not to be a jurisdictional bar. *Oryszak v. Sullivan*, 576 F.3d 522, 524-25 (D.C. Cir. 2009). Therefore, when the threshold requirements for APA review under sections 701 and 704 are not met, the proper vehicle for seeking dismissal is Rule 12(b)(6). *Id.* at 525. Courts on occasion, however, have "'loosely referred'" to the threshold requirements of the APA as "'jurisdictional.'" *Id.* at 525 n.2, thus creating a dispute among the district courts as to whether the availability of an alternative remedy should be assessed under Rule 12(b)(1) or Rule 12(b)(6). *Citizens for Responsibility & Ethics in Washington v. DOJ,* 164 F. Supp. 3d 145, 150 (D.D.C. 2016).

whether an "adequate remedy" exists for purposes of the APA is not dependent on the outcome of any specific lawsuit pursuing such a remedy. The question instead is whether Congress enacted a separate statutory scheme with the intention of creating a remedy for the conduct proscribed in the statute. *See Citizens v. Responsibility & Ethics in Washington v. DOJ ("CREW")*, 846 F.3d 1235, 1244-45 (D.C. Cir. 2017). The focus is "on whether a statute provides an independent cause of action or an alternative review procedure." *El Rio Santa Cruz Neighborhood Health Center, Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005).

An adequate "'alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.''" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *El Rio*, 396 F.3d at 1272). Moreover, the merits of any particular lawsuit has no bearing on whether an "adequate remedy is available" under the statutory scheme. *See, e.g., Williams v. Conner,* 522 F. Supp. 2d 92, 103 (D.D.C. 2007) (dismissing APA claim because adequate remedy existed under separate statutory scheme while at the same time dismissing plaintiff's claim under that statute as untimely); *CREW*, 846 F.3d at 1246 (determination that FOIA "offers an 'adequate remedy' within the meaning of section 704 such that CREW's APA claim is barred . . . is entirely distinct from the question whether CREW is entitled to relief"). For this additional reason, Plaintiff cannot pursue any claim under the APA.

### B.  Plaintiff Has Failed To Plausibly Plead A Claim Under The APA

Plaintiff asserts a violation of the APA on three grounds.

(1) Plaintiff alleges that "the 'wet ink' signature requirements are contrary to law and exceed the agency's authority under the law" because SSA's "rejection of electronic signatures violates federal statutes, including the decades-old E-SIGN Act and Government Paperwork Elimination Act, . . . impermissibly adds further conditions for

appearances by counsel before SSA beyond those permitted under the Agency Practice Act, and violates the First Amendment's protection for citizens seeking to petition and otherwise communicate with the government through the representatives of their choice."  (Compl. ¶ 2)

(2) Plaintiff alleges that the "'wet ink" signature requirements are "arbitrary and capricious because they not only lack a rational basis, but also are inconsistently applied" and "depend[] upon attributing inconsistent interpretations to the term 'sign' used in the governing regulations."  (Compl. ¶ 3)  Plaintiff asserts that "SSA allows an electronic signature on an application submitted by a claimant, and has not justified, and cannot logically justify, its failure to accept the same signature when a representative is appointed or submits the application on the claimant's behalf."  (*Id.*)

(3) Plaintiff alleges that the "'wet ink signature requirements, which appear only in SSA's program manual, amount to substantive rules affecting rights to benefits that are invalid because SSA did not adopt them through required notice-and-comment rulemaking."  (*Id.* ¶ 4)

Plaintiff reasserts these same grounds in its motion for summary judgment.  (Pl. Mot. at 1-2) Defendant addresses each of these assertions below, and establishes that each is legally deficient. Accordingly, in addition to the other reasons addressed above, the Court should dismiss the Complaint with prejudice for failure to plausibly plead a claim under the APA (or, to the extent the Court finds it necessary to rely on extrinsic evidence, alternatively grant summary judgment to SSA), and deny Plaintiff's motion for summary judgment.

