**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED SPINAL ASSOCIATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARTIN O'MALLEY, <br><br> Defendant. | Civil Action No. 20-cv-2236 (TSC) |

**<u>MEMORANDUM OPINION</u>**

Plaintiff—an organization representing individuals with spinal cord injuries and disorders—sued the Social Security Administration ("SSA"), alleging that it requires wet-ink signatures in situations where electronic signatures must be accepted, in violation of the Administrative Procedure Act ("APA"). Since this case was filed in 2020, the SSA has increased its use of electronic signatures, but still does not treat wet-ink and electronic signatures equally in all circumstances.

Plaintiff has moved for summary judgment, and Defendant has cross moved to dismiss, or, in the alternative, for summary judgment. Having considered the record and the briefing, the court will DENY Plaintiff's Motion and GRANT Defendant's Motion.

## I.    BACKGROUND

### A.    Legal Background

#### i.    *Legal framework at the time of filing*

In 1998, Congress enacted the Government Paperwork Elimination Act, Pub. L. No. 105-277, 112 Stat. 2681, 2751 (1998), which required that "electronic signatures submitted or maintained in accordance with procedures developed under this title, or other forms of electronic

authentication used in accordance with such procedures, shall not be denied legal effect." This Act gave agencies five years—until 2003—to provide for the "use and acceptance of electronic signatures" "when practicable." *Id.* at 2750. Two years later, Congress enacted the Electronic Signatures in Global National Commerce Act, Pub. L. No. 106-229, 114 Stat. 464 (2000) ("E-SIGN Act"). The E-SIGN Act provides that "a signature, contract, or other record relating to" a transaction in interstate commerce "may not be denied legal effect validity, or enforceability solely because it is in electronic form." 15 U.S.C. § 7001(a)(1).

As of 2018, federal agencies lagged in making electronic signatures available under the Government Paperwork Elimination Act and the E-SIGN Act. *See* Compl. ¶ 16. Consequently, Congress enacted the 21st Century Integrated Digital Experiences Act, Pub. L. No. 115-336, 132 Stat. 5025, 5026–27 (2018), which required the head of each agency to submit "a plan to accelerate the use of electronic signatures," review paper-based forms and services and determine to what extent they can be made digital, ensure that, within two years, "any paper based form that is related to serving the public is made available in digital format," and, for any form that cannot be made digital, explain why and provide potential solutions.

In 2020, however, the SSA still required wet-ink signatures from claimants in several situations. First, to obtain Social Security Disability Insurance ("SSDI") benefits, a claimant had to submit several documents, including the application itself, W-2 forms, a medical release form, medical records, reports from doctors, and test results. Compl. ¶ 24. A claimant could submit these documents online, mail them in, or make an appointment with an SSA agent, either in person or by phone. *Id.* ¶ 27. Claimants submitting the application themselves—rather than through a chosen representative—could electronically sign the online application, but not all claimants were eligible to submit an online application. *See id.* ¶¶ 28–30. Claimants who made

an appointment with an SSA agent, either by phone or in person, also did not need to hand-sign the application.  *Id.* ¶ 31.  Claimants who submitted applications by mail, however, were required to include a wet-ink signature.  *Id.* ¶ 32.  And, if a claimant used a chosen representative to submit the SSDI application and was not physically present to electronically sign the application, the claimant was required to verify the electronic submission telephonically or provide a wet-ink signature.  *Id.* ¶ 30.

Second, appealing a SSDI decision did not require an actual signature, *id.* ¶ 38, but if the claimant wished to appoint a representative to assist with their appeal, the claimant was required to sign a written notice, *id.* ¶ 46.  Although the SSA's regulations did not specify the type of signature required, its program manual provides that the SSA did not accept electronic signatures to appoint representatives.  *Id.* ¶ 49.  And finally, if a claimant sought past-due benefits following an appeal, the Commissioner would approve a fee for the representative if the claimant and the representative provided the SSA with an agreement between the claimant and the representative. *Id.* ¶ 51.  Again, even though regulations did not specify which kind of signature was required, the SSA's program manual required a wet-ink signature.  *Id.* ¶¶ 52–53.

### ii.   *Subsequent legal developments*

In 2021, the SSA made the representative appointment form and the fee agreement form available electronically.  Clemons Decl., ECF No. 27-2 ¶¶ 5–6.  Consequently, both forms can now be completed with an electronic signature, and do not require a wet-ink signature.  *See id.* Although these electronic forms were initially created because of the COVID-19 pandemic, they are "not temporary."  *Id.* ¶ 7.

In 2022, the SSA published its Equity Action Plan, which stated that efforts were underway to "remove requirements that applicants or beneficiaries must provide physical

signatures." *See* Min. Order, April 27, 2022. As of May 2022, an SSA representative explained

that it was "working to allocate resources for future technology development related to an online

version of [a] simplified SSI application," projecting that its development would begin in fiscal

year 2023. Evangelista Decl., ECF No. 31-1 ¶ 4. The SSA has not provided any further

declarations clarifying whether this process did indeed begin in 2023, or whether any other

progress has been made since this declaration was filed, however.

**B.      Factual and Procedural Background**

Plaintiff is a nonprofit organization dedicated to enhancing the quality of life of people

living with spinal cord injuries and disorders, particularly veterans, and providing support to

their loved ones, healthcare providers, and other professionals. Compl. ¶ 9. A "major focus" of

Plaintiff's work is preserving SSDI benefits and ensuring claimants receive those benefits as

quickly as possible. *Id.* ¶ 62. Plaintiff claims that wet-ink signature requirements burden its

members because people with spinal cord injuries and disorders may experience loss of motor

function in their hands, which can make producing a hand signature "difficult, if not impossible."

*Id.* ¶ 63.

Consequently, Plaintiff initiated this suit in August 2020, seeking declaratory and

injunctive relief and alleging that SSA's wet-ink signature requirements violate the APA because

they are contrary to law and arbitrary and capricious. *See id.* ¶¶ 1–5, 64–113. Not long after

filing, upon request of the parties, the court referred the case to mediation. *See* Min. Order,

Oct. 16, 2020. Mediation was unsuccessful and the parties filed dispositive motions. *See* Mot.

for Summ. J., ECF No. 17; Mot. to Dismiss, ECF No. 18. While those motions were pending,

the SSA released its Equity Action Plan pursuant to an executive order. *See* Min. Order, April

27, 2022; *supra* Section I.A.ii.  Consequently, the court denied the parties' motions without prejudice and stayed the case while the SSA implemented the Plan.  Min. Order, June 8, 2022.

In early 2023, Defendant represented that there were no new rollouts of electronic signatures publicly pending.  *See* Joint Status Report, ECF No. 38.  The court accordingly held a status conference where it lifted the stay and directed the parties to refile dispositive motions.  Min. Entry for Proceedings, Jan. 19, 2023; Tr. of Proceedings, ECF No. 41 at 8–9.  Plaintiff moved for summary judgment once again, ECF No. 42 ("Pl.'s Mot."), and Defendant cross moved to dismiss, or, in the alternative, for summary judgment, ECF No. 43 ("Def.'s Mot.").