**1.   The Challenged Procedures Are Not Contrary To Law.**

In evaluating whether the existing procedures are "contrary to law," the question is whether the statutes identified by Plaintiff, or the First Amendment (which Plaintiff also invokes), require SSA to accept a claimant's electronic signature on a third-party online application such that the current practice of relying on a telephonic attestation or hand-signed application summary by the claimant is unlawful; and, likewise, whether those statutes, or the First Amendment, require SSA to accept a claimant's electronic signature on a representative appointment form without the added step of confirming that signature through a claimant's telephonic attestation.   Neither the identified statutes, nor the First Amendment, even remotely renders these existing procedures unlawful.

Plaintiff contends that SSA's alleged failure to accept a claimant's electronic signature on a third-party online application and representative appointment form is unlawful on the basis of the Electronic Signatures in Global and National Commerce Act ("E-Sign Act"), 15 U.S.C. § 7001, et seq. (2000) and the Government Paperwork Elimination Act, 112 Stat. 2681, 2750 (1998). (Compl. ¶ 2)  In its summary judgment motion, Plaintiff adds that "SSA has separately also failed to comply with Congress's recent mandate in the 21st Century IDEA to accelerate the implementation of the E-SIGN Act."  (Pl. Mot. at 28)  As discussed below, Plaintiff's reliance on the IDEA and its unsupported conclusions related to IDEA – which was enacted in December 2018 – undermines Plaintiff's entire position because that statute recognizes that agencies have discretion regarding digitizing their forms and does not set any unconditional, final deadline for agencies to fully transition to acceptance of electronic signatures.  *See* 132 Stat. 5025 § 4(d), § 5.

Despite the language of the IDEA, Plaintiff nevertheless asks this Court to substitute its judgment for that of Congress and declare that SSA's alleged non-compliance "with these decades-old statutes is agency action unreasonably delayed that the Court should now compel" (Pl. Mot. at

28), something Congress has declined to do.  Plaintiff also contends that, by requiring claimants to provide a "wet ink" signature or phone confirmation of electronic signatures for representative appointments, SSA impermissibly imposes a requirement in excess of those established by the Agency Practice Act, 5 U.S.C. § 500, and also violates the First Amendment.  (Pl. Mot. at 38-39).  None of these arguments has merit.

### a.  The E-Sign Act and Government Paperwork Elimination Act

Plaintiff's reliance on the Government Paperwork Elimination Act and E-Sign Act is overstated.  Those statutes do not contain an unqualified directive that agencies accept electronic signatures in all circumstances, or by a particular date.  Instead, the former provides that the "Director of the Office of Management and Budget shall ensure that, commencing not later than five years after the date of enactment of this Act, [e]xecutive agencies provide . . . for the use and acceptance of electronic signatures, *when practicable*."  *See* Government Paperwork Elimination Act, 112 Stat. 2681-750 § 1704(2) (1998) (emphasis added).  Similarly, the E-Sign Act states that, "nothing in this title limits or supersedes any requirement by a Federal regulatory agency, self-regulatory organization, or State regulatory agency that records be filed with such agency or organization in accordance with specified standards or formats," subject to any continuing obligation under the Government Paperwork Elimination Act.  *See* E-Sign Act, 15 U.S.C. § 7004 (a) and (c)(2).  Thus, the E-Sign Act acknowledges that the law can *potentially* require governmental agencies to accept e-signatures for transactions to which the E-Sign Act applies and in accordance with specified formats, and the Government Paperwork Elimination Act provides terms under which that requirement exists—specifically, "when practicable."

Broad terms like "when practicable" do not dictate when action must be taken but afford agencies "broad policy discretion" in making that determination.  *See Alon Ref. Krotz Springs v.*

*EPA*, 936 F.3d 628, 655 (D.C. Cir. 2019); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2448-49 (2019) (Kavanaugh, J., concurring in the judgment) ("[S]ome cases involve regulations that employ broad and open-ended terms like 'reasonable,' '*appropriate*,' 'feasible,' or 'practicable.' Those kinds of terms afford agencies broad policy discretion, and courts allow an agency to reasonably exercise its discretion to choose among the options allowed by the text of the rule.")   Accordingly, Plaintiff's reliance on these statutes is misplaced for this additional reason.