## II.    LEGAL STANDARD

### A.    Subject Matter Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss any claim for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  A live case or controversy is critical to the court's subject matter jurisdiction.  *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64, 67 (1997).  To survive a Rule 12(b)(1) motion, the plaintiff must establish that the court has subject matter jurisdiction as to each claim, not just one.  *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

In assessing a motion to dismiss, the court must "accept all of the factual allegations in the complaint as true," *Jerome Stevens Pharms. Inc. v. FDA*, 402 F.3d 1249, 1250 (D.C. Cir. 2005) (citation omitted), and construe the complaint "in the light most favorable to" the non-moving party, *Navab-Safavi v. Glassman*, 637 F.3d 311, 316 (D.C. Cir. 2011).  That said, because the court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," the "factual allegations in the complaint . . . will bear closer scrutiny [than those allegations would] in resolving a 12(b)(6) motion for failure to state a claim."  *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001)

(quotation marks and citation omitted).  Moreover, the court need not accept "legal conclusions that are cast as factual allegations."  *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011) (citation omitted).

## B.    Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  In other words, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  The court presumes the truth of the complaint's factual allegations under Rule 12(b)(6), *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), but need not "accept as true 'a legal conclusion couched as a factual allegation,'" nor "inferences [that] are unsupported by the facts set out in the complaint," *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations omitted).

## C.    Summary Judgment

Federal Rule of Civil Procedure 56(a), which typically governs motions for summary judgment, does not apply to cases seeking APA review "because of the court's limited role in reviewing the administrative record."  *Coe v. McHugh*, 968 F. Supp. 2d 237, 239 (D.D.C. 2013).  Instead, the court must decide as a matter of law "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.* at 240.  Courts are "highly deferential" to agency action, *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275,

283 (D.C. Cir. 1981), only setting it aside if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2).

## III.    JURISDICTION

### A.    Mootness

Defendant first argues that Plaintiff's claims were mooted by the changes in the SSA's signature requirements since 2020, when the suit was filed.

### i.    Legal framework

"Article III, § 2, of the Constitution confines federal courts to the decision of 'Cases' or 'Controversies.'" *Arizonans for Off. Eng.*, 520 U.S. at 64.  A key aspect of the case or controversy requirement is standing.  *See id.*  To have standing, "the plaintiff must have suffered an 'injury in fact,'" "there must be a causal connection between the injury and the conduct complained of," and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).

This "actual controversy" must exist "at all stages of review, not merely at the time the complaint is filed." *Arizonans for Off. Eng.*, 520 U.S. at 67 (citation omitted).  The mootness doctrine analyzes whether standing continues throughout the existence of the case.  *Id.* at 68 n.22 ("Mootness has been described as 'the doctrine of standing set in a time frame.'").  Under this doctrine, if the court concludes that "an intervening circumstance" has deprived the court of jurisdiction "at any point during the litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (citation omitted).  Because both standing and mootness are aspects of Article III jurisdiction, the court may find a claim moot without first analyzing Plaintiff's standing.  *Arizonans for Off. Eng.*, 520 U.S. at 66–67.

"A case is moot if a 'decision will neither presently affect the parties' rights nor have a more-than speculative chance of affecting them in the future.'" *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024); *see Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d 512, 516 (D.C. Cir. 2019) (a case "becomes moot if intervening events make it impossible for [the court] to grant 'effectual relief' to the prevailing party"). A case may become moot when, for example, a challenged rule is withdrawn, or Congress passes a statute that alters a challenged agency action's effect. *See, e.g.*, *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 646–47 (D.C. Cir. 2011) (passage of the Clarification Act nullified an FTC policy statement).

Most of the time, however, a "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000) (citation omitted). Cessation is "voluntary" if it is the defendant's choice; in other words, it is not caused by a separate actor. *See, e.g.*, *Am. Bar Ass'n*, 636 F.3d at 648 (FTC policy statement was nullified by intervening legislation; therefore the FTC's abandonment of the policy was not voluntary); *Campbell v. Clinton*, 203 F.3d 19, 34 n.14 (D.C. Cir. 2000) ("The President's cessation of the attack on Yugoslavia was not 'voluntary'"—"the war ended because the United States won, not because the President sought to avoid litigation").

Voluntary cessation only moots a case if "the party urging mootness demonstrates that (1) 'there is no reasonable expectation that the alleged violation will recur,' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'" *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (citation omitted). When "the defendant is a government actor—and not a private litigant—there is less concern about the recurrence of objectionable behavior." *Citizens for Resp. & Ethics in Wash. v.*

*SEC*, 858 F. Supp. 2d 51, 61 (D.D.C. 2012).  The power to reenact the challenged law is not sufficient to show a reasonable expectation that it will recur; rather, "evidence indicating that the challenged law likely will be reenacted" is required.  *Nat'l Black Police Ass'n*, 108 F.3d at 349. Such evidence may include such things as announcing such an intention, failing to replace the challenged law, *id.*, a history of enacting a similar policy, *Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 724–25 (D.C. Cir. 2012), or "vigorously defend[ing]" the challenged law, *see West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (citation omitted); *accord Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008).  Moreover, voluntary cessation has "completely or irrevocably eradicated the effects of the alleged violation" in suits for declaratory or injunctive relief where the challenged law is no longer in force and has no "residual effect."  *Nat'l Black Police Ass'n*, 108 F.3d at 349–50; *see Larsen*, 525 F.3d at 4 ("because the Navy already eliminated" the challenged policy, "any injunction or order declaring it illegal would accomplish nothing").

This "voluntary cessation" test does not apply, however, in the "unusual case" where a court finds a low likelihood that the purpose of the voluntary act was to manipulate the court's jurisdiction.  *Pub. Citizen, Inc.*, 92 F.4th at 1129.  That may be the case where the defendant opposes mootness or has little to gain from dismissal.  *See id.*  For instance, in *Alaska v. Department of Agriculture*, 17 F.4th 1224, 1230, the D.C. Circuit held that it was "senseless to suppose that the defendants acted in order to manipulate the judicial process" in vacating an exemption during the litigation because it had prevailed before the district court, and therefore there was no "unfavorable decision" to avoid by vacating the exemption.  This test is also more likely to apply where "structural obstacles"—like a legislative process—would make reimposing a challenged law more difficult, rather than where the challenged law could be reimposed "at the stroke of a pen or otherwise face minimal hurdles."  *Id.* at 1229 n.5.

> ii.    *The fee agreement form claims are moot*

In each claim, Plaintiff alleges that "Defendant's rejection of electronic signatures for . . . fee agreements" is illegal.  Compl. ¶ 67 (Count I); *accord id.* ¶ 76 (Count II); *id.* ¶ 87 (Count III); *id.* ¶ 92 (Count IV); *id.* ¶ 105 (Count V).  Plaintiff accordingly seeks declaratory and injunctive relief requiring Defendant to accept electronic signatures on this form.  *Id.* Request for Relief.  In 2021, however, the SSA made the fee agreement form available entirely electronically.  Clemons Decl. ¶¶ 5–6.  Consequently, it no longer rejects electronic signatures on fee agreements, and any declaratory or injunctive relief the court could offer would not "affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Pub. Citizen, Inc.*, 92 F.4th at 1128.