In the absence of a clear, non-discretionary duty on the part of SSA, Plaintiff's assertion that SSA is in violation of these statutes should be rejected, and the Court likewise has no basis to compel agency action under section 706(1) of the APA.  *See, e.g., Pittston Coal Group v. Sebben*, 488 U.S. 105, 121 (1988); *see also Norton v. South Utah Wilderness Alliance*, 542 U.S. 55, 61, 65 (2004) ("*SUWA*") (when action is left to an agency's discretion, a court "has no power to specify what the action must be"); *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000) (in evaluating a claim for mandamus, the court "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act").

Plaintiff's invocation of the IDEA does not change this analysis because the IDEA also does not mandate a full transition to electronic signatures by a specified date but ultimately defers to agencies' discretion in completing that transition.  (Pl. Mot. at 5)  Section 4 of that statute sets a deadline of December 20, 2020 for agencies to make available "in a digital format that meets the requirements described in section 3(a)" any paper based form related to serving the public.  *See* IDEA, 132 Stat. 5025 § 4(c).  Although section 3(a) describes several requirements for the "digital format," none specify the unconditional acceptance of electronic signatures (or even reference electronic signatures) and the statute, moreover, requires only that the requirements in section 3(a) be addressed "to the greatest extent practicable."  *See* IDEA, 132 Stat. 5025, § 3(a) (1-8).  While

Congress established a compliance date of December 20, 2020 for digitizing forms in accordance with the requirements in section 3(a), which themselves only applied as "practicable" and thus remained subject to agency discretion, the statute also expressly recognized that it might not be practicable for agencies to fully transition all services into a digital format by December 20, 2020. Specifically, in recognition of that possibility, section 4(d) of the IDEA sets forth a reporting requirement as an alternative means of compliance. *Id.* § 4(d).

In terms of electronic signatures specifically, that term appears *only* in section 5 of the IDEA, which states: "Not later than 180 days after the date of the enactment of this Act, the head of each executive agency shall submit to the Director and the appropriate congressional committees a *plan to accelerate the use of electronic signatures standards* established under the [E-Sign Act]." *Id.* § 5 (emphasis added) Thus, the IDEA at most sets a date for agencies to provide "a plan to accelerate the use of electronic signatures standards," and not a deadline for agencies to fully transition to the unconditional acceptance of electronic signatures. Thus, rather than supporting Plaintiff's position, the IDEA recognizes that any failure by an agency to have fully transitioned to electronic signatures is not unlawful but rather part of a lawful, ongoing process.

Here, it is uncontested that SSA has a plethora of digitized forms, including the online SSDI application for both first parties and third parties; its digitized appointment form (SSA 1696) that, under its temporary COVID processes, can be submitted with electronic signatures (with telephone follow-up); and its forthcoming fully electronic representation appointment (SSA 1696) and fee agreement (SSA 1693) forms. To the extent SSA offers hard-copy options (requiring a wet ink signature) for applications and representative appointment forms, it does not require any claimant to use that option. Providing such an option is consistent with the IDEA's requirement that agencies "maintain an accessible method of completing digital services through in-person,

paper-based, or other means, such that individuals without the ability to use digital services are not deprived of or impeded in access to those digital services." *Id.* § 4(e).

### b. Plaintiff Has No APA Claim Based On The Agency Practices Act.

Over 40 years ago, SSA enacted 20 C.F.R. § 404.1707, which states in relevant part that SSA will "recognize a person as your representative if . . . [y]ou sign a written notice stating that you want the person to be your representative in dealings with us." *See* 20 C.F.R. § 404.1707(a) (Aug. 5, 1980)  That provision does not regulate an attorney's eligibility requirements for appearing before the SSA.  *Id.*  Instead, it "regulates only what is necessary for the SSA to recognize the *claimant's* appointment of an attorney to be their representative (*if* the claimant chooses to appoint one); that is, it calls for a written notice signed by the *claimant* stating they want the identified individual to be their representative in dealing with the SSA." *Levine v. Saul*, No. 19-569WES, 2020 U.S. Dist. LEXIS 160631, at *18 (D.R.I. Sept. 3, 2020).  Indeed, the regulation does not even require representatives who are attorneys to sign the representation notice. *See* 20 C.F.R. § 404.1707(b).