Nor are these claims exempted from mootness under the voluntary cessation doctrine.  Even assuming Defendant's changes in policy were "voluntary," and not the result of the changing legal landscape, there is no "evidence" in the record "indicating that the challenged law likely will be reenacted."  *Nat'l Black Police Ass'n*, 108 F.3d at 349.  Nor is there any indication anywhere in the record that, by making the fee agreement form electronic, Defendant has not "eradicated the effects of the alleged violation," or that the old policy has a "residual effect."  *Id.* at 350.  Consequently, the court will dismiss Plaintiff's claims challenging Defendant's fee agreement form as moot.

> iii.    *The representative agreement form claims are not moot*

In each claim, Plaintiff also alleges that "Defendant's rejection of electronic signatures for . . . representative appointment" is illegal.  Compl. ¶ 67 (Count I); *accord id.* ¶ 76 (Count II); *id.* ¶ 87 (Count III); *id.* ¶ 92 (Count IV); *id.* ¶ 105 (Count V).  Plaintiff accordingly seeks declaratory and injunctive relief requiring Defendant to accept electronic signatures for

representative appointments.  *Id.* Request for Relief.  In 2021, however, the SSA made the

representative appointment form available entirely electronically.  Clemons Decl. ¶¶ 5–6.

Consequently, Defendant no longer rejects electronic signatures for a claimant to appoint a

representative, and any declaratory or injunctive relief the court could offer would not "affect the

parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Pub.*

*Citizen, Inc.*, 92 F.4th at 1128.

Unlike with the fee agreement form, however, the representative agreement claims are

exempted from mootness under the voluntary cessation doctrine.  None of the potential

justifications for declining to apply the doctrine exist in this case:  Defendant does not oppose

mootness and could reimpose the wet-ink signature requirement simply by removing the

electronic form.  *See Pub. Citizen, Inc.*, 92 F.4th at 1129; *Alaska v. Dep't of Agric.*, 17 F.4th at

1229–30 & n.5.  But voluntary cessation only moots a case if "the party urging mootness

demonstrates that (1) 'there is no reasonable expectation that the alleged violation will recur,'

and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the

alleged violation.'"  *Nat'l Black Police Ass'n*, 108 F.3d at 349.  Plaintiff has submitted a

declaration providing that the online representative appointment form "has not been

implemented properly," and that SSA offices are still requiring telephonic verification of

electronic signatures.  Weisman Decl., ECF No. 25-1 ¶ 5.  Defendant has not provided any

contrary declarations, instead only noting that its new policy is not "temporary."  Def.'s Reply to

Opp'n to Mot. to Dismiss, ECF No. 47 at 9 ("Def.'s Reply").  Consequently, Defendant has not

demonstrated that there is "no reasonable expectation" that Defendant's refusal to accept

electronic signatures on representative appointment forms will recur, or that Defendant's

implementation of the electronic form has "completely or irrevocably eradicated the effects of the alleged violation." *Nat'l Black Police Ass'n*, 108 F.3d at 349.

       iv.     *The claims regarding SSDI applications from representatives are not moot*

      Finally, Plaintiff alleges that "Defendant's rejection of electronic signatures for verifying disability benefits applications submitted by representatives" is illegal.[1]  Compl. ¶ 67 (Count I); *accord id.* ¶ 76 (Count II); *id.* ¶ 92 (Count IV).  Defendant does not claim that its approach to verifying SSDI applications submitted by third parties has changed since the suit was filed.  Rather, it argues that it does not actually require a wet-ink signature because there are other options, including telephonic verification of SSDI applications submitted by representatives.  Def.'s Mot. at 18.  But this argument goes to the merits, not the mootness inquiry.  As Defendant acknowledges, if a claimant files an SSDI application through a representative and is not physically present while that application is completed, the claimant must either provide a wet-ink signature to attest to the application or do so telephonically.  *Id.* at 8.  Put another way, a claimant may not provide an electronic signature to verify the application.  It is that disparity between the SSA's treatment of electronic signatures and its treatment of wet-ink signatures that Plaintiff challenges.  And because there has been no "intervening event[]" that would "make it impossible for [the court] to grant 'effectual relief' to the prevailing party," *Planned Parenthood of Wisc., Inc.*, 942 F.3d at 516, these claims are not moot.

---

[1] Plaintiff does not appear to challenge any wet-ink signature requirement in the Supplemental Security Income ("SSI") application.  Although Plaintiff explains in the factual background of the Complaint that the SSI application may only be submitted electronically if it is being completed in tandem with the SSDI application, Compl. ¶ 35, none of the allegations in the "Assignment of Errors" section mention the SSI application, *see id.* ¶¶ 64–113.

**B.**     **Standing**

    *i.*     *Counts I, II, III, and IV*

An entity plaintiff may establish an injury in fact through either associational standing—showing that one of its members would have standing to sue in their own right—or organizational standing.  Organizational standing requires a plaintiff to allege a "concrete and demonstrable" injury to its activities that is "fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision."  *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*").  To decide whether an alleged injury is "concrete and demonstrable," the court first determines "whether the agency's action or omission to act 'injured the organization's interest' and second, whether the organization 'used its resources to counteract that harm.'"  *Id.* at 1094 (citation omitted).  For example, in *PETA*, the D.C. Circuit held that the Department of Agriculture impaired PETA's mission by refusing to apply the protections in the Animal Welfare Act to birds.  *Id.*  The Court explained that in doing so, the agency precluded PETA from using Department of Agriculture complaints to prevent cruelty to birds and deprived PETA of key information upon which it relies to educate the public.  *Id.* (citation omitted).  Consequently, PETA "expended resources to counter these injuries."  *Id.* at 1095.

The causation or traceability element requires that the defendant be responsible for the plaintiff's injury.  *See Lujan*, 504 U.S. at 560–61.  For example, in *Reed v. Goertz*, 143 S. Ct. 955, 960 (2023), plaintiff's injury—denial of access to evidence for DNA testing—was traceable to defendant's conduct because defendant was the state prosecutor who denied plaintiff access to the evidence.  By contrast, in *California v. Texas*, 141 S. Ct. 2104, 2113–14 (2021), in which plaintiffs challenged the constitutionality of the minimum essential coverage provision of the

Affordable Care Act, the Court held that individual plaintiffs' injury—making payments necessary to carry the minimum essential coverage— was not traceable to the statute because the statute had "no means of enforcement" if plaintiffs failed to comply.