Nevertheless, relying on an obscure district court case from 1982, *McDaniel v. Israel*, 534 F. Supp. 367 (W.D. Va. 1982), Plaintiff contends that SSA's regulatory claimant signature requirement violates the Agency Practices Act, 5 U.S.C. § 500, at least when the third party representative is a licensed attorney.  (Pl. Mot. at 39)  That Act, according to Plaintiff, "prescribes that in order to represent individuals before an agency, a licensed attorney need only file 'with the agency a written declaration that [the attorney] is currently qualified as provided by this subsection and is authorized to represent the particular person in whose behalf [the attorney] acts.'" (*Id.*) Plaintiff contends that these limited requirements are "the outer limits on what any agency can require for an attorney to practice before it" and that "by requiring claimants to provide a 'wet ink'

33

signature or phone confirmation for representative appointments, SSA impermissibly imposes a requirement in excess of those established by the Agency Practice Act." (*Id.*) Plaintiff concludes, therefore, that any signature requirement on the representative appointment form – at least when the representative is an attorney – is contrary to law and thus violates the APA.

To be clear, under Plaintiff's theory, *any* requirement that a claimant sign a representative appointment form when the representative is an attorney necessarily violates the Agency Practices Act, regardless of whether the signature is a "wet ink" signature, a signature via telephone attestation, or an electronic signature – because in Plaintiff's view, *any* form of claimant signature goes beyond the "outer limits" of what is required by that Act. Thus, as a threshold matter, the relief requested by Plaintiff – an order directing SSA to "accept electronic signatures for the purpose of . . . representative appointments and fee arrangements" (Compl. ¶ 5) – itself would violate the Agency Practices Act according to Plaintiff's own interpretation. That inherent contradiction in Plaintiff's position is fatal to Plaintiff's claim and an implicit acknowledgment that Plaintiff overstates the applicability of that Act to the benefit application process.

Plaintiff's argument also is inapt for multiple additional reasons. First, Plaintiff lacks standing to press the argument, since it is an entity and, as such, is not authorized to represent claimants in Social Security proceedings (nor does it plead that it does so). *See supra* note 5. Second, Plaintiff is conflating a statute and regulatory provision that serve different purposes. The Agency Procedures Act serves a limited purpose, namely, to establish uniform attorney admission requirements for eligibility to practice before a federal agency. Those requirements are similar to 42 U.S.C. § 406(a), which establishes similar attorney admission requirements for eligibility to practice before the SSA specifically. *Levine*, 2020 U.S. Dist. LEXIS 160631, at *16. The SSA regulation that governs attorney eligibility requirements, moreover, is not section 404.1707, but

section 404.1705. *Id.* at *19. That regulation, which requires that attorneys be members of a bar in good standing and not be disqualified or suspended from dealing with the SSA, is consistent with the provisions of both statutes. *See* 20 C.F.R. § 404.1705(a).

In contrast, the "clear and unambiguous language of 20 C.F.R. § 404.1707 regulates only what is necessary for the SSA to recognize the *claimant's* appointment of an attorney to be their representative (*if* the claimant chooses to appoint one); that is, it calls for a written notice signed by the *claimant* stating they want the identified individual to be their representative in dealing with the SSA." *Levine,* 2020 U.S. Dist. LEXIS 160631, at *18. Once a representative is appointed, the agency will make disclosures to the representative of highly sensitive medical and other personally identifiable information about the claimant – a matter strictly governed by the Privacy Act. That is because in administrative proceedings before SSA, an appointed representative may "[o]btain information about [the] claim to the same extent that [the claimant is] able to do…." 20 C.F.R. § 404.1710(a) and § 416.1510(a). Accordingly, as the agency clarified at the time it promulgated the regulation requiring the claimant to sign a written notice that he or she wishes to appoint the representative, "the 'purpose of this requirement is to protect confidential personal information from unauthorized disclosure, while facilitating its release to designated representatives.'" *Id.* (citing 45 Fed. Reg. 52078, 52078 (August 5, 1980)).

In short, the regulation on which Plaintiff bases its argument – 20 C.F.R. § 404.1707(b) – imposes no obligation on attorneys, nor does it impose any additional attorney eligibility requirements. Consistent with the Agency Practices Act, an attorney's eligibility to appear before the SSA is governed by section 404.1705, which requires only that the attorney be a member of a bar in good standing and not be disqualified or suspended from dealing with SSA. *See* 20 C.F.R. § 404.1705(a).