Moreover, to satisfy the redressability element, a plaintiff must allege that it is "substantially likely" they will "obtain relief that directly redresses the injury suffered." *Reed*, 143 S. Ct. at 960 (citation omitted); *see Barker v. Conroy*, 921 F.3d 1118, 1124 (D.C. Cir. 2019) (plausibility standard). "The key word is 'likely.'" *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (citation omitted). For example, in *Reed*, 143 S. Ct. at 960, the Supreme Court concluded that plaintiff had standing because the state prosecutor was "substantially likely" to "abide by . . . a court order" holding that his "justification" for withholding the evidence violated due process. By contrast, in *Lujan*, 504 U.S. at 568–71, the Court held that plaintiff could not show redressability because the "only" way to redress plaintiff's injury was for individual agencies to terminate funding of certain activities abroad until they consulted on environmental impacts, but the agencies at issue were not parties to the suit, and "any relief the [court] could have provided in this suit . . . was not likely to" result in redress.

Plaintiff has pleaded a straightforward case of organizational injury in Counts I through IV. It alleges that the wet ink signature requirements for representative agreements and for SSDI applications filed by third-party representatives are contrary to the Government Paperwork Elimination Act, E-SIGN Act, Agency Practice Act, the First Amendment, and the SSA's regulations. Compl. ¶¶ 67, 76, 79, 88–89, 92. Plaintiff's mission is to advocate for people living with spinal cord injuries and disorders, particularly veterans, and a "major focus" of its work is preserving SSDI benefits and ensuring that claimants receive those benefits as quickly as possible. *Id.* ¶¶ 9, 62. Moreover, Plaintiff alleges that the wet-ink signature requirements make

it more difficult for people with spinal cord injuries and disorders to obtain these benefits.  *Id.* ¶ 63.  Finally, Plaintiff claims that it "has increased the amount of time and money that it spends on its advocacy work to preserve Social Security benefits for its members living with spinal cord injuries and disorders," including volunteer member time, educating members on the issue, training staff on how to assist members with applications, raising awareness, and investigating potential relief.  Weisman Decl. ¶ 10.  Just as in *PETA*, 797 F.3d at 1093–95, Plaintiff has adequately alleged that it suffered a concrete injury from Defendant's wet-ink signature requirements and expended resources to counteract that injury.

Defendant first argues that the court should not rely on Plaintiff's declaration in analyzing standing, but should instead limit Plaintiff to the allegations in its Complaint, contending that Plaintiff did not allege any facts supporting organizational standing in its Complaint.  Def.'s Reply at 13–14.  The court disagrees.  *See* Compl. ¶¶ 9, 62, 63 (alleging that it is a major focus of Plaintiff's work to preserve social security benefits for its members and wet-ink signature requirements make it more difficult for its members to obtain those benefits).  Plaintiff's declaration merely fleshes out the allegations in the Complaint to establish the court's subject matter jurisdiction, as the D.C. Circuit encourages.  *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (plaintiffs "whose standing is not self-evident should establish standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding," which may be "in response to a motion to dismiss for want of standing").

Defendant also argues that Plaintiff's primary declaration is unreliable and outdated.  Def.'s Reply at 15–16.  Defendant, however, has not provided a contrary declaration that undermines the key aspect of Plaintiff's declaration—that Plaintiff has used its resources to

counter the problems caused by the wet-ink signature requirements. The court therefore has no reason to doubt the credibility of Plaintiff's declaration. Consequently, at this stage of the litigation, Plaintiff's declaration, combined with its Complaint, are sufficient to allege standing.

Plaintiff's alleged injury—increased challenges for individuals with spinal cord injuries in applying for benefits—is also fairly traceable to the wet-ink signature requirements. Without those requirements, individuals with spinal cord injuries could simply click "sign" online rather than having to provide a handwritten signature or, in the case of SSDI applications submitted by a representative, speak to an SSA agent on the phone. Moreover, Plaintiff seeks declaratory and injunctive relief that would require the SSA to accept electronic signatures for representative agreements and to verify an application for SSDI benefits submitted by a representative. *See id.* Request for Relief. Such a declaration or injunction is "substantially likely" to result in the SSA dropping its handwritten signatures in these situations. *See Reed*, 143 S. Ct. at 960

Defendant argues that any harm to Plaintiff is "voluntarily assumed" because claimants do not have to provide a wet-ink signature to apply for SSDI benefits or to appoint a representative. Def.'s Mot. at 25–28; *accord* Def.'s Reply at 17. But again, Plaintiff claims Defendant has violated the law by accepting wet-ink signatures in particular situations where it refuses to accept electronic signatures. By not treating wet-ink signatures and electronic signatures equally, as Plaintiff contends the law requires, Defendant puts additional burdens on individuals, like Plaintiff's members.

Defendant also refers to Plaintiff's allegations as mere "assertions of counsel," but Defendant misapprehends the burden at the motion to dismiss stage. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are

necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (citation omitted).  The allegations in Plaintiff's Complaint and assertions in its declaration are sufficient at this stage to allege Article III standing over Counts I through IV.

    *ii.*    *Count V*

In Count V, Plaintiff alleges that the wet-ink signature requirement for representative agreements amounts to a substantive legislative rule that was issued without following proper rulemaking procedures.  Compl. ¶¶ 105–13.  "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021). "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.*  Where a plaintiff alleges such an "archetypal procedural injury," moreover, causation is particularly important. *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 592 (D.C. Cir. 2019).  A plaintiff "need not show that a harm . . . has in fact resulted from the [agency's] procedural failures," but rather that "there is a 'substantial probability'" that the challenged agency action caused the plaintiff's injury. *Id.* (citation omitted).  This inquiry requires two causal links: one connecting the procedural deficiency to the substantive agency action, and another connecting that substantive agency action to the plaintiff's injury. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017).  Regarding the first link, "[a]ll that is necessary is to show that the procedural step was connected to the substantive result." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (citation omitted).  The final standing requirement—redressability—is "relaxed" in cases involving procedural injuries. *Ctr. for Biological Diversity*, 861 F.3d at 185.  A plaintiff need only show

that the agency revisiting its action "*could*" reach "a different conclusion." *Id.*; *accord*

*WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).

Plaintiff has failed to allege the first link of causation—"that that the procedural step was

connected to the substantive result." *Massachusetts v. EPA*, 549 U.S. at 518 (citation omitted).

All Plaintiff needed to allege was that the SSA's failure to engage in notice and comment

rulemaking affected its decision to reject electronic signatures for representative agreements, *see*

*id.*, but it has not done so in its Complaint. *See* Compl. ¶¶ 104–13.  Nor has it argued this

connection in its briefs or provided a declaration addressing it. *See* Pl.'s Reply to Opp'n to Mot.

for Summ. J., ECF No. 45 at 34–35 ("Pl.'s Reply").  Rather, Plaintiff argues the causation

element is satisfied because "SSA's refusal to accept electronic signatures is forcing United

Spinal's members to undergo an unnecessarily burdensome (and unlawful) process to utilize

representatives in submitting their applications." *Id.* at 34.  That suffices to allege causation

under Counts I through IV—but not for the procedural injuries alleged in Count V.  *See supra*

at 16–17.  Consequently, even if Plaintiff can show a procedural injury and redressability, it does

not have standing to bring Count V.