Plaintiff's reliance on *McDaniel* is therefore misplaced because *McDaniel* fails to contend with these distinctions.  As explained in *Levine*,

> *McDaniel* overlooks that § 404.1707 merely sets out the requirement for the claimant's notice of appointment of a representative; it is § 404.1705 that sets out the attorney admission/eligibility requirements for "[w]ho may be [a] representative." Further, *McDaniel* contradicts its own finding that § 404.1707 is "squarely in conflict" with 5 U.S.C. § 500 in also finding that the "provisions of [§ 404.1707] do not expressly controvert the provisions of" 5 U.S.C. §§ 500, *et seq.* Tacitly acknowledging that its outcome may be error, *McDaniel* subsequently amended the judgment to eliminate class relief and to limit its applicability to the attorney representing the named plaintiffs only.

*Id.* at \*19-20 (citations omitted).  This Court should reject *McDaniel* for the same reasons.

Plaintiff's challenge to section 404.1707 also is facially time barred.  "Every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a).  Actions challenging "agency regulations, like any other civil action filed against the United States, are subject to § 2401(a)'s six-year limitations period." *P & V Enters. v. Army Corps of Eng'rs*, 466 F. Supp. 2d 134, 143 (D.D.C. 2006) (concluding that plaintiff's 2005 challenge to Section 328.3(a)(3) was untimely because that regulation "became 'final agency action' for the purpose of § 2401(a) when it was first promulgated in 1986").

The Agency Practices Act became law in 1965, *McDaniel*, 534 F. Supp. at 369, and section 404.1707 was enacted in 1980.  Accordingly, any challenge at this time under the APA based on section 404.1707 is untimely and should be rejected for that additional reason.

### c. **Plaintiff Fails To State An APA Claim Based On The First Amendment**.

Plaintiff also contends that "SSA's unjustifiable interference with claimants' ability to appoint and use representatives for advice throughout this complicated process violates claimants' right to petition the government" under the First Amendment and, therefore, is contrary to law

under the APA. (Pl. Mot. at 41) By "complicated process," Defendant understands Plaintiff to be referencing the existing process by which a claimant can sign a representative appointment form either with a "wet ink" signature, or electronically subject to a telephonic attestation.

Plaintiff, however, has failed to plausibly allege how either process unconstitutionally burdens any of its members' ability to obtain representation in the benefit application process. Even if one were to assume for the sake of argument that the First Amendment is implicated by these processes (which Defendant contests), Plaintiff would need to demonstrate a "severe burden" on its right to petition in order to avail itself of close scrutiny; any lesser burdens "trigger less exacting review." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997). To be severe, any burden must "go beyond the merely inconvenient." *Crawford v. Marion Cty. Election Bd.,* 553 U.S. 181, 205 (2008) (Scalia, J., concurring in the judgment).

Here, as already explained, the agency has permanent policies in place allowing signatures from other appropriate individuals when a claimant is physically unable to sign documents. (Richardson Decl. at ¶¶ 31, 42); 20 C.F.R. §§ 404.612(b)-(c), 416.315(b)-(c); POMS GN 00204.003(B)(1)(c); POMS GN 02190.040A.1. The agency also has temporary COVID-19 processes in place for *all* claimants that allow electronic signatures on representative appointments with follow-up attestation by telephone (and will soon be migrating to a fully electronic process for same). (Richardson Dec. ¶¶ 44-49) As for applications, the agency has always permitted representatives or other third parties to assist a claimant in applying in person, by telephone or online; and when the claimant chooses to proceed by a third party online application, the agency follows up by both telephone and mail for an attestation or signature such that the claimant may finalize the application through either means. (Richardson Decl. ¶¶ 30-36) The agency has good

(and certainly rational) reasons for its policies, including fraud prevention and protection of highly sensitive personal information required by law.