## C.    Social Security Act

At this stage, the court only has Article III jurisdiction over Counts I, II, III, and IV as

they relate to the wet-ink signature requirements for representative agreements and for claimants

to verify SSDI applications submitted by representatives.  Defendant argues that the court lacks

jurisdiction over the remaining claims under the Social Security Act, 42 U.S.C. § 405, which

precludes federal jurisdiction over "any claim arising under" it.  42 U.S.C. § 405(h); *see Smith v.*

*Berryhill*, 139 S. Ct. 1765, 1776 n.13 (2019) (explaining that § 405(h) "withdraws federal-court

jurisdiction under 28 U.S.C. §§ 1331, 1346").  Section 405(g) separately provides that an

"individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain review of such decision."  Read together, "Congress made clear that" judicial review of any claim "arising under" the SSA "would be available only 'as herein provided'—that is, only under the terms of § 405(g)."  *Smith*, 139 S. Ct. at 1771–72 (quoting 42 U.S.C. § 405(h)).

The Supreme Court has construed the "arising under" language "quite broadly to include any claims in which 'both the standing and the substantive basis for the presentation' of the claims is the Social Security Act."  *Heckler v. Ringer*, 466 U.S. 602, 615 (1984) (citation omitted); *accord Your Home Visiting Nurse Servs.*, 525 U.S. 449, 456 (1999).  A claim may arise under the Social Security Act if it also arises under another statute or the Constitution. *Weinberger v. Salfi*, 422 U.S. 749, 760–61 (1975); *accord Heckler*, 466 U.S. at 615.  And it "is of no importance" whether a plaintiff seeks "only declaratory and injunctive relief" or "an actual award of benefits as well."  *Heckler*, 466 U.S. at 615; *accord Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 14 (2000).

The Court had "no trouble concluding that all aspects of" plaintiffs' challenges in *Heckler*, 466 U.S. at 615–16, "arose under" the Medicare Act because, if plaintiffs received the declaratory relief they sought—that a surgical procedure known as bilateral carotid body resection be covered by Medicare—"only essentially ministerial details" would remain before they would receive reimbursement for their procedures.  Recently, moreover, the D.C. Circuit held that a plaintiff's claim that the Centers for Medicare and Medicaid Services failed to engage in notice and comment rulemaking arose under the Medicare Act because the plaintiff sought "a substantive declaration that its products are reimbursable," even though it challenged the policy on procedural grounds.  *Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1146 (D.C. Cir. 2024).

Plaintiff's challenge, however, does not involve reimbursements.  It alleges that Defendant's wet-ink signature requirements create obstacles that make it more difficult for its members to apply for SSDI benefits using a third-party representative or to appoint a representative to assist in their appeals.  Compl. ¶¶ 62–63.  Consequently, an injunction or declaration providing that the wet-ink requirements are illegal would not entitle Plaintiff's members to benefits, *see Row 1 Inc.*, 92 F.4th at 1146, or even require just "ministerial details" before a member would be entitled to benefits, *see Heckler*, 466 U.S. at 615–16.  Indeed, Plaintiff does not argue that SSA is denying them benefits to which they are entitled.  *Contra Cmty. Oncology All., Inc. v. Off. of Mgmt. & Budget*, 987 F.3d 1137, 1143 (D.C. Cir. 2021) (concluding that claims arose under the Medicare Act because plaintiff "assert[ed] an injury that its members have not received the full reimbursement owed to them").  Rather, Plaintiff argues that SSA is creating an illegal burden on its members, and elimination of that burden is not equivalent to entitlement to benefits.  Accordingly, Plaintiff's claims do not "arise under" the Social Security Act, and the court has federal question jurisdiction.

Defendant argues that Plaintiff's claims "arise under" the Social Security Act because Plaintiff "challenges the means through which a claimant can apply for Social Security disability benefits and asserts that certain regulations implementing the Social Security Act, and certain sub-regulatory policies, are in conflict with one another and are otherwise unlawful."  Def.'s Reply at 21; *accord id.* at 22–23 (citing *Integrity Social Work Servs. v. Azar*, No. 20-cv-118, 2020 WL 3103913 (D.D.C. June 11, 2020); *Turnbull v. Kijakazi*, No. 20-5365, 2021 WL 5993232 (D.C. Cir. Dec. 10, 2021)).  Neither case Defendant cites supports such a broad reading of § 405(h).  In *Integrity Social Work Services*, 2020 WL 3103913, at *1, *4, a court in this district concluded that plaintiff's claims that a three-year delay in the administrative appeal

process violated the Fifth Amendment arose under the Medicare Act because the delay prevented

plaintiff from obtaining a final decision over an "unfavorable overpayment" ruling from the

agency.  Similarly, in *Turnbull*, 2021 WL 5993232, at *1, *3, the Court concluded that plaintiffs'

challenge to a SSA policy that resulted in the agency reducing their benefits arose under the

Social Security Act because it was "the same question" as whether plaintiffs were "owed their

full benefits" under the Act.  In both cases, the courts found that there was a sufficiently close

connection between plaintiffs' claims and social security benefits for the claims to "arise under"

the Social Security Act.  In this case, the balance comes out the other way; the relief Plaintiff

seeks does not affect whether its members are entitled to benefits.

**D.      Prudential Mootness**

Finally, Defendant argues that the court should exercise its discretion to find the case

prudentially moot.  "The cousin of the mootness doctrine, in its strict Article III sense, is a

mélange of doctrines relating to the court's discretion in matters of remedy and judicial

administration."  *Chamber of Comm. v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir.

1980).  Under the prudential mootness doctrine, "a controversy, not actually moot, is so

attenuated that considerations of prudence and comity for coordinate branches of government

counsel the government to stay its hand, and to withhold relief it has the power to grant."  *Id.*  A

court may abstain under this doctrine in suits for declaratory or injunctive relief where the

defendant "clearly . . . modified their behavior significantly since the suit was brought," such that

"the likelihood of recurrent confrontations . . . is much too small to warrant" a decision.  *Cmty.*

*for Creative Nonviolence v. Hess*, 745 F.2d 697, 701 (D.C. Cir. 1984); *accord Chamber of*

*Comm.*, 627 F.2d at 291.

   *i.*   *The representative agreement form claims are prudentially moot*

Although Plaintiff's claims regarding the representative agreement form are not moot in the Article III sense, *supra* Section III.A.iii, they are prudentially moot.  In 2021, the SSA made the representative appointment form available electronically.  Clemons Decl. ¶¶ 5–6.  Indeed, the only reason these claims are not moot in the Article III sense is because Plaintiff's declaration indicates that there were implementation issues with the online representative form.  *See* Weisman Decl. ¶ 5.  That declaration is sufficient to confer Article III jurisdiction because of the voluntary cessation doctrine, which only renders a case moot if a defendant "completely or irrevocably eradicated the effects of the alleged violation," *Nat'l Black Police Ass'n*, 108 F.3d at 349, but not to avoid prudential mootness.  By making the representative form available electronically, Defendant has clearly modified its "behavior significantly since the suit was brought."  *See Hess*, 745 F.2d at 701.  And, although Plaintiff's members may have had issues with the implementation as of 2022, "the likelihood of recurrent confrontations" arising from any issues in implementation is low.  *See id.*  Consequently, the court will exercise its discretion to dismiss Plaintiff's claims regarding the representative appointment form.