For its part, Plaintiff has not alleged, nor presented a shred of evidence, showing meaningful impediments to its members' ability to petition the agency in light of the panoply of available processes for establishing representative engagements and submitting applications. Any assertion of "burden" in the Complaint is entirely conclusory, lacking any supporting factual basis regarding any member's individual circumstances. (Compl. ¶¶ 80, 85, 95) Plaintiff fails to state a claim for relief and, regardless, cannot survive summary judgment on this totally deficient record.

### 2. SSA's Assessment Of What Constitutes An Acceptable "Signature" In Different Contexts Is Not Arbitrary Or Capricious

Plaintiff alleges that SSA's "'wet ink" signature requirements are "arbitrary and capricious because they not only lack a rational basis, but also are inconsistently applied" and "depend[] upon attributing inconsistent interpretations to the term 'sign' used in the governing regulations." (Compl. ¶ 3) Plaintiff asserts that "SSA allows an electronic signature on an application submitted by a claimant, and has not justified, and cannot logically justify, its failure to accept the same signature when a representative is appointed or submits the application on the claimant's behalf." (*Id.*) These assertions fail to state a claim or, alternatively, summary judgment should be granted to SSA under the deferential APA standard of review.

The question presented in an APA challenge is limited to whether the agency made a reasonable decision, not whether it made the best decision or the decision the Court may have reached had it considered the issue *de novo. See Lubow v. United States Dep't of State,* 783 F.3d 877, 887 (D.C. Cir. 2015) ("But under the APA's standard of review, 'a court is not to substitute its judgment for that of the agency.' . . . Instead, we ask whether the agency's decision 'was based on a consideration of the relevant factors' and whether 'there has been a clear error of judgment.'").

And in making that assessment, the Court may consider declarations by the agency that provide uncontroversial background information underlying the agency's decision. *Clifford v. Peña*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (internal quotation omitted); *see also Long Island Care at Home, Ltd v. Coke*, 551 U.S. 158, 171 (2007) ("Where, as here, an agency's course of action indicates that the interpretation of its own regulation reflects its considered views--the Department has clearly struggled with the third-party-employment question since at least 1993--we have accepted that interpretation as the agency's own, even if the agency set those views forth in a legal brief.")

Courts, moreover, have recognized that SSA has considerable discretion in administering the Social Security Act.  The "complexity" of the Act, "the vast number of claims that it engenders, and the consequent need for agency expertise and administrative experience" require the courts to "read the statute as delegating to the Agency considerable authority to fill in, through interpretation, matters of detail related to its administration." *Barnhart v. Walton*, 535 U.S. 212, 225 (2001). SSA receives nearly 2.5 million annual disability claims, more than 1.8 million claims for supplemental security income, and more than 6 million claims for retirement and survivor's benefits.  (Richardson Decl. ¶ 3)  As the Supreme Court has observed, in fulfilling its mission to serve tens of millions of Americans and adjudicate an unparalleled number of claims, SSA operates what is likely the largest adjudicative system in the western world, and its need for efficiency is "self-evident."  Social Security Ruling (SSR) 19-1p, n.7 (quoting *Barnhart v. Thomas*, 540 U.S. 20, 28-29 (2003), and *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983)).  Given the deferential standard for evaluating agency decisionmaking under the APA that lies with *any* agency charged with administering the particular statute in question, and given the complexity of the Social Security Act and the massive adjudicative system it engenders, Plaintiff's focus on regulations

promulgated by other agencies as somehow requiring SSA to act in lock-step (Pl. Mot. at 12-15) is utterly misplaced.

Plaintiff's other arguments are equally baseless.  Plaintiff contends that SSA "allows claimants to submit their own applications electronically, requires representatives to submit appeals online, and allows those applicants filing on their own behalf to authorize the release of sensitive medical information through an electronic signature, . . . , yet will not accept electronic signatures as valid when claimants seek to involve a representative in submitting their claims[.]" (Pl. Mot. at 32)  Plaintiff also contends that "SSA has even interpreted the word 'sign' in the regulations governing representative appointments to mean different things, depending on whether the signatory is a claimant or representative."  (Pl. Mot. at 33)  But SSA has articulated a rational basis for having different rules for what it deems an acceptable "signature" in different contexts.