   *ii.*   *The claims regarding SSDI applications submitted by representatives are not prudentially moot*

Defendant admits that it has not changed its policies or regulations regarding the signature requirements for SSDI applications submitted by third parties, *see* Def.'s Mot. at 18, and this action was filed almost four years ago.  Although Defendant did take steps to incorporate more electronic signature options in the wake of the COVID-19 pandemic, those efforts have slowed, if not ceased completely.  In its latest status report, Defendant explained that "no new roll-outs have occurred" since 2022, and it was "not in a position to share" any additional information regarding its efforts to implement electronic signatures.  Joint Status

Report ¶¶ 1–2.  In fact, Defendant points to these same 2022 developments in arguing that the case is prudentially moot.  Def.'s Mot. at 19–21; Def.'s Reply at 10–13.  Consequently, there is no reason for the court to believe that Defendant will eliminate this wet-ink signature requirement if this case does not move forward, and the claims regarding SSDI applications submitted by representatives are not prudentially moot.

## IV.   MERITS

Turning to the merits, only Counts I, II, and IV remain,[2] and only as they relate to the wet-ink signature requirement for claimants to verify SSDI applications submitted by a representative.

## A.   Adequate Remedy

At the outset, Defendant argues that no cause of action is available under the APA because the Social Security Act or the Rehabilitation Act provide an adequate remedy for Plaintiff's claims.  The court has already concluded that the suit does not arise under the Social Security Act, *supra* Section III.C, meaning that the Act cannot, and does not, provide an adequate remedy for Plaintiff's claims.  *See Heckler*, 466 U.S. at 615–17 (providing that, where a case arises under the Social Security Act, that Act provides an adequate remedy).  Consequently, the court will consider only whether the Rehabilitation Act provides an adequate alternative remedy precluding APA review.

---

[2] In Count III, Plaintiff focuses on the representative agreement form, but notes in passing that "SSA's rejection of electronic signatures for verifying disability benefits applications submitted by representatives . . . is unsupported by the plain text of its own regulations." Compl. ¶ 87; *see id.* ¶¶ 87–90 (focusing on representative agreement form).  Not only does Plaintiff's Complaint not explain why the verification requirement for SSDI applications submitted by representatives violates SSA regulations, but neither party has addressed this requirement.  Consequently, the court construes Count III to address only the representative agreement form, and therefore dismisses it as prudentially moot.  *Supra* Section III.D.i.

The APA creates a private cause of action for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see Oryszak v. Sullivan*, 576 F.3d 522, 525 n.2 (D.C. Cir. 2009). An "alternative remedy need not provide relief identical to relief under the APA" to bar an APA action, "so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). A court should only restrict APA review "upon a showing of clear and convincing evidence of . . . legislative intent." *Id.* at 523 (citation omitted). Courts in this district are split on whether the Rehabilitation Act provides an implied cause of action and usurps APA review in cases alleging discrimination against people with disabilities. *Compare Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 53–54 (D.D.C. 2020), *with SAI v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 112 (D.D.C. 2015) (Rehabilitation Act did not provide an implied cause of action in motor disability case). In *National Ass'n of the Deaf*, 486 F. Supp. 3d at 53–57, the court held that plaintiff's claims that defendant discriminated against people with disabilities by failing to provide access to those who require ASL interpreters arose under the Rehabilitation Act. By contrast, in *SAI*, 149 F. Supp. 3d at 105–06, 112, the court concluded that the APA, rather than the Rehabilitation Act, provided the cause of action for a plaintiff who alleged defendant discriminated against him based on his motor disability by restricting his access to medication and other necessary implements.

Plaintiff, however, does not allege that Defendant discriminates against people with disabilities, like the plaintiffs in *National Ass'n of the Deaf* and *SAI*. Rather, it claims Defendant violates legal mandates requiring electronic signatures. Of course, Plaintiff's claims imply that the agency's legal violations create downstream challenges for people with disabilities—which is why Plaintiff's members' disabilities contribute to its standing. *See supra* Section III.B.i. But those injuries alone are not actionable under the Rehabilitation Act.

Because there is no other adequate remedy available to Plaintiff, the APA provides Plaintiff's causes of action.  5 U.S.C. § 704.

**B.      Contrary to Law**

In Counts I and II, Plaintiff alleges that Defendant's wet-ink signature requirement violates the APA because it is contrary to law.  Under the APA, a "reviewing court shall" "hold unlawful and set aside agency action" if it is "not in accordance with law."  5 U.S.C. § 706(2)(A).  This provision applies to "any law"—"not merely those laws that the agency itself is charged with administering."  *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003).  Determining whether agency action violates existing law is just like other "questions of statutory interpretation."  *Pharm. Mfg. Rsch. Servs. v. FDA*, 957 F.3d 254, 260 (D.C. Cir. 2020).

*i.      Count I*

In Count I, Plaintiff alleges that "Defendant's rejection of electronic signatures for verifying disability benefits applications submitted by representatives" "violates the mandates of the E-SIGN Act and the Government Paperwork Elimination Act not to deny signatures legal effect solely because they are 'in electronic form.'"  Compl. ¶ 67 (citation omitted).  The E-SIGN Act provides that, "[n]otwithstanding any statute, regulation, or other rule of law . . . with respect to any transaction in or affecting interstate or foreign commerce . . . a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form."  15 U.S.C. § 7001(a)(1).  Plaintiff argues that the E-SIGN Act requires agencies to give legal effect to electronic signatures.  The SSA, however, still requires a claimant who uses a chosen representative to submit an SSDI application and is not physically present to electronically sign the application to verify the electronic submission in a telephone call or provide a wet-ink signature.  Compl. ¶ 30.

The parties disagree on whether the E-SIGN Act retains the "when practicable" caveat from the Government Paperwork Elimination Act.  *Compare* Def.'s Mot. at 33–34, *with* Pl.'s Reply at 9–10.  But the court need not decide that issue, because even if the E-SIGN Act does not retain the "when practicable" caveat, Defendant's practice of requiring telephonic verification for SSDI applications submitted by a remote third party does not deny "legal effect, validity, or enforceability" of an electronic signature "solely because it is in electronic form."  15 U.S.C. § 7001(a)(1).  Few courts have interpreted the E-SIGN Act, but in construing the same "solely because" language in § 525 of the Bankruptcy Code, which provides that governmental units may not revoke licenses to debtors "solely because such debtor has not paid a debt that is dischargeable," the Supreme Court held that "the failure to pay a dischargeable debt must alone be the proximate cause of the cancellation—the act or event that triggers the agency's decision to cancel."  *NextWave Pers. Commc'ns*, 537 U.S. at 300–01 (citation omitted; formatting modified).  Applying that reasoning to the E-SIGN Act, the electronic signature must be the reason why the agency denies its legal effect.  *See id.*  Here, however, the SSA would only deny an SSDI application with an electronic signature if the applicant failed to telephonically verify the application.  Thus, the electronic signature is not in and of itself the proximate cause of the agency's denial of a signature's legal effect.  The SSA's practice of requiring claimants to telephonically verify SSDI applications submitted by third parties remotely therefore does not violate the E-SIGN Act.