Before addressing those reasons, Plaintiff's argument fails at the threshold because SSA *does* recognize electronic signatures by claimants on representative appointment forms, albeit subject to confirmation of the electronic signature over the telephone, a step that completes the "signing process."  Although that process has been characterized by SSA as a temporary COVID protocol, under current planning, in or before June 2021 (before the agency allows the temporary COVID protocol to expire), SSA intends to stand up an electronic version of the representative appointment form that will allow representatives and claimants to complete and sign the appointment form through an online means and without telephone confirmation.  (Richardson Decl. ¶ 48)  Accordingly, to the extent Plaintiff's arguments are based on the premise that SSA only accepts "wet ink" signatures by claimants on representative appointment forms, those arguments are outdated and moot.

Contrary to Plaintiff's assertions, moreover, SSA has valid reasons for its acceptance of electronic signatures in certain contexts and not others.  The agency collects – and must scrupulously protect – an enormous compendium of highly sensitive personal information from millions of people.  That information includes personally identifiable information ("PII") such as a claimant's Social Security number, address, and date of birth, as well as a trove of especially sensitive information, including: medical records; mental health treatment records; alcohol and drug abuse treatment records; family and household composition; and detailed financial accounts, earnings, and resource information.  (Richardson Decl. ¶ 10)

SSA not only collects enormous quantities of sensitive information, but in some situations, including situations in which the claimant has appointed a representative, it *discloses* such information as well.  For example, when SSA issues decisional documents, it must provide them to not only the claimant, but also the claimant's appointed representative.  By way of additional example, when an appointed representative is preparing for a hearing, all of the claimant's relevant sensitive records are compiled and available for the representative to review.  (*Id.* ¶ 11)  Pursuant to agency regulations, an appointed representative may "[o]btain information about [the] claim to the same extent that [the claimant is] able to do." 20 C.F.R. § 404.1710(a) and § 416.1510(a).

SSA must also protect PII and sensitive information against fraud, including but not limited to identity theft.  Proper security and safeguarding procedures are essential to prevent unauthorized persons from gaining inappropriate access to PII and sensitive information.   (Richardson Decl. ¶ 12)  Consequently, SSA's applications and business processes that allow the public to transact business with SSA electronically – including through the use of electronic signatures – must be designed in a way to protect the privacy, integrity, and ensure security of the public's data, and those business processes must also remain operationally efficient.  (*Id.* ¶ 13)

41

For all of those reasons, the third party online application path and the first party online application path are different.  Although Plaintiff fails to meaningfully acknowledge the point, fraud risks associated with online applications for benefits are significant.  To mitigate risk, when an applicant goes online to complete and sign an application on her or her own behalf, the applicant generally does so after the agency has already authenticated her identity.  (*Id.* ¶ 37)  As explained in SSA's website, one of the agency's "most important responsibilities" is protecting the individual's "investment and personal information."  In line with federal protocols, it uses "security measures so we can be sure that you are who you say you are when you conduct online business with us."  (*Id.*; *see also* https://www.ssa.gov/myaccount/security.html.)

In contrast, third party applications can be inputted by anyone (including non-attorneys). Consequently, when an application is submitted online by a third party, the agency follows up separately with the claimant to ensure he or she wishes to make an application.  (Richardson Decl. ¶ 38)

Likewise, given the extensive access to sensitive information that is available to a claimant's appointed representative, SSA has long required that claimants submit a signed, written statement to SSA appointing an individual to represent him or her.  *See* 20 C.F.R. § 404.1707(a) (SSA cannot recognize a person as a claimant's representative without "written notice stating that [claimant] want[s] the person to be [their] representative in dealings with [SSA]").  The agency's policy requiring a claimant to provide a "wet ink" signature, as reflected in POMS GN 3910.040.A.1, is consistent with its longstanding informed consent policy, which is designed to minimize improper disclosures of the record holder's PII or other sensitive information to an unauthorized individual. *See* 45 Fed. Reg. 52078, 52078 (August 5, 1980) (stating that the purpose

of the signature requirement "is to protect confidential personal information from unauthorized disclosure, while facilitating its release to designated representatives").