      *ii.*     *Count II*

In Count II, Plaintiff alleges that the wet-ink signature requirement violates the Agency Practice Act and the First Amendment.  Compl. ¶¶ 76, 79.  The Agency Practice Act provides that an "individual who is a member in good standing of the bar . . . may represent a person

before an agency on filing with the agency a written declaration that he is currently qualified as provided by this subsection and is authorized to represent the particular person in whose behalf he acts."  5 U.S.C. § 500(b).  The First Amendment provides that "Congress shall make no law . . . abridging the . . . right of the people . . . to petition the government for a redress of grievances."  U.S. Const. amend. I.  Plaintiff contends that requiring a claimant to provide a wet-ink signature or telephonically verify an SSDI application submitted by a third party "impermissibly imposes a requirement in excess of those established by the Agency Practice Act" if the representative is an attorney, Compl. ¶ 77, and therefore "impose[s] an unjustifiable burden on claimants' ability to consult with advisors in connection with petitioning the government" in violation of the First Amendment, *id.* ¶ 80.

By its terms, the Agency Practice Act governs only attorney admission to practice before an agency.  *Polydoroff v. ICC*, 773 F.2d 372, 374 (D.C. Cir. 1985) (explaining that the Agency Practice Act "merely prohibits agencies from erecting their own supplemental admission requirements for duly admitted members of a state bar"); *accord Gould v. Harkness*, 470 F. Supp. 2d 1357, 1362 (S.D. Fla. 2006) (same); *Levine v. Saul*, No. 19-cv-569WES, 2020 WL 5258690, at *6 (D. R. I. Sept. 3, 2020) (Section "500(b)'s plain, ordinary and unambiguous language clearly applies to attorney admission requirements"); *Waller v. United States*, No. CV-S-01-1190-KJD PAL, 2002 WL 31476649, at *4 (D. Nev. Aug. 7, 2002) ("Section 500 governs who may practice before a federal agency" and "is neutral on representation not specifically provided in subsections (b) or (c)"); *Nat'l Ass'n for the Advancement of MultiJurisdiction Prac. v. Roberts*, 180 F. Supp. 3d 46, 58 (D.D.C. 2015) (noting that § 500(b) governs "admission of attorneys to" a "tribunal").  It does not, however, govern requirements for claimants' representatives, even if that representative is an attorney.  *See Levine*, 2020 WL 5258690, at *7

("[N]either the [SSA] regulation nor the [policy manual] that interprets it governs or impacts, in any manner, whether an attorney representative has met the foundational admission requirements to be eligible to practice before the SSA.").  Consequently, requiring a claimant to telephonically verify or submit a wet-ink signature to verify an SSDI application submitted by a representative does not violate the Agency Practice Act.

Plaintiff disagrees, arguing that the wet-ink signature requirement conflicts with the Agency Practice Act "because it requires an additional task . . . beyond that required by the Agency Practice Act."  Pl.'s Mot. at 42 (quoting *McDaniel v. Israel*, 534 F. Supp. 367, 370 (W.D. Va. 1982)).  In *McDaniel*, 534 F. Supp. at 370, the court held that a regulation was not consistent with the Agency Practice Act because, although it did not "expressly controvert the provisions of the Act," it "require[d] the Social Security claimant to perform a task that" went beyond the Act's requirements.  To be sure, Plaintiff and *McDaniel* are correct that the SSA places burdens on those seeking benefits through representatives that go beyond the requirements of the Agency Practice Act.  But the burdens fall on *claimants* in the process of appointing representatives—not on attorneys seeking to practice before an agency.  The requirement therefore does not conflict with the Agency Practice Act.

Plaintiff's claim that the wet-ink signature requirement violates the First Amendment also lacks merit.  The Petition Clause "protects the right of individuals to appeal to courts and other forums established by government for resolution of legal disputes" and "to express their ideas, hopes, and concerns to their government."  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387–88 (2011).  The right to petition is not merely a "right of access to the courts," but rather "extends to all departments of the Government."  *BE & K Constr. Co. v. NLRB*, 536 U.S. 516,

525 (2002).  The right "was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble."  *McDonald v. Smith*, 472 U.S. 479, 485 (1985).

The right to petition is implicated where individuals "'advocate their causes and points of view respecting resolution of their business and economic interests,' or attempt to 'influence the passage or enforcement of laws.'"  *Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 90 (D.C. Cir. 2015) (internal citation omitted).  When this right is implicated, access to a court or tribunal must "be adequate, effective, and meaningful."  *Broudy v. Mather*, 460 F.3d 106, 117 (D.C. Cir. 2006) (citation omitted); *see Nat'l Ass'n for Advancement of Multijurisdiction Prac. v. Howell*, 851 F.3d 12, 20 (D.C. Cir. 2017) (noting that plaintiff "has not established that" defendant "has prevented private litigants from accessing courts").  This right "is not absolute," however. *Patchak v. Jewell*, 828 F.3d 995, 1004 (D.C. Cir. 2016).  "For example, an individual does not have a First Amendment right to access courts in order to pursue frivolous litigation."  *Id.* (citation omitted).  Generally, "some encroachment on the right to petition . . . is permissible if it effectuates the important interests of the government."  *Khan v. Orbis Bus. Intel. Ltd.*, 292 A.3d 244, 257 (D.C. 2023).  In *Patchak*, 828 F.3d at 1004, the D.C. Circuit held that the Gun Lake Act, which stripped federal courts of jurisdiction to consider the subject of plaintiff's complaint, did not violate the Petition Clause because it did not "foreclose" plaintiff's "right to petition the government in all forums"—rather, it only foreclosed "his ability to do so via federal courts." Plaintiff could still seek to remedy his claims before administrative agencies.  *See id.*

Here, neither side properly frames the Petition Clause jurisprudence.  Plaintiff argues that the First Amendment protects the "right to seek and employ legal representation to assist in 'vindicating legal rights.'"  Pl.'s Mot. at 42–43 (quoting *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 437 (1963)); Pl.'s Reply at 18.  But *Button*, 371 U.S. at 437–38,

held that a Virginia law that functionally prohibited "every cooperative activity that would make advocacy of litigation meaningful" violated the First Amendment by "unduly inhibiting protected freedoms of expression and association"—not the right to petition.  In fact, the Supreme Court specifically explained that it did not "subsume" "constitutional protection for the kind of cooperative, organizational activity" at issue in that case "under a narrow, literal conception of freedom of speech, petition or assembly." *Id.* at 430.  And Plaintiff's First Amendment claim is, by its own terms, a Petition Clause—not a free expression—claim.  Compl. ¶¶ 81–82; Pl.'s Reply at 18 (arguing that the election cases cited by Defendant are "inapplicable to the right to petition here").