Since May 2020, moreover, the agency has accepted a claimant's electronic signature on a representative appointment form, subject to the claimant confirming the signature over the telephone. SSA determined that telephonic confirmation step was necessary to complete the signing process, and help protect claimants' sensitive information from improper disclosure to third parties and to guard against fraud. Similarly, SSA has initiated necessary protocols that will allow it to responsibly stand up an electronic version of the representative appointment form that will allow representatives and claimants to complete and sign the appointment form through an online means and without telephone confirmation. That process is currently in development and is slated for release by June 2021 (Richardson Decl. ¶ 48).

Thus, all of the case authority cited by Plaintiff is inapposite. Unlike the agencies in those cases, SSA has offered a rational basis for its different treatment of what constitutes an acceptable "signature" in different contexts based on its expertise and the discretion afforded to it as the administrator of the complex social security system. *Barnhart*, 535 U.S. at 225.[10] This Court is "not to" substitute its judgment in such matters. *Lubow*, 783 F.3d at 887. And, an agency's interpretation of its own regulations is "'controlling' unless 'plainly erroneous or inconsistent with the regulation.'" *Long Island Care at Home*, 551 U.S. at 171. Plaintiff has failed to establish either.

---

[10]     In light of the considerable decisionmaking afforded to the SSA, Plaintiff's conclusory assertion that SSA has exceeded its authority in assessing what constitutes an acceptable "signature" in different contexts pursuant to the "signature" requirement in its regulations is without merit. (Compl. ¶ 65)

### 3. The Challenged Procedures Do Not Violate Notice-And-Comment Rulemaking Procedures.

The APA's notice-and-comment requirement does not apply to procedures that reflect SSA's determination as to the form and manner of the "signature" requirement in existing regulations. The APA exempts such "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice," from notice-and-comment procedures. 5 U.S.C. § 553(b)(A); *see Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983) (holding that provisions of SSA claims manual were exempt).

SSA's guidance manuals simply interpret or provide rules of procedure that allow the agency to implement the statutory (42 U.S.C. § 406(a)(1)) and regulatory (20 C.F.R. § 404.1700 *et seq.*) regime for the representation of claimants, "advis[ing] the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted).  Plaintiff identifies no procedure that, on its own, "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

Plaintiff acknowledges that, through notice-and-comment rulemaking, the agency requires that claimant's application for benefits must be signed.  (Pl. Mot. at 42, citing 20 C.F.R. §§ 404.612(a)–(b), 416.315(a)–(b)). SSA's policies afford multiple options for claimants to comply with this regulatory requirement – ranging from electronic signatures on first party applications to telephonic attestation of third party online applications to "wet ink" signatures on hard copy applications – and do not impose obligations that are not already established by regulation.  They simply specify the form and manner of "signatures" that the agency will accept under the existing regulatory requirement based on the different risks posed and available security protocols for first party versus third party applications.  (Richardson Decl. ¶ 14)

With respect to the written notice of appointment for representatives, SSA's policies of requiring a "wet ink" signature by the claimant on that document or, more recently allowing telephonic confirmation of an electronic signature as an alternative to a "wet ink" signature, also do not add any new obligation.  Rather, they establish the form and manner of "signatures" that the agency will accept within the contours of a longstanding regulation established through notice and comment rulemaking that requires a claimant's signature on an appointment form.  *See* 20 C.F.R. § 404.1707(a).

The agency's original requirement of "wet ink" signature was consistent with the purpose of that regulatory requirement which was "to protect confidential personal information from unauthorized disclosure, while facilitating its release to designated representatives." *See* 45 Fed. Reg. 52078, 52078 (August 5, 1980).  The recent addition of an electronic signature option that is confirmed through a telephone call is likewise consistent with the underlying rationale for the regulation.  And, to the extent Plaintiff's argument rests exclusively on POMS GN 3910.040.A.1, which imposed a "wet ink" signature requirement on appointment forms, any procedural challenge to that policy is moot given the currently available alternative.

## CONCLUSION

For the reasons stated herein, the Court should deny Plaintiff's motion for summary judgment and instead grant Defendant's motion and dismiss this action with prejudice.

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN, D.C. BAR # 924092
Civil Chief

By: _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956

45

Assistant United States Attorney
Civil Division
555 4th Street, N.W. Washington, D.C. 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

 Counsel for Defendant