Defendant argues that the *Anderson-Burdick* framework applies and requires Plaintiff "to demonstrate a 'severe burden' on its right to petition in order to avail itself of close scrutiny." Def.'s Mot. at 39–41 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).  *Anderson-Burdick* balancing, however, is confined to laws regulating elections.  In *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983), the Supreme Court held that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest" and consequently, courts must resolve challenges to election laws by considering "the character and magnitude of the asserted injury to the rights protected" and "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Accord Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992).  The *Anderson-Burdick* framework arises primarily out of the right to vote, and acknowledges that election restrictions may burden other First, Fifth, and Fourteenth Amendment rights.  For example, in *Burdick*, 504 U.S. at 432, 434, the Court held that a Hawaii election law prohibiting write-in voting did not "unconstitutionally limit access to the ballot by party or independent candidates or unreasonably interfere with the right of voters to

associate and have candidates of their choice placed on the ballot."  Thus, the right to petition

can be relevant in *Anderson-Burdick* cases if the election law at issue infringes on that right, but

it is the presence of an election restriction that triggers the framework's application—not a

Petition Clause challenge.

Even assuming that applying for SSDI benefits implicates the Petition Clause, the wet-

ink signature requirement does not violate the First Amendment because it does not deny

Plaintiff's members—or anyone else—the opportunity to apply for SSDI benefits.  *See Patchak*,

828 F.3d at 1004.  Rather, this requirement places a minor burden on claimants who choose to

have a representative apply for SSDI benefits on their behalf by requiring the claimant to either

telephonically verify their identity or submit a hand signature rather than an electronic signature.

In fact, Plaintiff's novel position that this additional step violates the Petition Clause might

render any number of agency regulations or court rules—such as rules regulating the format or

typeface of pleadings—unconstitutional.  The First Amendment does not reach so far.

## C.     Arbitrary and Capricious

Finally, in Count IV, Plaintiff argues that the wet-ink signature requirement is arbitrary

and capricious because SSA failed to provide a reasoned explanation for refusing to allow

electronic signatures and because it arbitrarily allows electronic signatures in some situations but

not others.

### i.     *Reasoned explanation*

"The requirement that agency action not be arbitrary and capricious includes a

requirement that the agency adequately explain its result."  *Jost v. Surface Transp. Bd.*, 194 F.3d

79, 85 (D.C. Cir. 1999) (citation omitted).  Procedurally, a reasoned explanation enables the

court to "discern[]" the "path" the agency took.  *Encino Motorcars, LLC v. Navarro*, 579 U.S.

211, 221 (2016) (citation omitted); *accord Jost*, 194 F.3d at 85.  Substantively, this requirement

"is meant to ensure that agencies offer genuine justifications for important decisions."  *Dep't of*

*Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

   To fulfill this requirement, an agency must "examine the relevant data and articulate a

satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463

U.S. 29, 43 (1983) (citation omitted) ("*Motor Vehicle Mfrs.*"); *accord Encino Motorcars*, 579

U.S. at 221.  And in reviewing the agency's justification, the court must "consider whether the

decision was based on a consideration of the relevant factors and whether there has been a clear

error of judgment."  *Motor Vehicle Mfrs.*, 463 U.S. at 43 (citation omitted).  Agency action may

be arbitrary and capricious if the agency "relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation

for its decision that runs counter to the evidence before the agency or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

   The SSA has articulated a rational basis for requiring telephonic verification or wet-ink

signatures for SSDI applications submitted by third parties.  It is tasked with safeguarding

"highly sensitive personal information from millions of people," including medical records,

mental health treatment records, and personally identifiable information.  Richardson Decl., ECF

No. 18-2 ¶ 10.  As part of that task, the SSA must protect personal information against identity

theft and other forms of fraud.  *Id.* ¶ 12.  In deciding to offer electronic signature options, it was

required to "conduct a comprehensive cost/benefit risk assessment," considering "operational

efficiencies as well as risks related to fraud, disclosure, and identity theft."  *Id.* ¶ 14.

SSDI applications submitted by third parties present unique fraud and identity theft risks. For one thing, anyone can file an SSDI application on a claimant's behalf—not just an attorney or other professional. *Id.* ¶ 38; *see* Def.'s Mot. at 42. For another, SSDI applications require disclosure of considerable sensitive information, and "[f]raud risks associated with online applications for benefits are significant." Richardson Decl. ¶ 37. These risks, in light of the SSA's obligations to protect sensitive information, provide a reasonable basis for its decision to require a wet-ink signature or telephonic verification when a third party files an SSDI application.

Plaintiff argues that the "use and acceptance of electronic signatures both by SSA and other agencies" that are "charged with protecting similarly significant and sensitive personally identifiable information and personal health information shows that protecting information is not a legitimate basis for rejecting electronic signatures." Pl.'s Reply at 12–13. But Plaintiff has not pointed to an agency that allows a third-party representative to file for benefits on a claimant's behalf. And even if other agencies allow electronic signatures for similar applications for benefits, that does not necessarily mean Defendant has not articulated a reasonable basis for refusing to do so here. *See infra* Section IV.C.ii.

ii.     *Arbitrarily inconsistent treatment*

"A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (citing cases). For example, the Federal Aviation Administration would violate the APA if it applied different criteria to considering applications to regulatory exemptions from different airlines. *See Airmark Corp. v. FAA*, 758 F.2d 685, 691 (D.C. Cir. 1985). So too would an agency that came to "diametrically opposite

conclusions on the basis of virtually identical fact situations." *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N.A., AFL-CIO, v. NLRB*, 603 F.2d 862, 869 (D.C. Cir. 1978) (citations omitted) ("*Local 777*").

Plaintiff contends that the SSA arbitrarily treats electronic signatures inconsistently.  Pl.'s Mot. at 33–34; Pl.'s Reply at 11–12.  But Plaintiff has not identified any scenario in which the SSA allows a remote electronic signature to verify an application for benefits submitted by a third-party representative.  Consequently, there are no "virtually identical fact situations" in which the SSA arbitrarily applies different standards.  *See Local 777*, 603 F.2d at 869 (citations omitted).  Moreover, the SSA has offered "reasons" for treating third-party benefits applications differently from other circumstances.  *Supra* Section IV.C.i; *see Transactive Corp.*, 91 F.3d at 237.  The mere fact that it allows electronic signatures in some situations, but not others, depending on the unique risks and benefits of electronic signatures on those particular facts, *see* Richardson Decl. ¶¶ 10–14, 37–38, does not violate the APA.

## V.    CONCLUSION

For the foregoing reasons, the court will DENY Plaintiff's Motion for Summary Judgment, ECF No. 42, and GRANT Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment, ECF No. 43.  An Order will accompany this Memorandum Opinion.


Date: July 11, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge